1  John van Loben Sels (State Bar No. 201354)
   jvanlobensels@whgclaw.com
2  **WANG, HARTMANN, GIBBS & CAULEY, P.L.C.**
3  2750 W. El Camino Real, Suite 440
   Mountain View, California 94040
4  Telephone: (650) 209-1230
   Facsimile: (650) 209-1231
5

6

7

8                    **UNITED STATES DISTRICT COURT**
                   **SOUTHERN DISTRICT OF CALIFORNIA**
9                         **SAN DIEGO DIVISION**

10

11 **GABRIEL TECHNOLOGIES**              **CIVIL ACTION NO. 3:08-cv-01992-MMA-POR**
   **CORPORATION and TRACE**
   **TECHNOLOGIES, LLC,**
12                          Plaintiffs,   **PLAINTIFFS' FOURTH AMENDED**
                                          **COMPLAINT**
13        vs.

14 **QUALCOMM INCORPORATED,**            **DEMAND FOR JURY TRIAL**
   **SNAPTRACK, INC., and NORMAN**
15 **KRASNER,**
16                          Defendants.

17          Pursuant to the Court's Orders dated September 3, 2009 and October 8, 2009, Plaintiffs
18
   Gabriel Technologies Corporation and Trace Technologies, LLC (collectively, "Gabriel") and
19
   file their Third Amended Complaint against Defendants Qualcomm Incorporated ("Qualcomm"),
20
21 SnapTrack, Inc. ("SnapTrack"), and Norman Krasner ("Krasner") (collectively, "defendants"), as
22 follows:

23                          I.  **INTRODUCTION**
24
25          1.      Gabriel files this lawsuit to hold technology thieves responsible for their wrongful
26 conduct.  The chief thief is Krasner, who on paper appears to be a prolific inventor with over 60
27 published domestic patents mostly related to global positioning satellite systems.  As Gabriel
28

would find out the hard way, Krasner's prolific inventions are often based on the work of others, and Krasner has made a career out of preparing, prosecuting, and procuring domestic and foreign patents based on work done by others.

2.       Krasner and SnapTrack entered into a license agreement with Loc8.net a/k/a Locate Networks, Inc. ("Locate"), a predecessor-in-interest to Gabriel, ostensibly to jointly develop technology for their mutual benefit.  As it would turn out, SnapTrack and Krasner used the relationship to obtain millions of dollars from Locate to keep SnapTrack afloat while negotiating a billion dollar buyout.  Unaware of the sinister intentions of SnapTrack and Krasner, Locate brought to the table real technological value, which SnapTrack and Krasner stole for themselves and for SnapTrack's eventual purchaser, Qualcomm.   Over time, Krasner, SnapTrack, and Qualcomm surreptitiously misappropriated Locate's valuable enabling technology and other disruptive intellectual property rights.

3.       Although it paid more than a billion dollars for SnapTrack's technology, Qualcomm did not pay the true owner of much of that technology.  Qualcomm took no steps to correct ownership or inventorship of the patents with the United States Patent & Trademark Office.   Instead, Qualcomm wrongfully continued to file patents and patent applications based on Locate's technology and failed to pay Gabriel, the true owner, for its many inventions and patents.

4.       Gabriel brings this suit to obtain payment for the technology unlawfully acquired and used and to correct ownership and inventorship on what should be its patents.

## II.  **PARTIES**

5.      Plaintiff Gabriel Technologies Corporation is a corporation organized pursuant to the laws of the State of Delaware with its principal place of business in Omaha, Nebraska.

6.      Plaintiff Trace Technologies, LLC is a limited liability company organized pursuant to the laws of the State of Nevada.  Trace Technologies, LLC is a wholly-owned subsidiary of Gabriel Technologies Corporation.

7.      Defendant Qualcomm is a corporation organized pursuant to the laws of the State of Delaware.  Qualcomm's principal place of business and United States headquarters is located in San Diego, California.  Qualcomm may be served by serving its counsel of record, COOLEY GODWARD KRONISH LLP, 4401 Eastgate Mall, San Diego, California 92121-1909.

8.      Defendant SnapTrack is a corporation organized pursuant to the laws of the State of California.  SnapTrack's principal place of business is located in California.  Since its acquisition by Qualcomm in 2000, SnapTrack is a wholly owned subsidiary of Qualcomm.  SnapTrack may be served by serving its counsel of record, COOLEY GODWARD KRONISH LLP, 4401 Eastgate Mall, San Diego, California 92121-1909.

9.      Defendant Krasner is an individual who is a citizen of and resides in the State of California.  Krasner may be served by serving his counsel of record, COOLEY GODWARD KRONISH LLP, 4401 Eastgate Mall, San Diego, California 92121-1909.

## III.  **JURISDICTION AND VENUE**

10.      This Court has subject matter jurisdiction over this action and Gabriel's claims for correction of inventorship, patent ownership, declaratory judgment, and equitable patent infringement pursuant to 28 U.S.C. §§ 1331 and 1338, as well as 28 U.S.C. §§ 2201 and 2202.

In addition, this Court has supplemental jurisdiction over the related state law claims asserted herein pursuant to 28 U.S.C. § 1367.

11.     Venue in this Court is proper under 28 U.S.C. §§ 1391 and 1400(b).

## IV.   FACTS APPLICABLE TO ALL COUNTS

**Gabriel, Trace, and Locate.**

12.     Gabriel Technologies Corporation is a publicly-traded corporation focused on two rapidly growing segments of the homeland security market: asset tracking and physical security. Through its wholly-owned subsidiary, Gabriel Technologies, LLC, a Nebraska limited liability company, the company designs, develops, manufactures, and sells a series of physical locking systems for the transportation and shipping industries collectively known as the War-Lok™ security system.   Gabriel Technologies Corporation's other wholly-owned subsidiary, Trace Technologies, LLC ("Trace"), was formed to develop location based services to enable customers to track assets and personnel worldwide.

13.     Locate, a Washington corporation, was formed to focus on location determining devices and location-based services.

14.     Trace was developed as a joint venture entity between Locate and Gabriel.  Trace subsequently acquired substantially all of the assets of Locate, including Locate's rights under the License Agreement with SnapTrack.  Gabriel then acquired all of Locate's rights in Trace, which today operates as a wholly-owned subsidiary of Gabriel.

