1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                   **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   GABRIEL TECHNOLOGIES                   CASE NO. 08 CV 1992 MMA (POR)
     CORPORATION and TRACE
12   TECHNOLOGIES, LLC,                     **ORDER GRANTING IN PART
                                            AND DENYING IN PART
13                          Plaintiffs,     DEFENDANTS' MOTION FOR
                                            BOND**
             vs.
14                                          [Doc. No. 81]

15   QUALCOMM INCORPORATED,
     SNAPTRACK, INC., and NORMAN
16   KRASNER,

17                          Defendants.

18         Currently before the Court is Defendants' motion for a bond pursuant to California Code of

19   Civil Procedure section 1030.  [Doc. No. 81.]  Plaintiffs filed an opposition to the motion on

20   August 2, 2010[1] [Doc. No. 90], and Defendants submitted their reply brief on August 23 [Doc. No.

21   105].  On September 7, the Court heard oral argument.  For the reasons set forth below, the Court

22   affirms its tentative decision to **GRANT IN PART** and **DENY IN PART** Defendants' motion for

23   a bond.

24

25   / / /

26   _____

27         [1] Plaintiffs filed their memorandum of points and authorities in support of their opposition to
     Defendants' motion for bond, under seal.  After careful review, the Court concludes the entire
28   document need not be sealed.  Accordingly, the Clerk of Court is **INSTRUCTED** to **UNSEAL**
     Plaintiffs' opposition [Doc. No. 93], *except* for pages 2-5 and 13-15, which contain confidential
     information; these seven pages shall be redacted from the public version and remain under seal.

1

**BACKGROUND**

2        This action arises out of events related to technology licenses and related joint ventures

3   between Plaintiffs and their predecessor in interest, and Defendants, commencing in 1998.

4   Plaintiff Gabriel Technologies Corporation ("Gabriel") is a publicly-traded corporation focused on

5   technologies related to asset tracking and physical security.  [Doc. No. 53, *Fourth Am. Compl.*

6   *("FAC")*, ¶12.]  Gabriel is organized pursuant to the laws of Delaware, with its principal place of

7   business in Omaha, Nebraska.  [*Id*. at ¶5.]  Gabriel and Loc8.net a/k/a Locate Networks, Inc.

8   ("Locate"),[2] a predecessor-in-interest to Gabriel, created Trace Technologies as a joint venture.

9   [*Id*. at ¶¶2, 14.]  Trace is a wholly-owned subsidiary of Gabriel, and is a limited liability company

10  organized under the laws of Nevada.  [*Id*. at ¶6.]

11       In late 1998, the founders of Locate, Richard Crowson and William Clise, started

12  discussing joint development projects with Defendants Norman Krasner and SnapTrack.  [*Id*. at

13  ¶15.]  Locate focused on location determining devices and location-based services; SnapTrack

14  developed broadband network and assisted Global Positioning System ("aGPS") technology.  [*Id*.

15  at ¶¶12, 19.]  On August 20, 1999, SnapTrack and Locate entered into a license agreement ("1999

16  Agreement").  [*Id*. at ¶23.]  The 1999 Agreement set forth the terms under which Locate obtained

17  from SnapTrack a license to use SnapTrack's aGPS software in exchange for paying SnapTrack

18  licensing and royalty fees.  [*Id*. at ¶25.]  The parties also agreed to jointly own "Program

19  Technology," defined as work product carried out by the parties in connection with the 1999

20  Agreement, and identified as Program Technology in the agreement.  [*Id*. at ¶¶23, 28.]  Plaintiffs

21  allege that SnapTrack and Krasner used the relationship created by the 1999 Agreement to obtain

22  millions of dollars from Locate to keep SnapTrack afloat while negotiating a billion dollar buyout

23  of SnapTrack.  [*Id*. at ¶2.]

24       In March 2000, Qualcomm acquired SnapTrack for $1 billion, stating in its press release

25  that "SnapTrack's patents are necessary for the commercial viability of any Wireless Assisted GPS

26  System."  [*Id*. at ¶46.]  Qualcomm is a Delaware corporation, with its principal place of business

27  in California.  [*Id*. ¶7.]

28

_____

[2] Locate is a Washington corporation.  [*Id*. at ¶13.]

In 2004, Locate sold its assets to Trace, transferred its interest in Trace to Gabriel, and went out of business. [*Id*. at ¶14.] Defendants then presented Trace, the successor in interest to Locate's assets, with a proposed amended license agreement. [*Id*. at ¶110.] Defendants claimed that no joint Program Technology existed under the 1999 Agreement. [*Id*. at ¶11.] As such, the proposed amended license agreement deleted the relevant section of the 1999 Agreement which stated that "[a]ll Program Technology was jointly owned by the parties." [*Id*. at ¶112.] On January 16, 2006, Trace and Defendants entered into the amended license agreement ("2006 Agreement" or "Amended and Restated License Agreement"). [*Id*. at ¶123.] Plaintiffs state that at the time, Trace was not aware SnapTrack had misappropriated Locate's intellectual property and technology. [*Id*.] Plaintiffs further assert that Krasner secretly filed and obtained numerous patents based on Locate's technology, which he was able to access when the parties entered into the 1999 Agreement. [*Id*. at ¶111.] Once Qualcomm acquired SnapTrack, Plaintiffs assert that Qualcomm continued filing patents based on Locate's technology. [*Id*. at ¶¶111, 120.] Plaintiffs allege that at least 92 U.S. and foreign patents and patent applications filed by Krasner and Qualcomm should list Locate employees as the sole inventors, or at least joint inventors. [*Id*. at ¶62.]

Over time, as the patents became publicly available, Plaintiffs discovered certain patents that incorporate Locate's pre-existing technology and jointly owned Program Technology. [*Id*. at ¶126.] Plaintiffs approached Qualcomm with these claims in June 2007, and were ignored by Qualcomm's Board of Directors. [*Id*. at ¶128.] Upon continuing investigation, Plaintiffs filed this lawsuit, seeking over $1 billion in damages. [*Id*. at ¶159.]

In the Fourth Amended Complaint, Plaintiffs assert claims for: (1) Breach of the Amended and Restated License Agreement; (2) Correction of Inventorship (pursuant to 35 U.S.C. § 256); (3) Declaratory Judgment of Ownership Interest in the Patents (pursuant to 28 U.S.C. § 2201); and (4) Misappropriation (pursuant to Cal. Uniform Trade Secrets Act). On August 13, 2010, the Court denied Plaintiffs' motion for leave to file a fifth amended complaint, which sought to add a fraudulent concealment claim. [Doc. No. 104.]

/ / /

On July 2, 2010, Defendants filed the pending motion for a cost bond under California Code of Civil Procedure section 1030.  [Doc. No. 81.]  The Court also has authority under Civil Local Rule 65.1.2(a) to require Plaintiffs to post a bond "where authorized by law and for good cause shown."