**Krasner and SnapTrack.**

15.     In late 1998, the founders of Locate, Richard Crowson and William Clise, started discussing joint development projects with SnapTrack.

16.     Although Locate was seeking opportunities to develop its existing business, Krasner saw Locate as providing access to two resources he wanted: (1) funds to keep

SnapTrack running while he was attempting to sell SnapTrack and (2) valuable enabling technology that he could steal and wrongfully add to SnapTrack's patent portfolio.

17.     While negotiating the terms of a potential venture, SnapTrack and Locate discussed their intellectual property and how the parties could best work together.

18.     Unlike SnapTrack, Locate negotiated in good faith and shared its experience in the field of narrowband telecommunication networks for the purpose of collaborating with SnapTrack.

19.     At this time, SnapTrack was focused on broadband networks and assisted Global Positioning System ("aGPS") technology and the development of related intellectual property.

20.     Although SnapTrack was not as interested in narrowband networks because it was concentrating its investment in broadband networks, SnapTrack liked the opportunity that Locate presented.  SnapTrack could continue to focus on broadband networks and sell itself to a company focusing on broadband.  At the same time, Krasner and SnapTrack could obtain patents based on valuable enabling technology that Locate had already conceived of and was implementing in the narrowband field.

21.     SnapTrack hoped to find potential purchasers in the aGPS field who needed a significant aGPS patent portfolio.  In the aGPS market, such a patent portfolio would provide incredible licensing opportunities to the owner of the patent portfolio and would create significant barriers to entry for competitors.

**SnapTrack and Locate Enter Into the License Agreement.**

22.     Prior to the entry of the License Agreement, representatives of Locate, including Crowson and Clise, discussed in early 1999 the intellectual property ownership rights with representatives of SnapTrack, including Stephen Poizner, then Chief Executive Officer of

SnapTrack, and Krasner.   SnapTrack assured Locate that Locate's rights in its existing intellectual property would not be affected by entering into the License Agreement.  With respect to Program Technology, Poizner represented that it would be jointly-owned and that the parties would set up a process to protect such joint ownership rights.   These statements where untrue or misleading when made because, as discussed below, Krasner, SnapTrack, and Qualcomm (i) did not respect and separately safeguard Locate's existing intellectual property rights; (ii) did not work with or otherwise provide Locate any joint ownership rights; and (iii) failed to disclose and affirmatively misrepresented the existence of Program Technology.   Had Locate known that these representations were false and were not going to be complied with, Locate would have not entered into the License Agreement.

23.   On August 20, 1999, SnapTrack and Locate entered into a License Agreement (the "License Agreement").   Although titled a "License Agreement," the agreement was more akin to a joint development agreement because the parties agreed to jointly develop and own "Program Technology," as discussed below.

24.   The stated purpose of the License Agreement was to allow Locate to obtain (i) a license to use SnapTrack's aGPS software to develop location pager devices and related location services and (ii) technical support and engineering services from SnapTrack related to its software.

25.   Locate agreed to pay SnapTrack millions of dollars in license and royalty fees in exchange for the rights to use, make, or have made the SnapTrack Server Software and the SnapTrack Client Software required for provisioning aGPS location-based services to Locate customers.

26.    As part of the License Agreement, Locate expressly protected its existing intellectual property rights.  To that end, Section 8, entitled "Proprietary Rights," provided:

> Each party shall retain ownership of its respective patents, trade secrets, copyrights, and other Intellectual Property Rights that are in existence as of the Effective Date.

27.    Because SnapTrack realized the value that Locate brought to the table, SnapTrack agreed that "Program Technology," or items of work carried out by the parties in connection with the License Agreement, would be jointly owned by Locate and SnapTrack.

28.    In clear and unambiguous terms, section 8(b) of the License Agreement stated:

> All Program Technology shall be jointly owned by and between the parties, with each party owning an undivided, equal ownership interest in any such Program Technology, and all rights therein shall be vested in [SnapTrack] and [Locate] as joint and equal owners.

29.    In addition to setting forth the parties' joint ownership interest, the License Agreement further provided that this joint ownership interest was to be protected by the parties. Section 8(b)(i) of the License Agreement stated:

> The parties shall establish a process for identifying all Program Technology Intellectual Property Rights.  With respect to all such Program Technology so identified, the parties shall establish a process for determining (1) which intellectual property filing to make with respect to such Program Technology (including but not limited to patent applications, reissues, and reexaminations, copyright and trademark registrations, and similar intellectual property registrations), (2) which party shall be responsible for such filings.

30.    Because of the proprietary nature of the information the parties were exchanging, SnapTrack and Locate further expressly provided for confidential treatment of that information. Specifically, paragraph 9(a) of the License Agreement states:

> Nondisclosure.  Each party shall treat as confidential all Confidential Information of the other party, shall not use such Confidential Information except as set forth herein and in order to allow the parties to meet their obligations under this Agreement, and shall use reasonable efforts not to disclose such Confidential Information to any third party. Without limiting the foregoing, each of the parties shall use at least the same degree of care which it uses to prevent the disclosure of

its own confidential information of like importance to prevent the disclosure of Confidential Information disclosed to it by the other party under this Agreement. Each party shall promptly notify the other party of any actual or suspected misuse or unauthorized disclosure of the other party's Confidential Information.

31.    Thus, Locate endeavored from the outset to set up a process to protect intellectual property rights pertaining to the Program Technology, trade secrets, and other confidential information by requiring: (i) a process for identifying all Program Technology Intellectual Property Rights; (ii) determination of the type of intellectual property filings needed, *e.g.*, patent, copyright, etc.; (iii) determination of which party would be responsible for obtaining such intellectual property protection; and (iv) protection of each party's confidential information.

32.    As it would turn out, Krasner and SnapTrack (and later Qualcomm) had no intention of recognizing Locate's joint ownership of Program Technology or protecting Locate's joint ownership interest.

**SnapTrack Finds a Buyer: Qualcomm.**

33.    Although Qualcomm is no stranger to intellectual property disputes, a brief history of Qualcomm's patent portfolio and business is necessary to understand Qualcomm's acquisition of SnapTrack's—but in reality, Locate's—intellectual property.