## <u>LEGAL STANDARD</u>

The Federal Rules of Civil Procedure do not contain a provision governing cost bonds or other means for securing costs.  *See generally* Fed. R. Civ. Proc.; *see also Simulnet East Assocs. v. Ramada Hotel Operating Co*., 37 F.3d 573, 574 (9th Cir. 1994).  "However, the federal district courts have inherent power to require plaintiffs to post security for costs. . . . Typically federal courts, either by rule or by case-to-case determination, follow the forum state's practice with regard to security for costs, as they did prior to the federal rules; this is especially common when a non-resident party is involved."  *Simulnet*, 37 F.3d at 574 (9th Cir. 1994); *see also Plata v. Darbun Enterprises, Inc.*, 2009 U.S. Dist. LEXIS 89608 *33-37 (S.D. Cal.) ("federal courts have inherent authority to require plaintiffs to post security for costs").  Here, the forum state's statute regarding imposition of a cost bond is California Code of Civil Procedure section 1030.  Under section 1030, a defendant may move the court to issue a cost bond against a plaintiff who resides outside of California, or, is a foreign corporation.  The defendant must also demonstrate that there is "a reasonable possibility . . . [it] will obtain judgment in the action . . ."  Cal. Civ. Proc. Code § 1030.  California state courts describe the purpose of section 1030 as a way to assist California defendants to "secure costs in light of the difficulty of enforcing a judgment for costs against a person who is not within the court's jurisdiction."  *Shannon v. Sims Serv. Center*, 164 Cal. App. 3d 907, 913 (1985).

To determine whether imposition of a cost bond is appropriate under section 1030, courts in the Ninth Circuit consider the following factors: "(i) the degree of probability/improbability of success on the merits, and the background and purpose of the suit; (ii) the reasonable extent of the security to be posted, if any, viewed from the defendant's perspective; and (iii) the reasonable extent of the security to be posted, if any, viewed from the nondomiciliary plaintiff's perspective. *Simulnet*, 37 F.3d at 576 (citations omitted).  Courts may also consider the absence of attachable

property within the district, the conduct of the parties, and the plaintiff's ability to post the bond. *Id.* "While it is neither unjust nor unreasonable to expect a suitor 'to put his money where his mouth is,' toll-booths cannot be placed across the courthouse doors in a haphazard fashion." *Id.* (internal citation omitted).

## **DISCUSSION**

Defendants assert a bond is warranted under section 1030 because they have a "reasonable possibility" of defeating each of Plaintiffs' causes of action, and, they are concerned that Plaintiffs will be insolvent by the time judgment is entered, prohibiting Defendants from recouping the fees and costs to which they will be entitled. Defendants describe Gabriel and its wholly-owned subsidiary Trace as "shell companies with no business, no products, and no revenue." [Doc. No. 81 at p.1.] Plaintiffs admit they are no longer operating. [Doc. No. 93, p.21.] Defendants also offer evidence that Plaintiffs have, to this point, financed this litigation by soliciting nearly six million dollars from investors, which is now gone. [*See* Doc. No. 81, p.3 (internal citations omitted).] Defendants further point out they have successfully defeated seven of Plaintiffs' claims on motions to dismiss, and argue that Plaintiffs have yet to produce any facts during discovery to support their remaining causes of action. [*Id.* at p.1.] Accordingly, Defendants seek a cost bond under section 1030 so that they are not forced to spend millions of dollars defending against Plaintiffs' meritless allegations, only to succeed against an insolvent company.

Plaintiffs oppose Defendants' motion on the ground that Gabriel is no longer an out-of-state plaintiff, as it recently relocated its principal place of business to Northern California. [Doc. No. 93, p.8.] In addition, Plaintiffs argue each of their claims is meritorious. [*Id.* at p.9-10.]

## I.    PLAINTIFFS' RESIDENCY OR STATUS AS A FOREIGN CORPORATION

The first requirement under California Code of Civil Procedure section 1030 is that the plaintiff resides out-of-state, or, is a foreign corporation. Cal. Civ. Proc. Code § 1030(a). In the FAC, Plaintiff Gabriel alleges it is a Delaware corporation, with its principal place of business in Omaha, Nebraska. [FAC, ¶5.] Gabriel's formation and residency outside of California satisfies the first requirement of section 1030.

/ / /

1    Plaintiffs assert, however, that Gabriel recently relocated its primary place of business to

2    northern California on July 16, 2010, which takes Gabriel outside the reach of section 1030.  [Doc.

3    No. 93, p.8.]  Defendants argue Plaintiffs' purported relocation is a farce, as it did not take place

4    until after Defendants filed their motion for bond.  In response, Plaintiffs admit they moved

5    Gabriel's office while Defendants' motion was pending, but that Gabriel's board of directors

6    authorized the move in May 2010.  [*Id*.]  Plaintiffs provide minutes from that board of directors

7    meeting, during which Gabriel's board purportedly authorized the company to relocate its primary

8    place of business from Omaha, Nebraska to San Francisco, California.  [*Id*.; Doc. No. 90-6,

9    Affidavit of George Tingo, ¶7; Exhibit 2 (Minutes).]  The applicable portion of the minutes states,

10   "the next order of business was the authorization of the hiring of a contract administrative assistant

11   and leasing of an office space in San Francisco, California at the cost of no more than $2,500 per

12   month each for the administrative assistant and the office."  [Tingo Affidavit, Exhibit 2 at p.2.]

13   The minutes make no reference to relocating Gabriel's primary place of business.

14      In addition, Defendants correctly note that the lease agreement Plaintiffs provide as

15   evidence of the relocation is for a *residential* property.  [Tingo Affidavit, Exhibit 1.]  Indeed, the

16   express terms of the "Residential Tenancy Agreement" state that, "[t]he Premises shall be used as

17   a permanent, full-time dwelling for residential purposes only and for no other reason.  No retail or

18   commercial or professional use of the Premises shall be made unless such use conforms to

19   applicable zoning laws and the prior written consent of Owner is obtained in advance of such

20   proposed use."  [*Id*. at ¶11.]  At the hearing, Plaintiffs admitted they leased a residential unit to

21   house Gabriel's headquarters, but insisted they had obtained consent from the Owner to utilize the

22   space for commercial purposes.  [*Rough Transcript*, p.41]  Plaintiffs, however, did not provide

23   evidence of the alleged consent.  Defendants argue the board minutes and residential lease

24   agreement do not support Plaintiffs' assertion that Gabriel moved its primary place of business to

25   California.  The Court agrees.

26      Plaintiffs have not produced credible evidence that Gabriel relocated its primary place of

27   business to California.  At best, the board minutes suggest Gabriel was authorized to lease space

28   for an additional office to be located in San Francisco, as there is no mention of moving the

- 6 -

1    Omaha office, nor relocating Gabriel's headquarters.  The Court acknowledges that George

2    Tingo's declaration[3] states the board approved the decision to move Gabriel's headquarters to San

3    Francisco in May 2010.  [Tingo Affidavit ¶7.]  Yet, for the reasons discussed above, the minutes

4    themselves contradict this assertion.  In addition, copies of Gabriel's company website obtained on

5    August 18, 2010, indicate Gabriel was still publically representing that its corporate headquarters

6    was located in Omaha, more than one month after the alleged move.