34.    Qualcomm was founded in 1985 to develop and patent a wireless technology system known as Code Division Multiple Access (CDMA).

35.    Instead of manufacturing its own cell phones, Qualcomm made money by obtaining a large patent portfolio relating to CDMA and then licensing those CDMA patents to cell phone manufacturers like Samsung, Ericsson, and Motorola.

36.    In 1999, the year CDMA was included as standard technology for phones, Qualcomm's licensing deals generated more than $400 million in revenue.

37.     Although still highly lucrative, many of Qualcomm's fundamental CDMA patents were approaching expiration. To diversify its revenue sources, Qualcomm sought to strengthen its patent portfolio by investing in certain disruptive technologies, including aGPS.  Acquisition of the SnapTrack patent portfolio was intended to allow—and actually did allow—Qualcomm to dominate the aGPS market just as it had the CDMA market.

38.     Qualcomm decided to acquire SnapTrack and its intellectual property and technology and conducted due diligence with respect to that proposed acquisition.

39.     Bruce Greenhaus, a Qualcomm vice president and registered United States patent attorney, led a team of Qualcomm engineers and inventors involved in the SnapTrack due diligence.  At times, Greenhaus has falsely claimed that he alone was responsible for the due diligence related to SnapTrack's intellectual property.

40.     Initially, Qualcomm offered to make a sizeable investment in SnapTrack, but rejected that offer and insisted that Qualcomm acquire SnapTrack outright.

41.     On January 26, 2000, Qualcomm announced that it was acquiring SnapTrack for $1 billion. In its press release, Qualcomm announced the acquisition as follows:

> In a move designed to enable broad new applications for mobile location-based services and wireless Internet systems, Qualcomm Incorporated (Nasdaq: QCOM) today announced that it will acquire SnapTrack, Inc. of San Jose, Calif., a leader in wireless position location technology. Combining SnapTrack's technology with Qualcomm's innovative gpsOne™ technology will accelerate the introduction of powerful location-enabled mobile phones and other devices utilizing Wireless Assisted GPS™ (Global Positioning System) technology. The acquisition provides Qualcomm with an even stronger patent portfolio covering Wireless Assisted GPS. *SnapTrack's patents are necessary for the commercial viability of any Wireless Assisted GPS system.* Under the agreement, SnapTrack will become a wholly owned subsidiary of Qualcomm, and will continue its work on position location technology and meeting its customer commitments. Qualcomm will pay $1 billion in stock for the acquisition of SnapTrack. Completion of the agreement, which is subject to regulatory approval and other customary closing conditions, is expected by mid-March of this year.

42.     Focusing on SnapTrack's patent portfolio, Dr. Irwin Mark Jacobs, then chairman and CEO of Qualcomm, stated, "SnapTrack's impressive technology strengths and patent portfolio will provide Qualcomm with increased position location capabilities."

43.     In describing SnapTrack's patent portfolio, Qualcomm acknowledged the existence of the relationship and the License Agreement between Locate and SnapTrack, as follows:

> SnapTrack has nearly 50 patents, either issued or pending, that are critical to the efficient, cost-effective deployment of Wireless Assisted GPS. SnapTrack has royalty-bearing licensing agreements with Denso, DSPC/Intel, Loc8.net/Glenayre, Motorola and Texas Instruments for patents and technology that cover the deployment of assisted GPS-based wireless location systems, and an agreement with Microsoft to integrate SnapTrack's solution into the Microsoft Mobile Explorer smart phone platform.

44.     At the time Qualcomm announced the acquisition, Locate had no reason to believe that its technology had been misappropriated by Krasner and SnapTrack or that any of its technology was involved in the acquisition.  Even after the acquisition, Locate continued to perform under the License Agreement.

45.     During its due diligence (and after its acquisition of SnapTrack), Qualcomm and, in particular, Greenhaus and his due diligence team ignored or disregarded both the intellectual property provisions of the License Agreement and Locate's contributions to Program Technology.

46.     On March 2, 2000, Qualcomm announced that it had completed the acquisition of SnapTrack, which became a wholly owned subsidiary of Qualcomm.  Again, Qualcomm focused on and touted "SnapTrack's patent portfolio of nearly 50 patents, either issued or pending, that are critical to the efficient, cost-effective deployment of Wireless Assisted GPS systems."

47.     As part of the acquisition, Krasner's SnapTrack stock was converted into Qualcomm stock.  Upon information and belief, Krasner and his wife received approximately 300,000 shares of Qualcomm stock then valued at $139.56 per share.  In connection with the acquisition, Krasner became a "key employee" of Qualcomm.

48.     In its press releases and SEC filings relating to the acquisition of SnapTrack, Qualcomm never mentioned any other SnapTrack assets or even SnapTrack's revenues.  Upon information and belief, none of these items played a role in Qualcomm's acquisition of SnapTrack.  Instead, the sole value to Qualcomm and reason for the $1 billion acquisition of SnapTrack was the valuable intellectual property.

49.     In acquiring SnapTrack, Qualcomm willfully ignored the fact that SnapTrack did not solely own all of the intellectual property SnapTrack and Krasner sold to Qualcomm for $1 billion.

50.     After acquiring SnapTrack's patent portfolio, Qualcomm set its sights on achieving market dominance in the aGPS market as it had done with CDMA.

51.     In 2002, Qualcomm announced that its gpsOne™ technology, which features SnapTrack technology, "is the world's most widely developed personal location system for mobile handsets."

52.     From 2002 to 2005, the number of gpsOne™-enabled devices in use in the world skyrocketed from 5 million to 150 million.  Qualcomm claimed that it is "the most widely-developed GPS technology in the world."

**Krasner, SnapTrack, and Qualcomm Misappropriate Gabriel's Trade Secrets and Confidential Information.**

53.     Unbeknownst to Locate, Krasner decided to take Locate's intellectual property and inventions and patent them as if he were the actual inventor.  Locate's intellectual property

and confidential information derived independent economic value from not being generally known to the public.  For example, such confidential information and trade secrets had value as patentable technology.

54.   Although SnapTrack was focused on aGPS and the broadband market, Krasner filed patent applications directed to narrowband innovations upon which Locate was focused and that had valuable application within the broadband market upon which SnapTrack was focused.