7            Plaintiffs' also assert a bond is improper because Gabriel's presence in California is

8    inconsistent with section 1030's purpose, to protect California residents from being unable to

9    enforce judgments against out-of-state plaintiffs.  The Court disagrees.  Although Mr. Tingo's

10   declaration indicates that "substantially all of [Gabriel's] assets are located in California," he does

11   not identify any assets in the forum.  Thus, Gabriel has no known assets in California, and the

12   purpose of section 1030 remains relevant and weighs in Defendants' favor.  For purposes of the

13   pending motion, the Court concludes Gabriel is an out-of-state plaintiff within the meaning of

14   section 1030, and does not address whether Gabriel is also a foreign corporation.  In addition, the

15   Court notes Gabriel's residency is not dispositive, as it has inherent authority under Local Rule

16   65.1.2 to require Plaintiffs to post a bond if good cause is shown.

17   **II.      LIKELIHOOD OF SUCCESS ON THE MERITS**

18           **(A)      DEFENDANTS' BURDEN**

19           Next, the Court considers whether Defendants have demonstrated a reasonable possibility

20   of success on the merits.  *See* Cal. Civ. Proc. Code § 1030(b).  Plaintiffs argue that to satisfy this

21   burden, Defendants must "substantially refute" each of Plaintiffs' claims.  [Doc. No. 93, p.10.]

22   Plaintiffs are mistaken for two reasons.  First, the plain language of section 1030 states a defendant

23   moving to impose a cost bond must show that it has a "reasonable possibility" of obtaining a

24   judgment in its favor.  Cal. Civ. Proc. Code § 1030(b).  The higher burden proposed by Plaintiffs

25   contradicts the clear language of the statute.  Second, the term "substantially refute" appears only

26

27   _____

28           [3] George Tingo is the Chief Executive Officer and President of Gabriel, and the manager of
     its subsidiary Trace.  [Tingo Affidavit, ¶7.]  Mr. Tingo is Gabriel's sole officer.  [*Id*. at ¶3.]

in a single case cited by Plaintiffs—*A. Farber & Partners, Inc. v. Garber*, 417 F. Supp. 2d 1143, 1148 (C.D. Cal. 2006)—which misquotes an unpublished opinion.

In *Farber*, the court denied the defendants' motion for a cost bond because they "presented absolutely no competent evidence showing a 'reasonable possibility' they will obtain judgment in this action." *Id*. at 1147.  There, the defendants asserted they had a reasonable possibility of defeating plaintiff's claims because they raised an unclean hands affirmative defense in their answer, the plaintiff was unable to obtain a temporary restraining order, and one of the defendants took and passed a polygraph test. *Id*. at 1147.  Such "evidence" was not sufficient.  The court explained, "no reasonable inference regarding the merits of the . . . defendants' case can be drawn from plaintiff's failure to obtain a temporary restraining order on an ex parte basis," plaintiff survived a motion to dismiss which suggests "plaintiff has not acted vexatiously in bringing this litigation," and it is unclear whether a polygraph would be admitted at trial because courts have broad discretion to reject this type of evidence. *Id*. at 1146-48.  In closing, the court held: "For the reasons discussed above, at this early stage of the trial proceedings, the court cannot conclude that defendants have a reasonable possibility of obtaining a judgment on the merits because defendants have not argued or offered evidence to ***substantially*** refute plaintiff's claims." *Id*. at 1148 (internal marks omitted) (emphasis added) (quoting *Ismart Int'l Ltd. v. I-DocSecure, LLC*, 2005 WL 588607 *9 (N.D. Cal.).  In the *Ismart* case, however, the court actually held that, "[a]t this early stage of the trial proceedings, the court cannot conclude . . . defendants have a reasonable possibility of obtaining a judgment on the merits because defendants have not argued or offered evidence to ***substantively*** refute ISM's claims." *Ismart*, 2005 WL 588607 at *9 (emphasis added). Thus, the higher standard Plaintiffs urge this Court to apply is the result of an inadvertent typographical error, not a deliberate decision to increase the burden imposed by California Code of Civil Procedure section 1030.[4]

----

[4] In addition, *Ismart* is factually inapposite, as the defendant brought its motion for bond in connection with a motion to dismiss. *Id*. at *8.  The defendant sought a cost bond on the ground that the plaintiff had not sufficiently pled a valid cause of action; the defendant did not offer evidence  to refute the plaintiff's allegations.  *Id*.  Conversely, here, Defendants do more than argue Plaintiffs' claims are facially deficient; Defendants offer substantial affirmative evidence to rebut each of Plaintiffs' claims.

To satisfy the requirements of section 1030, Defendants must produce sufficient evidence to demonstrate they have a "reasonable possibility" of defeating each of Plaintiffs' claims, but no more.  Cal. Civ. Proc. Code § 1030(b); *Kourtis v. Cameron*, 358 Fed. Appx. 863, 866 (9th Cir. 2009).  The Court agrees with Plaintiffs that this burden requires Defendants to do more than simply raise possible defenses.  However, Defendants have provided affirmative evidence in support of each defense, which for the reasons explained below, is sufficient to demonstrate a reasonable possibility of success on the merits.[5]

**(B)  CORRECTION OF INVENTORSHIP / DECLARATORY JUDGMENT OF OWNERSHIP INTEREST IN THE PATENTS (COUNTS FIVE AND SIX)**

Defendants assert they have a reasonable possibility of prevailing against Plaintiffs' claims to correct the named inventors on approximately 92 patents, because the law presumes the named inventors are correct, and Plaintiffs have offered no evidence to rebut this presumption.  [Doc. No. 81, p.5-7.]  "The Patent Act accords each patent a presumption of validity.  35 U.S.C. § 282.  Under this doctrine, each patent also receives the presumption that its named inventors are the true and only inventors."  *Acromed Corp. v. Sofamor Danek Group*, 253 F.3d 1371 (Fed. Cir. 2001) (citing *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997)).  Therefore, to rebut the presumption, Plaintiffs must present "clear and convincing evidence that the omitted individual actually invented the claimed invention."  *Id.* (citing *Environ. Prods. v. Furon Co.*, 215 F.3d 1261, 1265 (Fed. Cir. 2000)).  To satisfy the clear and convincing standard, Plaintiffs must offer more than the alleged co-inventor's testimony that he or she conceived the technology at issue or otherwise contributed to the patent.  *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1327 (Fed. Cir. 2004).  "Reliable evidence of corroboration preferably comes in the form of records made contemporaneously with the inventive process."  *Id.*

---

[5] Plaintiffs also argue *Plata v. Darbun Enterprises, LLC*, 2009 U.S. Dist. LEXIS 89608 (S.D. Cal.), *Farber*, 417 F. Supp. 2d 1143, and *Ismart*, 2005 WL 588607, require Defendants to demonstrate Plaintiffs' claims are frivolous to warrant imposition of a bond.  Plaintiffs are mistaken.  None of these cases *require* defendants to demonstrate frivolousness as a prerequisite to a cost bond.  Rather, the courts acknowledged frivolousness and vexatiousness as factors that bear on the court's analysis.