55.   One example of Krasner filing patents based on enabling technology developed by Locate occurred in March 1999.  During the negotiations culminating in the License Agreement, Locate discussed its past experience in narrowband and solutions to problems it had encountered and which were applicable to telecommunications more broadly.  This information was Locate's solely-owned know how, intellectual property, and confidential information.

56.   Krasner, without telling Locate's founders that he was doing so, filed a provisional patent application incorporating Locate's technology under his own name while excluding the actual inventor prior to the execution of the License Agreement, Krasner had no right to do so because (i) he was not one of the true inventors and (ii) Locate was supposed to retain ownership of its own existing pre-agreement intellectual property rights.

57.   Upon information and belief, Krasner filed the provisional patent application to add value to SnapTrack's patent portfolio for a potential purchaser (like Qualcomm) as well as to put additional arrows in its quiver for future battles with its competitors. Of course, Locate had no reason to believe that Krasner was improperly filing patent applications for which he was not the inventor.  Despite SnapTrack's representations regarding the parties' existing intellectual property rights, Krasner did not disclose to Locate the decision to pursue and file this patent application, which incorporated Locate's solely-owned technology.  Had Locate known that

Krasner and SnapTrack were going to take Locate's solely-owned technology for themselves in direct contravention of the prior representations, Locate would not have entered into the License Agreement.

58.     After entering into the License Agreement, Krasner continued his practice of "ghost writing" patents by filing patent applications relating to Program Technology and naming either Krasner as a sole inventor or Krasner and other SnapTrack engineers as joint inventors. No Locate employees were listed as inventors.

59.     While filing these patent applications beginning in 1999, Krasner and SnapTrack failed to disclose to Locate that Program Technology existed or follow the procedures required by the License Agreement regarding Program Technology and intellectual property filings. Because these patent applications were not disclosed to Locate, Locate was not aware of Krasner and SnapTrack's clandestine filings relating to technology solely owned or jointly owned by Locate.

60.     Following Krasner's lead, Qualcomm filed patent applications relating to Program Technology and named San Diego-based Qualcomm engineers as inventors instead of Locate (or Gabriel) employees.   Again, because these patent applications were not disclosed to Locate, Locate was not aware of these unpublished filings relating to technology solely owned or jointly owned by Locate.

61.     Locate's jointly-owned Program Technology was misappropriated by Krasner, SnapTrack, and Qualcomm in multiple ways:

          i)     Krasner, SnapTrack, and Qualcomm filed new patent applications that incorporated Program Technology;

ii)      Krasner, SnapTrack, and Qualcomm included the Program Technology in continuation-in-part patent applications;

iii)      Krasner, SnapTrack, and Qualcomm broadened patent claims in pending patent application to encompass the Program Technology; and

iv)      Krasner, SnapTrack, and Qualcomm failed to credit Locate as an assignee or Locate employees as co-inventors.

62.    At least ninety-two (92) U.S. and foreign patents and patent applications filed by Krasner, SnapTrack, and Qualcomm are based upon—in whole or in part—Program Technology, Locate's sole intellectual property, or both.  These patents and patent applications can be grouped into at least thirteen (13) core inventions.

63.    Nine (9) of at least thirteen (13) core inventions are embodied in the following U.S. patents (and related foreign patents or applications):

i)      Patent Nos. 6,377,209 and 6,583,757 ("the '209 and '757 Patents") and six (6) related PCT/foreign patents, including WO2000057203, EP1171779, MXPA01009528, CN1344372, CA2367032, and AU773464;

ii)      Patent No. 6,661,372 ("the '372 Patent");

iii)      Patent No. 6,799,050 ("the '050 Patent");

iv)      Patent No. 6,861,980 ("the '980 Patent") and six (6) related PCT/foreign patents, including AU2005250882, BRPI0511499, CN1957264, EP1749215, JP2008500543, and WO2005119287;

v)      Patent No. 6,895,249 ("the '249 Patent") and ten (10) related PCT/foreign patents, including AU777646B, AU7689401, BR0106971, CA2383685, CN1201627, EP1302081, HK1050606, JP2004504614, MXPA02002692, and WO0207458;

vi)     Patent No. 7,254,402 ("the '402 Patent") and ten (10) related PCT/foreign patents, including AU1534202, AU2002215342, CA2425547, CN1608211, EP1330662, IL155206, JP4018535B2, JP2007306588, MXPA03003208, and WO0231526;

vii)    Patent No. 7,289,786 ("the '786 Patent") and U.S. Application Serial No. 11/538,436 ("the '436 Application") and six (6) related PCT/foreign patents, including CN1762173, EP1588578, JP2007521712, KR20050090461, MXPA05007633, and WO2004066665;

viii)   Patent No. 7,319,876 ("the '876 Patent") and ten (10) related PCT/foreign patents, including AU2003270026, BR0313697, CA2496460, CN1689365, EP1532833, JP2005537709, KR20050040131,MXPA05002231, RU2005108595, and WO2004019650; and

ix)     Patent No. 7,421,277 ("the '277 Patent") and related U.S. Application Serial No. 11/377,856 ("the '856 Application").

64.     The remaining four (4) core inventions are embodied in the following U.S. patent applications (and related foreign patents or applications):

i)      Application Serial No. 10/418,799 ("the '799 Application") and ten (10) related PCT/foreign patents, including AU2003301350, BR0315350, CA2501268, CN1705894, EP1552323, JP2006504110, KR20050051695, MXPA05003921, RU2005114912, and WO2004036240;

ii)     Application Serial No. 10/792,062 ("the '062 Application") and nine (9) related PCT/foreign patents, including BRPI0408017, CA2517800, CN1778127, EP1600020, JP2006521767, KR20050104420, MXPA05009417, RU2005130765, and WO2004080096;

iii)    Application Serial No. 10/956,409 ("the '409 Application) and two (2) related PCT/foreign patents, including BRPI0512122 and WO2006009712; and

iv) Application Serial No. 10/961,986 ("the '986 Application) and seven (7) related PCT/foreign patents, including CA2463543, CN1602636, EP1435184, IL161315, JP2005537690, KR20050035147, and WO03032662.

65. These patents and patent applications should name Locate employees as the sole inventors or, at the very least, as joint inventors.