Here, Plaintiffs direct the Court to their discovery responses in which they identify multiple inventors whom Defendants allegedly omitted from several patents, including broad summaries of the purported contributions by the omitted inventors.  [*See* Doc. Nos. 97-98, Declaration of Gregory M. Williams, Exhibits 7, 8.]  Plaintiffs also submit a declaration from one of the allegedly omitted inventors, William Clise, who is the co-founder of Locate and was its Chief Technology Officer from 1999 through 2004.  [*See* Doc. No. 94, Declaration of William Clise.]  As Defendants correctly note, however, Mr. Clise's declaration speaks in generalities regarding various purported technological advancements achieved by Locate.  [Doc. No. 81, p.6.]  Mr. Clise does not state he invented any of the inventions contained in the patents at issue, nor does he indicate when or how he contributed to any specific claims in those patents.  [*See* Doc. No. 94.]  As such, in the absence of evidence linking specific Locate technology to particular claims in the patents at issue, the Court finds that Defendants have demonstrated a reasonable possibility of prevailing on the merits. In other words, Plaintiffs have not provided evidence that suggests they will be able to meet their burden at trial by rebutting the presumption that the inventors named on the patents are correct. While Plaintiffs need not actually rebut the presumption at this stage of the case, they do need to provide evidence that contains sufficient detail linking specific inventors to identifiable technologies and claims in the patents, such that it is reasonable to infer Plaintiffs will be able to rebut the presumption at trial.[6]  Plaintiffs' generalized descriptions of Locate technologies, coupled with excerpts from only two of the more than 92 patents Plaintiffs desire to correct is not sufficient.  Because the law imposes a presumption in Defendants' favor, and Plaintiffs have not presented evidence that calls that presumption into question, Defendants have adequately shown they have a reasonable possibility of defeating Plaintiffs' correction of ownership claims.

**(C)   BREACH OF AMENDED AND RESTATED LICENSE AGREEMENT (COUNT TWO)**

Plaintiffs allege Defendant SnapTrack breached the Amended and Restated License Agreement when it: "(1) took ownership of Locate's patents, trade secrets, copyrights, and other

---

[6] The Court further notes that although the parties are in a fairly early stage of discovery, Plaintiffs have been investigating and pursuing their claims against Defendants since at least late 2007; before filing the present action in October 2008, the parties entered a series of tolling agreements that ultimately expired in September 2008.

Intellectual Property Rights; (2) took and destroyed Locate's joint ownership interest in Program Technology; (3) failed to maintain the confidentiality of Locate's trade secrets and other confidential and proprietary information; (4) failed to establish a process for identifying all Program Technology Intellectual Property Rights; (5) failed to establish a process for determining which intellectual property filings to make with respect to such Program Technology; and (6) filed patent applications and patents without listing Locate as an assignee or Locate personnel as inventors."  [FAC, ¶134.]  Defendants argue they have a reasonable possibility of defeating Plaintiffs' breach of contract claim for three reasons: (1) there was no Program Technology so Defendants could not have breached a purported duty to establish a process for determining which intellectual property filings to make with respect to non-existent Program Technology; (2) even if Program Technology existed and Defendants breached their duty to establish such a process, Plaintiffs waived their right to assert a breach when they entered the 2006 Agreement, which reaffirmed the challenged provisions; and (3) because Plaintiffs have not identified evidence that demonstrates they invented or contributed to the Qualcomm patents at issue, they necessarily cannot show that Defendants breached the 2006 Agreement by misappropriating Plaintiffs' confidential and proprietary information.  [Doc. No. 81, p.6-10.]  The Court addresses each of Defendants' arguments in turn.

First, Defendants assert the "[1999] Agreement does not state that Program Technology did, in fact, exist.  Rather, the Agreement expressly provided and anticipated that *if Program Technology items of work existed,* the parties would identify them in Exhibit B."  [*Id.* at p.8 (emphasis in original).]  Consequently, because no Program technology was ever identified in Exhibit B, Defendants had no obligation to establish a process for determining which intellectual property filings to make with respect to Program Technology.[7]  [*Id.*]  Plaintiffs interpret the terms of the 1999 Agreement differently, arguing that the absence of any items specifically identified in Exhibit B as Program Technology is inapposite.  Plaintiffs assert the 1999 Agreement defined

---

[7] Section 8(b) of the 1999 Agreement imposes a duty on the parties, not just Defendants, to "establish a process for identifying all Program Technology Intellectual Property Rights."  [Doc. No. 95.]

1   Program Technology as "work carried out by the parties in connection with this Agreement that

2   are identified as Program Technology in the Project Plan [Exhibit B] . . .[Thus, by] implication, the

3   technology to be developed that is discussed in the Project Plan[,] and not otherwise exempted[,] is

4   Program Technology."  [Doc. No. 93, p.17.]

5          When interpreting a contract, the Court first looks to the plain meaning of the language

6   used.  Cal. Civ. Code § 1638.  Here, the parties specifically define "Program Technology" on page

7   two of the 1999 Agreement as "those items of work carried out by the parties in connection with

8   this Agreement *that are identified as Program Technology* in the Project Plan." [*See* Doc. No. 95,

9   p.2 (emphasis added).]  The Project Plan (Exhibit B), identifies several broad categories or stages

10  of development largely dealing with the parties' respective obligations to test and accept certain

11  technologies.  [*Id*. at p.16-22.]  Nowhere, does the Project Plan identify any "items of work" as

12  "Program Technology."  Thus, applying the plain meaning of the definition created by the parties,

13  if there are no items of work identified as Program Technology in the Project Plan (Exhibit

14  B)—which there are not—there is no Program Technology.  Moreover, Plaintiffs' interpretation is

15  contrary to the definition of Program Technology provided in the agreement—"those items of

16  work carried out by the parties in connection with this Agreement *that are identified as Program*

17  *Technology* in the Project Plan."  [*Id*. at p.2 (emphasis added).]  If Plaintiffs' definition were

18  intended, the words "as Program Technology" would have been unnecessary; the definition,

19  instead, would have read, "those items of work carried out by the parties in connection with this

20  Agreement that are identified in the Project Plan."   Accordingly, Defendants have demonstrated a

21  reasonable possibility of defeating Plaintiffs' breach of contract claims based on Defendants'

22  alleged failure to develop processes with respect to the non-existent Program Technology.