66. By filing these patent applications and obtaining these patents, Krasner, SnapTrack, and Qualcomm obtained valuable technology without paying for it. The procurement of these issued patents has unfairly allowed SnapTrack and Qualcomm to create barriers of entry to third-party competition in the aGPS market that was not rightfully theirs to use and from which to benefit. Upon information and belief, Qualcomm licenses these patents to industry leaders as part of its patent portfolio and lucrative business model. Because Gabriel did not—and still does not—have access to Qualcomm's license agreements, it was not aware of any licensing of patents that should have listed Locate employees as sole or joint inventors.

67. In addition to filing patents based on Locate's inventions, upon information and belief, Krasner has filed patents relating to wireless network technology which was likely developed by companies other than SnapTrack or Qualcomm. Examples of such suspicious patents include U.S. Patent Nos. 6,937,872 and 6,665,541.

68. Qualcomm's clandestine activities in obtaining the patents have forced aGPS users and providers to either obtain a license from Qualcomm or attempt to design around these patents. Thus, Qualcomm was able to represent ownership of and control barriers to entry in the marketplace that were not its own.

**The Specific Patents and Patent Applications.**

69.     Krasner, SnapTrack, and Qualcomm filed the patents and patent applications listed above without listing Locate or any of its employees as having any inventorship or ownership rights.  As summarized below, Locate employees contributed to each of these patents and patent applications and, in most cases, were the sole inventors.

The '209 Patent and the '757 Patent

70.     The '209 Patent and the '757 Patent list Krasner as the sole inventor.

71.     In January and February 1999, during preliminary discussions between SnapTrack and Locate, Locate identified its experience with latency problems in networks like the ReFLEX paging network, which latencies are significantly greater than the latencies in any other type of wireless transmission network.

72.     These problems were not known to Krasner or SnapTrack until these discussions with Locate, and Locate even provided the solution to these latency issues.

73.     As part of his efforts to make SnapTrack's patent portfolio as valuable as possible to potential buyers, Krasner took Locate's technology and patented it under his own name.

The '372 Patent

74.     The '372 Patent only lists Richard Girerd and Krasner as inventors.

75.     The '372 Patent was broadened during prosecution to cover new types of acquisition assistance information having reduced satellite information payloads.

76.     The new types of acquisition assistance information were contributed as Program Technology by Locate engineers.

77.     Rather than amending the patent application of the '372 Patent, the new acquisition assistance technique should have been included in either a new patent application or,

if possible, in a continuation-in-part (CIP) patent application, which should have named Locate employees as inventors.

The '050 Patent

78.    The '050 Patent lists Krasner as the only inventor.

79.    The '050 Patent resolves conflicts between transmission to a terrestrial network and reception from GPS satellites.

80.    The Locate location pager implements a mechanism that resolves similar conflicts to those addressed in the '050 Patent.

81.    In addition, the user-initiated conflict resolution mechanism is illustrated and discussed in multiple Locate documents that pre-date the filing of the '050 Patent by more than a year.

The '980 Patent

82.    Claim 1 of the '980 Patent is directed to a method for messaging position-based information in an assisted wireless position determination system.   Qualcomm employees Rowitch and Patrick are listed as inventors.

83.    The elements of Claim 1 are disclosed in the Locate document entitled "Location Message Handling Protocol" (LMHP), dated November 2002, and in the Locate document entitled "Sputnik Software Functional Specifications" ("Sputnik"), dated December 2000.  Both of these documents pre-date the May 26, 2004 filing of the '980 patent.

The '249 Patent

84.    The '249 Patent lists Gaal, a Qualcomm employee, as the only inventor.  That patent uses position location data classifications to determine a broadcast schedule.

85.     The LS-GF IF Specification, dated December 15, 1999, which SnapTrack had in its possession, discloses the broadcasting of acquisition assistance information.  A June 1999 letter discusses a location dependent simulcast of unique satellite data, and a September 1999 e-mail discusses a meeting about the immediate need for a broadcast data aging analysis.

86.     Thus, Locate provided the details of the broadcast method claimed in the '249 Patent well prior to the July 10, 2001 filing of the patent.

The '402 Patent

87.     The '402 Patent lists Vayanos, a Qualcomm employee, as the first-named inventor.  Samir Soliman, another Qualcomm employee who was a member of the SnapTrack due diligence team, is also listed as an inventor.

88.     The Locate paging network delivers acquisition assistance information either in a broadcast mode to all location pagers in a GPS zone or in a targeted mode to a targeted location pager in a single base station coverage area.

89.     In addition, documents authored by Locate in 1999 disclose relevant information regarding the acquisition assistance information discussed in the '402 Patent.  Specifically, claims of the '402 Patent recite limitations regarding the GPS code phase search range shown in the Locate documents.

90.     Because Qualcomm was a member of a standard-setting subcommittee and because Vayanos represented Qualcomm on that committee, if Vayanos were truly the inventor of the '402 Patent, the patent should have been disclosed prior to the balloting and publication of the relevant standard.

91.     However, Qualcomm did not make a declaration of intellectual property rights and licensing until after publication of the standard.

92.     Locate, as the sole inventor of this patent, may not have been obligated to declare the patent to the standard setting organization or to grant licenses under favorable terms to standard members.

The '786 Patent and the '436 Application

93.     The '786 Patent and the '436 Application list Krasner as the sole inventor and relate to a "method and apparatus for communicating emergency information using wireless devices."

94.     Locate documents that pre-date the filing of the '786 Patent and the '436 Application illustrate the triggering of an alert on the location pager and the transmission of an alert message to an emergency center.  Other Locate documents supporting inventorship include an internal e-mail and memorandum.

95.     Claims of the '786 Patent and the '436 Application recite limitations that are shown in these documents.

The '876 Patent

96.     Claim 1 of the '876 Patent, which has a priority date of August 26, 2002, is directed to a location services apparatus for providing location services to a mobile station. Qualcomm employees Jha and Grilli are listed as the inventors.

97.     The Sputnik document discloses the elements of Claim 1 and pre-dates the priority date of the '876 Patent.

The '277 Patent and the '856 Application

98.     Claim 1 of the '277 Patent, which has a priority date of February 5, 2004, is directed to a method of performing position determination in a network. Qualcomm employee Burroughs is listed as the inventor.