23          Second, Defendants argue Plaintiffs waived any breach of contract claim based on Program

24  Technology when they entered the Restated and Amended License Agreement in 2006.  [Doc. No.

25  81, p.9-10.]  Plaintiffs summarily dismiss Defendants' waiver argument, stating only that it

26  "suffers from all the flaws of Defendants' initial contentions.  It rests on the faulty notion that the

27  parties did not identify any potential Program Technology and ignores both SnapTrack's

28  misrepresentations to Locate with respect to Program Technology and Plaintiffs' claims with

1    respect to Locate's confidential information."  [Doc. No. 93, p.18.]  The Court, however,

2    concludes Defendants' waiver argument has merit.

3         "California courts will find waiver when a . . . party's acts are so inconsistent with an intent

4    to enforce the right as to induce a reasonable belief that such right has been relinquished." *Waller*

5    *v. Truck Ins. Exchange*, 11 Cal. 4th 1, 33-34 (1995).  In 2006, the parties entered the Amended and

6    Restated License Agreement, which explicitly incorporated the Project Plan (Exhibit B) from the

7    1999 Agreement.  [Doc. No. 96, p.4.]  In addition, the 2006 Agreement also explicitly

8    incorporated by reference the provisions of the 1999 Agreement regarding the Program

9    Technology.  [*Id.* at ¶8.]  Plaintiffs retained counsel prior to entering the 2006 Agreement.  [*See,*

10   *e.g.*, FAC, ¶117.]  Plaintiffs knew no Program Technology was identified in the 1999 Agreement,

11   and that the parties had not established a "procedure" for determining the intellectual property

12   rights in any such technology.  [*See id.* at ¶116.]  Indeed, Plaintiffs allege they inquired of

13   Defendants "whether any Program Technology or related intellectual property filings existed."

14   [*Id.*]  Nevertheless, Plaintiffs executed the 2006 Agreement, which reaffirmed the provisions

15   Plaintiffs challenge now.  These actions by Plaintiffs are inconsistent with their alleged belief that

16   Defendants did not meet their obligations with respect to Program Technology.  Defendants have

17   demonstrated a reasonable possibility that Plaintiffs waived any such claim when they entered the

18   2006 Agreement.

19        Third, Defendants argue that to the extent Plaintiffs' breach of contract claim is based on

20   Defendants' failure to include Locate inventors on numerous patents, it must fail because Plaintiffs

21   have not identified evidence linking Locate inventors to the patent claims in any meaningful way.

22   [*Id.* at p.6-7.]  The Court agrees.  As discussed in more detail above, given the absence of evidence

23   demonstrating what specific Locate technology appears in Qualcomm's patents, Defendants have a

24   reasonable possibility of defeating a breach of contract claim based on misappropriation and

25   failure to protect Locate's confidential information.

26        **(D)    MISAPPROPRIATION (COUNT EIGHT)**

27        Plaintiffs allege Defendants utilized and disclosed Locate's confidential and proprietary

28   information, as well as jointly-owned Program Technology, without Locate's knowledge or

1    consent.  [FAC, ¶154.]  Defendants argue they have a reasonable possibility of defeating

2    Plaintiffs' misappropriation claims because they are barred by the applicable three-year statute of

3    limitation.  [Doc. No. 81, p.10-12.]

4          To state a cause of action for misappropriation of trade secrets under the California

5    Uniform Trade Secrets Act ("CUTSA"), Plaintiffs must establish two elements: (1) the existence

6    of a trade secret, and (2) misappropriation of the trade secret.  *AccuImage Diagnostics Corp. v.*

7    *Terarecon, Inc.*, 260 F. Supp. 2d 941, 950 (N.D. Cal. 2003).  Misappropriation occurs if the

8    defendants utilize or disclose the plaintiff's trade secrets without the plaintiff's permission.  *See*

9    Cal. Civ. Code § 3426.1(b).  An action for misappropriation under CUTSA must be brought within

10   three years after the misappropriation is discovered, or by the exercise of reasonable diligence

11   should have been discovered.  *Id.* at § 3426.6.  The statute of limitation is triggered when the

12   plaintiff has reason to "suspect that a type of wrongdoing has injured him."  *Fox v. Ethicon Endo-*

13   *Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005).

14         Plaintiffs' misappropriation claims are based, in large part, on the allegation that

15   Defendants acquired Locate's confidential information and began to use it for their own benefit

16   during the co-development period in 1999 and 2000.  For example, the FAC asserts Defendants

17   misappropriated Locate's technology in March 1999.  [FAC, ¶55.]  In Plaintiffs' fifth amended

18   complaint, which has since been stricken, they elaborated on Defendants' misconduct during this

19   period, alleging that "at various times during the co-development period in 1999 to 2001, William

20   Clise . . . and other Locate employees inquired into the patentability of various innovations

21   conceived, collaborated, or otherwise developed as part of the co-development agreement between

22   Locate and SnapTrack.  In response to Locate's inquiries . . . Locate employees were told that the

23   innovations had already been disclosed in patents owned by SnapTrack."  [Doc. No. 72-2 (Exhibit

24   A), *Fifth Am. Comp.*, ¶160.]  Defendants argue that based on their alleged response to Locate's

25   inquiries regarding the patentability of certain technologies, Plaintiffs had reason to suspect

26   Defendants were misusing Locate's technology and confidential information for their own benefit

27   approximately nine years before Plaintiffs filed this action in late 2008.  [Doc. No. 81, p.11.]

28   Although the parties entered a series of tolling agreements before the complaint was filed, the

1  agreements only tolled the statute of limitation from November 30, 2007 to September 1, 2008; the

2  statute of limitation on Plaintiffs' misappropriation claim had already expired.  [*Id*.]

3       In response, Plaintiffs again summarily dismiss Defendants' statute of limitation argument,

4  asserting only that "[a]s explained previously, this [statute of limitation] argument is untenable,

5  resting entirely on a distortion of Plaintiffs' proposed Fifth Amended Complaint."  [Doc. No. 93,

6  p.18-19.]  Plaintiffs refer the Court to their reply brief submitted in support of their motion for

7  leave to file the fifth amended complaint.  [*Id*. at p.19.]  There, Plaintiffs argue the allegations

8  regarding inquiries by Locate "only state[] that Mr. Clise inquired at various times whether the

9  jointly-owned advancements achieved in the parties' 1999-2001 co-development program were

10  patentable and was informed that those inventions were already embodied in SnapTrack patents

11  obtained prior to working with Locate. . . . [At no time however, did Defendants inform] Mr. Clise

12  that SnapTrack and/or Qualcomm had taken information and filed patent applications regarding

13  the inventions arising from the co-development program without Locate's permission or

14  assistance."  [Doc. No. 89, p.3.]  In essence, Plaintiffs admit they asked Defendants whether

15  certain technology could be patented, and Defendants responded that they already owned and

16  patented the technology themselves.  Mr. Clise's question—whether the jointly-owned

17  advancements created during the co-development period in 1999 and 2001 was

18  patentable—indicates he assumed certain technology was jointly owned.  Thus, when Defendants

19  responded to Mr. Clise's inquiry by stating that the technology at issue had already been disclosed

20  in patents owned by Defendants, Mr. Clise had reason to suspect that Defendants were

21  misappropriating Plaintiffs' technology discussed during the co-development period.  That

22  Defendants did not inform Mr. Clise they were using the technology arising from the co-

23  development efforts without Locate's permission is immaterial.  The statute of limitation is

24  triggered when the plaintiff has reason to suspect wrongdoing.  Based on the current record, it

25  appears Plaintiffs had reason to suspect Defendants were misappropriating Locate's technology

26  during the co-development period in 1999-2001.  Thus, the Court finds that Defendants have a

27  reasonable possibility of defeating Plaintiffs' misappropriation claim.