99.     Elements of the '277 Patent and the '856 Application are disclosed in the Sputnik document, the Locate document entitled "Location Message Handling Protocol" (LMHP), dated November 2002, and other Locate documents.

The '799 Application

100.     Claim 1 of the '799 Application, which has a priority date of October 17, 2002, is directed to a method of determining a position estimate for a wireless terminal. Leonid Sheynblat is listed as the inventor.

101.     Claim 1 encompasses a Locate method of improving the location estimation in the network and is disclosed in the Sputnik document.

The '062 Application

102.     Claim 1 of the '062 Application, which has a priority date of March 5, 2003, is directed to a method of providing location services.  Wang, Sheynblat, Agahse, Gollens, and Hsu are listed as the inventors on the '062 Application.

103.     The Sputnik document and other Locate documents describe the functionality discussed in the '062 Application.

The '409 Application

104.     The '409 Application relates to tracking lost and stolen mobile devices using unique equipment identifiers.  Anjali Jha, a Qualcomm employee, and Krasner are listed as the inventors.

105.     Claims in the '409 Application recite limitations regarding the tracking of a targeted mobile station based on status information.  These limitations were taught in various documents provided to SnapTrack by Locate.

The '986 Application

106.    The '986 Application establishes permission criteria to allow others to track the location of a mobile device. Krasner and Sheynblat are listed as the inventors.

107.    Multiple Locate documents, which pre-date the filing of the '986 Application, define creating permissions for users, and the claims of the '986 Application recite limitations that are shown in those documents.

108.    The above-discussed patents and patent applications read on the following Qualcomm/SnapTrack products and services:  the SnapTrack Position Determination Module software, the Qualcomm QPoint server, the GlobalWARN system, the inGeo device, the Brew Location Signature Solution server, the Qualcomm MedioFlo network, and/or any product incorporating Qualcomm's gpsOne technology.

**Qualcomm Continues Its Wrongdoing.**

109.    Despite Qualcomm's protestations to Gabriel that Locate did not have people who contributed to the inventions or the patents at issue, Gabriel learned that Qualcomm, through an entity called Qualcomm Ventures, considered an investment in Locate and later pursued a buyout of Locate, including all of Locate's hardware, software, key personnel (both current and former), and intellectual property rights.   During the due diligence of that proposed transaction, Qualcomm had access to Locate's financial information and other valuable company information.  Qualcomm did not consummate the buyout nor did Qualcomm inform Locate of its potential ownership interest in portions of the SnapTrack patent portfolio.

110.    After Qualcomm's failed attempt to buy Locate and its intellectual property rights, in or around June 2004, SnapTrack and Qualcomm presented Trace, the successor-in-interest to Locate's assets, with an Amended and Restated License Agreement.   The proposed

Amended and Restated License Agreement stated that it "supersedes and replaces in its entirety the prior License Agreement made and entered as of August 20, 1999, as amended, by and between [SnapTrack] and Trace Technologies LLC, as successor-in-interest to substantially all of the assets of Locate Networks, Inc."

111.    Neither SnapTrack nor Qualcomm informed Trace that they had filed patent applications incorporating Locate's intellectual property without listing Locate personnel as inventors.  To the contrary, representatives of SnapTrack and Qualcomm fraudulently concealed that information from Gabriel and falsely claimed that no Program Technology existed under the License Agreement.  Representatives of SnapTrack and Qualcomm further falsely claimed that the sole purpose of presenting the Amended and Restated License Agreement was to standardize the prior License Agreement to the form now used by Qualcomm.

112.    The provisions of the proposed Amended and Restated License Agreement were significantly different from the License Agreement entered into by SnapTrack and Locate.  First, the proposed Amended and Restated License Agreement deleted section 8(b) of the License Agreement which stated that "[a]ll Program Technology was jointly owned by the parties." Second, the proposed Amended and Restated License Agreement stated:

> Trace hereby grants, on behalf of itself and its Affiliates, to [SnapTrack] an irrevocable, perpetual, nonexclusive, paid-up, royalty-free, worldwide license under the Necessary IP of Trace and its Affiliates, without the right to sublicense (except to [SnapTrack]'s Affiliates, and by [SnapTrack] and/or its Affiliates to their direct and indirect customers) in order to use, make, have made, sell, offer to sell, lease, offer to lease, and import the Software.

113.    Necessary IP was defined in the proposed Amended and Restated License Agreement as "all Intellectual Property Rights which are essential or commercially necessary to the development, manufacture, use, sale or distribution of licenses or other rights to Software in

order to comply with the specifications of the location services portion of any wireless communications standard adopted for any air interface by any nation."

114.    By the deletion of the joint ownership provision of the License Agreement and the inclusion of a broadly-defined license from Trace to SnapTrack, SnapTrack and Qualcomm attempted to transfer Locate's existing intellectual property rights to themselves.

115.    As part of the proposed Amended and Restated License Agreement, SnapTrack and Qualcomm also requested that Trace pay approximately $342,000 in additional fees and costs.  Knowing quite well what they had done with Locate's intellectual property over the past few years, SnapTrack and Qualcomm kindly offered to waive these fees if Gabriel would just sign the Amended and Restated License Agreement.

116.    In April 2005, when Trace inquired as to whether any Program Technology or related intellectual property filings existed, Qualcomm's Senior Legal Counsel Phillip Fries responded that Qualcomm would only address those issues after Trace paid certain fees to SnapTrack or signed the proposed Amended and Restated License Agreement.  Although Qualcomm did agree that the change regarding joint ownership rights would only apply prospectively, Qualcomm still did not acknowledge or identify Locate's contributions.  In point of fact, Fries indicated that Locate was a "sales" team without engineering capability.

117.    In August 2005, counsel for Gabriel met with Greenhaus.  During that meeting, Greenhaus explained that he had been part of the original Qualcomm team involved in the valuation of SnapTrack and that as part of the acquisition, he knew SnapTrack's patent portfolio very well.  To begin that meeting, Greenhaus stated that Locate did not make any contribution to SnapTrack's patent portfolio.  By the end of the meeting, Greenhaus stated that he may have been wrong and that steps needed to be taken to verify several points.