28  / / /

III.     **REASONABLENESS OF BOND AMOUNT REQUESTED**

Because the Court finds Defendants have satisfied the requirements of California Code of Civil Procedure section 1030 by demonstrating Gabriel is an out-of-state plaintiff and Defendants have a reasonable possibility of defeating Plaintiffs' claims, the Court next considers whether the bond amount proposed by Defendants is reasonable.  Defendants request the Court require Plaintiffs to post a bond in the amount of $2.9 million; $1.9 million for costs and $1 million for attorneys' fees.  [Doc. No. 81, p.12.]  The Court considers the reasonableness of the bond from both the Defendants' and Plaintiffs' perspectives.  *Simulnet*, 37 F.3d at 576.  With respect to costs, Federal Rule of Civil Procedure 54 "creates a presumption in favor of awarding costs to the prevailing party."  *Champion Produce, Inc. v. Ruby Robinson Co.*, 342 F.3d 1016, 1022 (9th Cir. 2003).  The Court may in its discretion, however, deny costs if an award would be "inappropriate or inequitable."  *Id*. (citation omitted).

Defendants argue $2.9 million is reasonable given the scope of this lawsuit in which Plaintiffs attempt to correct ownership on at least 92 patents and seek to recover over $1 billion in damages.  Further, Defendants have already expended over $1 million defending this action, and expect defense costs to exceed $5 million in attorneys' fees alone.  [Doc. No. 81, p.12-13.] Plaintiffs assert Defendants' cost estimate is unreasonable because they include non-taxable costs, they greatly inflated amounts for taxable items, and Defendants will not be entitled to attorneys' fees because Plaintiffs' claims are not vexatious or frivolous.  [Doc. No. 93, p.19-24.]

**(A)     COSTS**

Defendants provide a chart that identifies each cost item they expect to recover if they prevail, pursuant Rule 54 and Civil Local Rule 54.1.  [*See* Doc. No. 81, p.13-15.]  The chart estimates: (1) $10,000 for service of process and subpoenas; (2) $4,000 for reporter's transcripts; (3) $97,180 for an original and one copy of deposition transcripts (34 named witnesses); (4) $960 for witness fees at depositions; (5) $1,600 for witness fees at trial; (6) $28,820 for witness mileage, transportation and per diem expenses; (7) $220,800 for translators and interpreters; (8) $6,448 for costs of patent file wrappers and prior art patents; (9) $10,000 for copies provided to the Court or opposing counsel; (10) $18,000 for copies of exhibits admitted into evidence/attached to motions;

1    (11) $1,500,000 for a third-party consultant to assist with e-discovery requests from Plaintiffs; and

2    (12) $50,000 for costs to prepare demonstratives for use at trial.  With the exception of item 11,

3    each type of cost Defendants identify is taxable under Civil Local Rule 54.1(b).

4           Defendants assert the cost to engage a third-party consultant to review and manage

5    Defendants' electronic documents to respond to Plaintiffs' broad discovery requests is recoverable

6    under *CBT Flint Partners, LLC v. Return Path, Inc.*, 676 F. Supp. 2d 1376, 1381 (N.D. Ga. 2009).

7    In *CBT Flint*, the defendant retained an outside "computer consultant to collect, search, identify

8    and help produce electronic documents from [defendant's] network files and hard drives in

9    response to [plaintiff's] discovery requests."  Over plaintiff's objections, the District Court for the

10   Northern District of Georgia deemed the consultant's fee recoverable, and ordered the clerk to tax

11   costs in the amount $268,311.12 against plaintiff.  In doing so, the court acknowledged "[t]here is

12   a division of opinion as to whether these costs are recoverable," but ultimately concluded "[t]he

13   services are certainly necessary in the electronic age.  The enormous burden and expense of

14   electronic discovery are well known. Taxation of these costs will encourage litigants to exercise

15   restraint in burdening the opposing party with the huge cost of unlimited demands for electronic

16   discovery." *Id*.

17          The Ninth Circuit has not addressed this issue.  However, this circuit has held, that

18   "[n]otwithstanding the district court's discretionary authority under Federal Rule of Civil

19   Procedure Rule 54(d) to refuse to tax costs in favor of a prevailing party, a district court may not

20   rely on its 'equity power' to tax costs beyond those expressly authorized by [28 U.S.C. §] 1920."

21   *Romero v. Pomona*, 883 F.2d 1418, 1428 (9th Cir. 1989) (overruled in part on unrelated grounds)

22   (citing *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (overruled in part on

23   unrelated grounds)).  In applying *Romero* and *Crawford*, the Ninth Circuit has limited recoverable

24   exemplification fees to those "for the physical preparation and duplication of documents, not the

25   intellectual effort involved in their production." *Zuill v. Shanahan*, 80 F.3d 1366, 1371 (9th Cir.

26   1996).  Accordingly, for purposes of Defendants' motion for bond, the Court concludes the $1.5

27   million fee to engage a consultant to assist with e-discovery productions is not recoverable.

28   / / /

1    Next, the Court turns to the reasonableness of the remaining cost items.  Fees for service of

2    process and service of subpoenas are recoverable under Civil Local Rule 54.1(b)(1), whether

3    served by the United States Marshal or other persons authorized by Federal Rule of Civil

4    Procedure 4.  Defendants estimate an expense of $10,000 to serve 26 third-party document

5    subpoenas and 18 third-party deposition subpoenas; approximately $227 per subpoena.  The U.S.

6    Marshals Service charges $55 per hour for personal service of process and subpoenas.  *See* 28

7    C.F.R. § 0.114.  Although the Southern District does not prevent parties from recovering service

8    costs in excess of the rates charged by the U.S. Marshals, at this stage of the litigation where costs

9    are necessarily estimates and are not supported by invoices or other billing documents, the Court

10   concludes that $227 is excessive, and reduces this item to $55 per subpoena.  Accordingly, for

11   purposes of Defendants' bond, $2,420 for service is appropriate.

12    Defendants request $4,000 in costs for reporter's transcripts, including one copy and one

13   original, for matters occurring before, during and after trial.  These transcript costs are recoverable

14   under Civil Local Rule 54.1(b)(2), if approved by the presiding judge *before* the cost is incurred.

15   Here, the parties have not sought approval from the undersigned for any such transcripts.  For

16   purposes of a bond, this cost item is denied in its entirety.