118.    After the meeting, Greenhaus, knowing at that time that Gabriel lacked needed capital, continued to conceal Krasner, SnapTrack, and Qualcomm's fraud and misappropriation by claiming that Locate did not contribute any technology and that no Program Technology existed. However, SnapTrack and Qualcomm did not provide Locate access to any inventor notebooks or other information exclusively in their possession regarding any inventions or patent filings.   Greenhaus had promised to do so and then purposefully delayed in the hopes of bankrupting Gabriel.

119.    In October 2005, Qualcomm Senior Director Brian Salisbury again requested that Trace sign the Amended and Restated License Agreement.   He also reiterated Qualcomm's position that no SnapTrack patents were jointly owned by Locate.

120.    Over a period of years, Krasner, SnapTrack, and Qualcomm failed to disclose and actively misled Locate about the existence of Program Technology and related intellectual property filings.   When Gabriel attempted to discover whether and what Program Technology existed, Qualcomm refused to provide any information regarding Program Technology or related intellectual property filings and outright claimed that no Program Technology existed.   To date, Qualcomm has refused to provide information regarding patent filings on the grounds that such information is confidential and/or privileged.

121.    Despite SnapTrack and Qualcomm's false representations about the existence of Program Technology or any patents or patent applications based on Program Technology, Trace refused to sign the proposed Amended and Restated License Agreement, which had been prepared by SnapTrack and Qualcomm in an attempt to have Trace waive its intellectual property rights.

122.    Instead, Trace only agreed to sign an Amended and Restated License Agreement which preserved its intellectual property rights and its rights that had accrued under the original license agreement from August 20, 1999 through the January 16, 2006 effective date of the Amended and Restated License Agreement.

123.    As of January 16, 2006, SnapTrack and Trace entered into the Amended and Restated License Agreement.  At the time that Trace entered into the Amended and Restated License Agreement, Trace was not aware that SnapTrack had misappropriated Locate intellectual property and technology.

124.    Because Trace did not intend to waive its intellectual property rights and ownership interest in Program Technology, the Amended and Restated License Agreement includes provisions regarding the parties' proprietary rights.  Paragraph 8(a) of the Amended and Restated License Agreement states:

> Each party shall retain ownership of its respective Intellectual Property Rights that (i) its employees have developed or may in the future develop or (ii) it has acquired or will acquire in the future from others.  The parties acknowledge that certain provisions existed in the Prior License that addressed the joint ownership by the parties of certain technology.  Those provisions are incorporated by reference herein to the same extent as if repeated in this Agreement, as to any Program Technology (as such term is defined in the Prior License) developed prior to May 31, 2004.  The deletion of such joint ownership provisions herein shall have prospective effect and apply only to potential activities the parties have conducted or may conduct on or after May 31, 2004, but shall not affect the parties' underlying ownership rights in or to the Program Technology developed prior to May 31, 2004, or their ability to use such Program Technology without any duty of accounting to the other as contemplated by the Prior License for such Program Technology developed prior to May 31, 2004.

125.    Thereafter, Gabriel retained intellectual property counsel to review published patents and patent applications filed worldwide by Krasner, SnapTrack, and Qualcomm to determine whether any were based on Program Technology.  SnapTrack is listed as an assignee on 55 patents.  Qualcomm has filed approximately 6,500 U.S. patent applications and is listed as

an assignee on approximately 2,345 issued domestic patents, of which almost 2,000 issued during the last eight years.

126.    Over time, as the patents and patent applications discussed above matured and were published and Gabriel obtained access to them, Gabriel began reviewing these documents. Because Locate was no longer in business, Gabriel interviewed people familiar with Locate and its business as well as the business relationship with SnapTrack.  Gabriel also searched for documents relating to Locate that may discuss Locate technology or inventions.  Gabriel then compared this information against the patent filings in an effort to determine whether Locate contributed to these filings.

127.    Even without access to SnapTrack's purported inventors' notebooks and other materials that are in the possession of Krasner, SnapTrack, and Qualcomm, Gabriel discovered certain patents that incorporate Locate's pre-existing technology and jointly-owned Program Technology.  However, defendants have exclusive control of important information, and defendants have refused to provide such information to Gabriel.  Upon information and belief, other patents and patent applications in addition to those identified thus far likely incorporate Locate's pre-existing technology and jointly-owned Program Technology.  Upon information and belief, Gabriel has uncovered preliminary evidence that indicates that Krasner and SnapTrack may have misappropriated other parties' intellectual property rights in a manner very similar to that used against Locate.

128.    Gabriel presented information concerning its intellectual property claims to Qualcomm and its Board of Directors in June 2007.  To the best of Gabriel's knowledge, Qualcomm has taken no steps to correct the inventorship issues or otherwise address the misappropriation of Locate's technology and intellectual property.

129.    All conditions precedent to recovery have occurred.   Furthermore, Locate and Trace's employees, agents, and representatives have assigned all right, title, and interest in the subject intellectual property to Locate and Trace.

130.    Gabriel's claims are timely filed because: (1) the applicable statutes of limitations have not expired; (2) the parties entered into multiple tolling agreements; and/or (3) the doctrines of fraudulent concealment, discovery rule, equitable tolling, and/or equitable estoppel preclude defendants from raising statutes of limitations as a defense.

## V.  CAUSES OF ACTION

### COUNT TWO: Breach of the Amended and Restated License Agreement

131.    Gabriel repeats and realleges the allegations above.

132.    Trace and SnapTrack entered into the Amended and Restated License Agreement.

133.    Trace performed under the Amended and Restated License Agreement and/or was excused from not performing because of SnapTrack's prior material breaches.

134.    SnapTrack breached the Amended and Restated License Agreement when it, among other things, (1) took ownership of Locate's patents, trade secrets, copyrights, and other Intellectual Property Rights; (2) took and destroyed Locate's joint ownership interest in Program Technology; (3) failed to maintain the confidentiality of Locate's trade secrets and other confidential and proprietary information; (4) failed to establish a process for identifying all Program Technology Intellectual Property Rights; (5) failed to establish a process for determining which intellectual property filings to make with respect to such Program Technology; and (6) filed patent applications and patents without listing Locate as an assignee or Locate personnel as inventors.