17    Defendants estimate $97,180 in costs to obtain copies of deposition transcripts.  Costs

18   incurred for one original and one copy of deposition transcripts are generally taxable under Civil

19   Local Rule 54.1(b)(3)(a) and (b).  "Depositions need not be introduced in evidence or used at trial

20   to be taxable so long as at the time it was taken it could reasonably be expected that the deposition

21   would be used for trial preparation, rather than mere discovery."  S.D. Civ. L.R. 54.1(b)(a).  This

22   case is in the early stages of discovery, and few, if any, depositions have occurred.  In addition, it

23   is impossible for the Court to estimate the length of each deposition, which bears heavily on the

24   cost of the transcripts.  Thus, it is difficult for the Court to accurately evaluate the reasonableness

25   of this cost item.  Admittedly, if Defendants prevail they will be entitled to significant transcript

26   costs given the nature and scope of this action, but it is unreasonable to assume Defendants will

27   use all 44 witnesses identified by the parties for trial preparation, as opposed to mere discovery.

28   Accordingly, the Court reduces the estimated transcript expenses by approximately fifty percent to

$45,000.  Defendants also seek $960 for deposition witness fees for 24 witnesses at the statutory rate of $40 per day, per witness.  S.D. Civ. L.R. 54.1(b)(3); *see* 28 U.S.C. § 1821.  The Court finds this amount can reasonably be included in the bond.

Defendants also assert they anticipate $1,600 in fees for witnesses' attendance at trial, which are recoverable under Civil Local Rule 54.1(b)(4) and 28 U.S.C. § 1821.  It is unreasonable to assume Defendants will call all 44 witnesses at trial.  Again, reducing this estimated cost by fifty percent is appropriate given the likelihood that Defendants will not call every witness the parties have identified.  Presumably some witnesses will be deemed unnecessary for trial, and others will be called by opposing counsel.  Thus, the Court finds $800 in fees for witnesses at trial is reasonable.  Defendants also request $28,820 in additional costs related to witness expenses including mileage, transportation and per diem costs, which are taxable under Civil Local Rule 54.1(b)(4).  The Court finds these additional costs are too speculative at this stage given the absence of evidence regarding the number of witnesses who will actually testify at trial, where any witnesses are located, or how they expect to travel to the courthouse.  This cost item will not be included in the bond amount.

Defendants next assert they expect to incur $220,800 to have 92 foreign patents translated, at a rate of $0.24 per word, and assuming 10,000 words per patent.  Under Civil Local Rule 54.1(b)(4) "[t]he reasonable fee of a competent translator is taxable if the document translated is necessarily filed, or admitted into evidence."  The FAC identifies 76 foreign patents that allegedly include information and technology misappropriated from Locate.  [FAC, ¶¶63-64.]  Assuming each patent contains approximately 10,000 words, at $0.24 per word, the Court concludes $182,400 is a more reasonable estimate for use in calculating an appropriate bond amount.

Defendants seek $6,448 in costs for patent file wrappers and prior art patents, which are recoverable at the rate charged by the patent office.  S.D. Civ. L.R. 54.1(b)(6)(a)(6). Unfortunately, the Court cannot evaluate the reasonableness of this amount because Defendants have not provided any information regarding the number of patent file wrappers or prior art patents they expect to request, nor the amount charged by the patent office for such items. Accordingly, this speculative item cannot be included for purposes of imposing a bond.

Defendants estimate they will incur approximately $10,000 in copy costs, at a rate of $0.20 per page for copies provided to the Court or opposing counsel "by court order, rule or statute." *See* S.D. Civ. L.R. 54.1(b)(6)(a)(1). Pursuant to the undersigned's chamber rules, parties must provide a courtesy copy of any filings that exceed twenty pages in length to chambers. Defendants also estimate an additional $18,000 for copies "used as court exhibits, either admitted into evidence, or attached to a motion" which are taxable under Civil Local Rule 54.1(b)(6)(a)(1). Given the chambers rule requiring courtesy copies of lengthy filings, the Court finds these two cost items are largely duplicative. In the absence of evidence to the contrary, the Court will consider only the first amount of $10,000 in determining an appropriate bond amount.

Lastly, Defendants request $50,000 for costs associated with preparing charts, diagrams, videos and other visual aids. Civil Local Rule 54.1(b)(7)(a) provides such costs are taxable if they "are reasonably necessary to assist the jury or the court in understanding the issues at trial." The Court finds this estimate reasonable given the complex nature and number of technologies at issue in this action. Accordingly, the Court concludes it may consider $291,580 in anticipated costs when setting an appropriate bond amount.[8]

**(B)   ATTORNEYS' FEES**

Defendants argue a portion of their attorneys' fees should also be incorporated into the bond amount because attorneys' fees are permitted under CUTSA and the Patent Act, where the action is "vexatious, unjustified and brought in bad faith." [Doc. No. 81, p.15.] CUTSA allows a prevailing party to recoverable reasonable attorneys' fees if "a claim of misappropriation is made in bad faith." Cal. Civ. Code § 3426.4. Similarly, under the Patent Act, the Court may award reasonable attorneys' fees to the prevailing party in exceptional circumstances. 35 U.S.C. § 285.

---

[8] Plaintiffs argue the bond amount Defendants request is excessive because it "exceeds many multiples the bonds granted in the cases on which Plaintiffs rely." [Doc. No. 93, p.21.] The cost amounts awarded in other factually distinguishable cases are not an appropriate gauge to determine a reasonable bond in the present action. Taxable costs are necessarily unique to the scope, complexity, duration and nature of an action. *See, e.g., BigFix Asia PTE LTD v. BigFix, Inc.*, 2009 U.S. Dist. LEXIS 50470 (N.D. Cal.) (defendant requested $700,000 cost bond; court issued $200,000 bond). Here, Plaintiffs have placed at least 92 patents at issue, which involve complex technologies. In addition, the acts complained of span more than a decade, and Plaintiffs seek over a $1 billion in damages from Defendants. As such, the costs associated with this litigation can reasonably be expected to be significant.

Whether a case is exceptional is within the trial judge's discretion.  *Kemart Corp. v. Printing Arts Research Laboratories, Inc.*, 269 F.2d 375, 394 (9th Cir. 1959).  Attorney fee awards, however, are the exception in patent cases, not the rule.  "The exercise of discretion in favor of such an allowance should be bottomed upon a finding of unfairness or bad faith in the conduct of the losing party, or some other equitable consideration of similar force, which makes it grossly unjust that the winner of the particular lawsuit be left to bear the burden of his own counsel fees which prevailing litigants normally bear."  *Kemart*, 269 F.2d at 394 (quoting *Park-In-Theatres v. Perkins*, 190 F.2d 137, 421 (9th Cir. 1951)).  "Any wilful act with respect to the matter in litigation which would be condemned and pronounced wrongful by honest and fair-minded men will be sufficient to make the hands of plaintiff unclean" and warrant the imposition of attorneys' fees.  *Thermovac Industries Corp. v. The Virtis Co., Inc.*, 159 U.S.P.Q. (BNA) 349 at *9 (S.D.N.Y. 1968).