135.   SnapTrack breached the Amended and Restated License Agreement in secret by, among other things, not disclosing its patent filings relating to both Locate's technology and Program Technology. The harm flowing from SnapTrack's breaches was not reasonably discovered by Gabriel until a future time as discussed above.

136.   As a result of SnapTrack's breaches, Gabriel has suffered damages for which it seeks recovery.

## COUNT FIVE: Correction of Inventorship (Pursuant to 35 U.S.C. § 256)

137.   Gabriel repeats and realleges the allegations above.

138.   As discussed above, Krasner and representatives of SnapTrack and Qualcomm applied for and were issued U.S. Patents based on the representation that they were the inventors.

139.   This representation was false, because Krasner, SnapTrack, and Qualcomm failed to disclose that representatives of Locate conceived of claims in the patents and were the true inventors.

140.   At all relevant times, the true inventors, including Crowson and Clise, were without deceptive intent and were unaware of and played no role in any deception by Krasner, SnapTrack, and Qualcomm.

141.   Pursuant to 35 U.S.C. § 256, the patents should be corrected to reflect that representatives of Locate/Gabriel are the sole inventors or, at the very least, co-inventors. Pursuant to assignments from and agreements with these true inventors, Gabriel would be an owner/assignee of intellectual property developed by such inventors, including the subject patents.

## COUNT SIX: Declaratory Judgment Of Ownership Interest In The Patents (Pursuant to 28 U.S.C § 2201)

142.   Gabriel repeats and realleges the allegations above.

143.    Gabriel seeks a declaratory judgment that Gabriel has an ownership interest in and to the above-listed patents.

144.    There is a substantial and continuing justiciable controversy between Gabriel and Krasner, SnapTrack, and Qualcomm as to Gabriel's ownership interest in and to the patents.

145.    A valid case and controversy exists sufficient for this Court to declare the rights and remedies of the parties, because there is a dispute between the parties as to the ownership of valuable technology and related patents.

146.    This controversy is ripe for determination at this time because the parties dispute ownership of valuable technology and related patents and because those patents have been issued by the USPTO.

147.    Representatives of Gabriel conceived of such technology and assigned all right, title, and interest in such technology to Gabriel.  Thus, Gabriel has the requisite standing to request this declaration.

148.    Krasner, SnapTrack, and Qualcomm utilized these contributions made by Gabriel without payment and/or acknowledgment of inventorship and ownership rights.

149.    To resolve this controversy, Gabriel requests that the Court declare the respective rights and duties of the parties in this matter and, in particular, that Gabriel is the owner of certain technology and patents.

## COUNT EIGHT: Misappropriation (Pursuant to California Uniform Trade Secrets Act)

150.    Gabriel repeats and realleges the allegations above.

151.    Locate's confidential and proprietary information as well as Program Technology derived independent economic value from not being generally known to the public or to other persons who could obtain economic value from its disclosure or use.

152.    Gabriel's trade secrets and other proprietary confidential information includes Program Technology, enabling technology discussed above that was incorporated into patent filings by defendants, and Locate's experience and expertise in the field of narrowband, including solutions to problems in the telecommunication industry.

153.    Locate took reasonable efforts under the circumstances to maintain the secrecy of its confidential and proprietary information, such as the inclusion of confidentiality provisions in the License Agreement.

154.    Krasner, SnapTrack, and Qualcomm misappropriated Locate's confidential and proprietary information as well as Program Technology by (i) acquiring the information by improper means and (ii) disclosing or using the information without Locate's consent.

155.    As the direct and proximate result of Krasner, SnapTrack, and Qualcomm's misappropriation, Gabriel suffered actual loss for which it seeks recovery and seeks recovery of the unjust enrichment caused by the misappropriation.   In the alternative, Gabriel seeks a reasonable royalty.

156.    Because Krasner, SnapTrack, and Qualcomm willfully and maliciously misappropriated Locate's confidential and proprietary information, Gabriel is entitled to an award of exemplary damages and attorneys' fees and costs.

157.    Because its remedy at law is inadequate, Gabriel seeks injunctive relief to enjoin defendants' misappropriation.

## VI.  JURY REQUEST

158.    Gabriel requests a jury trial on all issues so triable.

## VII.  REQUEST FOR RELIEF

159.     WHEREFORE Gabriel Technologies Corporation and Trace Technologies, LLC respectfully request that the Court:

A.     Enter judgment against Krasner, SnapTrack, and Qualcomm for actual, consequential, and compensatory damages suffered by Gabriel in an amount exceeding $1 billion;

B.     Enter judgment against Krasner, SnapTrack, and Qualcomm for exemplary damages;

C.     Enter judgment correcting ownership and inventorship of the patents and order the USPTO to so correct ownership and inventorship;

D.     Enter declaratory judgment that Gabriel is the owner of certain technology and patents discussed above;

E.     Enter judgment finding infringement by SnapTrack and/or Qualcomm of Gabriel's patents;

F.     Enter preliminary and permanent injunctive relief preventing Krasner, SnapTrack, and Qualcomm from using Gabriel's confidential and proprietary information, technology, and patents;

G.     Award Gabriel attorneys' fees and costs;

H.     Award Gabriel pre-judgment and post-judgment interest at the highest rates allowed by law; and

I.     Grant Gabriel such other and further relief to which it may be entitled at law or equity.

Dated: January 11, 2010                    Respectfully submitted,


                                By: */s/ John van Loben Sels*
                                    John D. van Loben Sels
                                    State Bar No. 201354
                                    **WANG, HARTMANN, GIBBS & CAULEY, P.L.C.**
                                    2750 W. El Camino Real, Suite 440
                                    Mountain View, California 94040
                                    Telephone: (650) 209-1230
                                    Facsimile:  (650) 209-1231


                                    **COUNSEL FOR PLAINTIFFS GABRIEL
                                    TECHNOLOGIES CORPORATION AND
                                    TRACE TECHNOLOGIES, LLC**


### CERTIFICATE OF SERVICE

I hereby certify that on January 11, 2010, a true and correct copy of Plaintiffs' Fourth Amended Complaint was served on Defendants' counsel of record, COOLEY GODWARD KRONISH LLP, 4401 Eastgate Mall, San Diego, California 92121-1909, via the Court's CM/ECF system.


                                    */s/ John van Loben Sels*
                                    John D. van Loben Sels