Here, Defendants request the Court include $1 million in the bond amount for attorneys' fees they have already incurred to defend against Plaintiffs' allegations.[9]  Defendants argue Plaintiffs' claims objectively lack merit and are improperly being used to extort money from Qualcomm.  Defendants point out that seven of Plaintiffs' causes of action have been dismissed, Plaintiffs have yet to identify any affirmative evidence to support their claims, they recently engaged in a "sham change of residence" to evade the requirements of section 1030, and email correspondence among Gabriel insiders proves Plaintiffs know their claims are frivolous.  In response, Plaintiffs argue that their remaining claims are meritorious, the relocation of their primary place of business to California was not a sham because it was approved by Gabriel's board of directors before Defendants filed their motion for bond, and the email correspondence is inapposite because Defendants quote them out of context.

---

[9] Based on information collected by the American Intellectual Property Law Association, the "average cost through trial of a trade secret misappropriation case where more than $25 million is at stake, is $5,967,000 in San Francisco, and approximately $3,500,000 country-wide."  [Doc. No. 81, p. 13 (citing AIPLA, Report of the Economic Survey (2009), at 32, I-143, Kyle Decl., Exhibit 31) (information for Los Angeles and San Diego not available).] Defendants therefore estimate their attorneys' fees will exceed $5 million to defend this action through trial.  Defendant have already incurred over $1 million.

1    At this stage, the Court does not decide whether this case will ultimately be deemed

2  "exceptional" within the meaning of 35 U.S.C. § 285.  However, Defendants have presented

3  significant, unrebutted evidence that Plaintiffs' lawsuit is likely unmeritorious, and brought in bad

4  faith to salvage Gabriel.  The Court will not go through each individual email correspondence

5  here, but will note that when read as a whole, the Court is convinced they create a logical inference

6  that Gabriel has suffered a long history of corrupt officers and directors who are not above taking

7  illegal and fraudulent actions to guarantee their own personal gain.[10]  Plaintiffs assert the emails

8  are nothing more than disgruntled employees' expressions of frustration with Gabriel's

9  management, and have no bearing on the merits of this case.  The Court disagrees.  Although the

10  emails indicate their authors are upset by how Gabriel has treated them, and alone, they do not

11  conclusively establish this action is without merit, the Court finds that when the emails are

12  considered in connection with Defendants' evidence demonstrating a reasonable possibility of

13  success on the merits, there is a strong likelihood Defendants will ultimately prove this case is

14  exceptional, and attorneys' fees will be warranted at the conclusion of the litigation.  The Court

15  recognizes at this stage of the litigation Plaintiffs do not have all the evidence they need to prove

16  their case.  But the Court is troubled by Plaintiffs' inability to draw any meaningful connection

17  between Locate's technology and the allegedly misappropriated information found in more than 92

18  patents.  The parties began working together approximately a decade ago, Plaintiffs assert they

19  suspected wrongdoing in approximately 2007, and they have been investigating their claims for

20  several years.  By now, Plaintiffs should have more than mere allegations to support their theory.

21  Thus, the $1 million in attorneys' fees Defendants have incurred to date may reasonably be

22  included in the Court's determination of an appropriate bond amount.

23

24    [10] In connection with their bond motion Defendants request the Court take judicial notice of
   a criminal judgment against Nicholas Fegen, a former Gabriel consultant, and a complaint filed  in
25  bankruptcy court against Gabriel's former founder, president and chief operating officer, Keith
   Feilmeier, Exhibits 29 and 30 to the Kyle Declaration, respectively.  The Court **CONFIRMS** its
26  tentative ruling and **GRANTS** Defendants' request for judicial notice.  The Court, however, takes
   judicial notice of the existence of the documents, not the truth of the matters asserted therein. *Ritchey
27  v. Upjohn Drug Co.*, 139 F.3d 1313, 1319 (9th Cir. 1998); *Lee v. City of Los Angeles*, 250 F.3d 668,
   689-90 (9th Cir. 2001) (court may take judicial notice of existence of court opinion, but not "the truth
28  of the facts recited therein.").

08cv1992

**(C)    BOND AMOUNT**

At the beginning of the hearing on September 7, the Court indicated it was tentatively inclined to require a bond in the amount of $100,000 to $150,000.  [*Rough Transcript*, p.4.]  After hearing oral argument, however, the Court stated a more substantial bond was likely appropriate.  [*Id*. at p.48.]  Upon further review and consideration, the Court finds a bond in the amount of $1,291,580 is reasonable.  This amount includes costs of $291,580, which reflects a significant reduction of the costs sought by Defendants.  It also includes $1 million for the attorneys' fees Defendants have already incurred.  The bond amount is further justified in light of the $1 billion in damages Plaintiffs have demanded.

Lastly, the Court considers Plaintiffs' ability to post security.  Plaintiffs' opposition does not address their assets, nor their ability to post a bond of any amount.  At the hearing, the Court questioned Plaintiffs about their financial condition and received little information.  Specifically, Plaintiffs asserted a bond of approximately $100,000 or $150,000 "would be extremely detrimental and maybe kill this case."  [*Rough Transcript*, p.53.]  But Plaintiffs made no attempt to support this statement.

The Court appreciates that Gabriel is admittedly a non-operating company that appears to be financing this litigation by soliciting money from investors.  This fact, however, cuts both ways.  On the one hand, without any ongoing business, Gabriel's income and assets are necessarily limited, and posting a bond will likely be difficult.  On the other hand, Gabriel has waged a significant litigation against Qualcomm, and the purpose of section 1030 is to protect defendants like Qualcomm from being unable to collect judgments against out-of-state plaintiffs like Gabriel.  Gabriel's near insolvency demonstrates the importance of a bond to protect Defendants.  Accordingly, although the Court believes a bond for $1,291,580 is reasonable, it will reduce the bond amount in light of Plaintiffs' financial condition, and require Plaintiffs to post a bond for $800,000.  *See, e.g., Kourtis*, 358 Fed. Appx. 863 (reduced bond amount from $100,000 to $50,000 in light of plaintiffs' financial condition); *Hiraide v. Vast Systems Tech. Corp.*, 2009 U.S. Dist. LEXIS 71383 *38-41 (N.D. Cal.) (reduced requested bond from $150,000 to $50,000 to balance equities of the parties).

1

## CONCLUSION

2        For the reasons set forth above, the Court **GRANTS IN PART** and **DENIES IN PART**

3   Defendants' motion for bond.  Plaintiffs' shall post a bond in the amount of $800,000 within

4   ninety (90) days of entry of this order.  If Plaintiffs are unable to post the required security within

5   this time, their action may be dismissed.

6        **IT IS SO ORDERED.**

7

8   DATED:  September 20, 2010

9

10                                 Hon. Michael M. Anello
                                   United States District Judge
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28