1
2
3
4
5
6
7
8
9
10
11

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

12  GABRIEL TECHNOLOGIES                    )   Civil No. 08CV1992 AJB (MDD)
    CORPORATION and TRACE                   )
13  TECHNOLOGIES, LLC,                      )
                                            )
14                         Plaintiffs,      )   ORDER GRANTING IN PART AND
                                            )   DENYING IN PART PARTIAL MOTION
    v.                                      )   FOR SUMMARY JUDGMENT, [Doc. No.
15                                          )   188], AND GRANTING EX PARTE
    QUALCOMM INCORPORATED,                  )   APPLICATION, [Doc. No. 249], AND
16  SNAPTRACK, INC. and NORMAN              )   GRANTING  REQUEST FOR JUDICIAL
    KRASNER,                                )   NOTICE, [Doc. No. 188-54]
17                                          )
                           Defendants.      )
18  _____)

19        Defendants filed a partial motion for summary judgment, [Doc. No. 188-1], arguing Plaintiffs'

20  Eighth Claim for Misappropriation of Trade Secrets and Second Claim for Breach of Contract set forth

21  in the Fourth Amended Complaint ("FAC"), Doc. No. 53], are barred by the statute of limitations.

22  Plaintiffs' filed an opposition, [Doc. No. 218], and Defendants filed a reply, [Doc. No. 221].  Plaintiffs'

23  subsequently filed an ex parte application for leave to further supplement the record, [Doc. No. 249].

24  The Defendants also filed a request for judicial notice, [Doc. No. 188-54], which was unopposed by

25  Plaintiffs.  The hearing on the summary judgment motion was set for February 24, 2012, however, the

26  Court found this motion appropriate for submission on the papers without oral argument pursuant to

27  Civil Local Rule 7.1.d.1 and vacated the hearing date.  Based upon the parties moving papers and for the

28  reasons set forth below, the Defendants' partial motion for summary judgment, [Doc. No. 188], is

1   GRANTED IN PART and DENIED IN PART; Defendants' request for judicial notice,[1] [Doc. No. 188-

2   54] is GRANTED; and the Plaintiffs ex parte application to further supplement the record, [Doc. No.

3   249], is GRANTED.

4   ### ***Background***

5       This action arises out of events related to technology licenses and joint ventures between

6   Plaintiffs and their predecessor in interest, and Defendants, commencing in 1998. The facts as set forth

7   below are taken from the FAC and parties moving papers. Plaintiff Gabriel Technologies Corporation

8   ("Gabriel") is a publicly-traded corporation focused on technologies related to asset tracking and

9   physical security.  FAC at ¶12.  Gabriel is organized pursuant to the laws of Delaware, with its principal

10  place of business in Omaha, Nebraska.  *Id*. at ¶5.  Gabriel and Loc8.net a/k/a Locate Networks, Inc.

11  ("Locate"),[2] a predecessor-in-interest to Gabriel, created Trace Technologies as a joint venture. *Id*. at

12  ¶¶2, 14.  Trace is a wholly-owned subsidiary of Gabriel, and is a limited liability company organized

13  under the laws of Nevada.  *Id*. at ¶6.

14      In late 1998, the founders of Locate, Richard Crowson and William Clise, started discussing

15  joint development projects with Defendants Norman Krasner and SnapTrack.  *Id*. at ¶15.  Locate

16  focused on location determining devices and location-based services; SnapTrack developed broadband

17  network and assisted Global Positioning System ("aGPS") technology.  *Id*. at ¶¶12, 19.  On August 20,

18  1999, SnapTrack and Locate entered into a license agreement ("1999 Agreement").  FAC at ¶23.  The

19

20          [1] Defendants unopposed request asks the Court to take judicial notice of: (1)  The publication
21  and issue date of all Patents and Patent Applications in dispute, particularly those that were publicly
    available as of fall 2004 and are attached as Exhibits 37 - 50 to the Declaration of Jeffrey S. Karr in
22  support of Defendants' Motion for Summary Judgment ("Karr Declaration"); (2) The complaint that
    Gabriel Technologies Corporation and Trace Technologies, LLC ("Plaintiffs") filed against Locate
23  Networks, Michael Crowson and William Clise on September 13, 2004, which is attached to the Karr
    Declaration as Exhibit 13; (3) Gabriel Technologies Corporation's SEC Form 10-QSB for the period
24  ending December 31, 2004, which is attached to the Karr Declaration as Exhibit 15; (4) Gabriel
    Technologies Corporation's SEC Form 8-K, dated July 1, 2007 (Date of earliest event reported), which
25  is attached to the Karr Declaration as Exhibit 22; and (5) the January 25, 2010 shareholder letter, Exhibit
    99.1 to Gabriel Technologies Corporation's SEC Form 8-K, dated August 21, 2009 (Date of Earliest
26  Event Reported), which is attached to the Karr Declaration as Exhibit 30.  The Plaintiff has not opposed
    Defendants' request or disputed the authenticity of these documents. Accordingly, the Court hereby
27  GRANTS Defendants' request for judicial notice of the documents as they are matters of public record.
    *Intri-Plex Technologies, Inc. v. Crest Group Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007) (quoting *Lee*, 250
    F.3d at 689).

28          [2] Locate is a Washington corporation.  [*Id*. at ¶13.]

1   1999 Agreement set forth the terms under which Locate obtained a license to use SnapTrack's aGPS

2   software in exchange for paying SnapTrack licensing and royalty fees. *Id*. at ¶25.  The parties also

3   agreed to jointly own "Program Technology," defined as work product carried out by the parties in

4   connection with the 1999 Agreement, and identified as Program Technology in the agreement. *Id*. at

5   ¶¶23, 28.  Plaintiffs allege that SnapTrack and Krasner used the relationship created by the 1999

6   Agreement to obtain millions of dollars from Locate to keep SnapTrack afloat while negotiating a

7   billion dollar buyout of SnapTrack.  *Id*. at ¶2.

8          In March 2000, Qualcomm acquired SnapTrack for $1 billion, stating in its press release that

9   "SnapTrack's patents are necessary for the commercial viability of any Wireless Assisted GPS System."

10  *Id*. at ¶46.  Qualcomm is a Delaware corporation, with its principal place of business in California. *Id*. ¶

11  7.

12         In 2004, Locate sold its assets to Trace, transferred its interest in Trace to Gabriel, and went out

13  of business. FAC at ¶14. Defendants then presented Trace, the successor in interest to Locate's assets,

14  with a proposed amended license agreement. *Id*. at ¶110. Defendants claimed that no joint program

15  technology existed under the 1999 agreement. *Id*. at ¶11.  The proposed amended license agreement

16  deleted the Program Technology section of the 1999 agreement which stated that "all Program

17  Technology was jointly owned by the parties." *Id*. at ¶112. On January 16, 2006, Trace and Defendants

18  entered into the amended license agreement ("2006 license agreement").  *Id*. at ¶123.  Plaintiffs state

19  that at the time, Trace was not aware that SnapTrack had misappropriated Locate's intellectual property

20  and technology. *Id*.

21         Plaintiffs allege that during 1999-2006 time period Krasner misappropriated Plaintiffs' trade

22  secrets and other confidential information.  Plaintiffs assert that Krasner secretly filed and obtained

23  numerous patents based on Locate's technology, which he was able to access when the parties entered

24  into the 1999 license agreement.  FAC at  ¶111. Once Qualcomm acquired SnapTrack, Plaintiffs assert

25  that Qualcomm continued filing patents based on Locate's technology.  *Id*. at ¶¶111, 120.  Plaintiffs

26  allege that at least (92) ninety-two U.S. and foreign patents and patent applications filed by Krasner and

27  Qualcomm should list Locate employees as the sole inventors, or at least joint inventors. *Id*. at ¶62.  By

28  filing these patent applications and obtaining these patents, Plaintiffs allege that Defendants obtained

valuable technology without paying for it. *Id*. at ¶66.  According to Plaintiffs, the procurement of these patents allowed SnapTrack and Qualcomm to create barriers of entry to third-party competition in the GPS market. *Id.*  Qualcomm benefits from the patents by licensing them to industry leaders as part of its patent portfolio and business model.  *Id.*

Over time, as the patents became publicly available, Plaintiffs discovered certain patents that incorporate Locate's pre-existing technology and jointly owned program technology.[3] FAC at  ¶126.  Plaintiffs contend that they approached Qualcomm with these claims in June 2007, and were ignored by Qualcomm's Board of Directors. *Id.* at  ¶128.  Upon continuing investigation, Plaintiffs filed this lawsuit, which initially contained eleven (11) causes of action against Defendants, including: (1) breach of the 1999 license agreement; (2) breach of the 2006 license agreement; (3) fraud/fraudulent inducement; (4) tortious interference with contract; (5) correction of inventorship; (6) declaration of ownership; (7) equitable patent infringement; (8) misappropriation of trade secrets pursuant to California's Uniform Trade Secrets Act; (9) conversion; (10) unfair competition pursuant to Cal. Bus. & Prof. Code section 17200; and (11) unjust enrichment.  Plaintiffs seek over $1 billion in damages.

On September 3, 2009, [Doc. No. 35], the Court granted in part and denied in part the Defendants' motion to dismiss, and ordered Plaintiffs to file an amended complaint by September 14, 2009.[4]  On September 14, 2009, Plaintiffs filed a Second Amended Complaint, which contained an amended fraud and fraudulent inducement claim and incorrectly re-alleged claims that had been dismissed with prejudice.  [Doc. No. 36.]  The Court held a telephonic status conference with the parties on October 8, 2009 and granted Plaintiffs leave to file a Third Amended Complaint that did not include

---

[3] Defendants patent filings at issue in this case are: United States Patent No. 6,377,209, issued April 23, 2002; United States Patent No. 6,895,249, application published June 13, 2002; United States Patent No. 7,254,402, application published September 5, 2002; United States Patent No. 6,583,757, application published March 21, 2002; United States Patent No. 6,661,372, issued December 9, 2003; United States Patent No. 6,665,541, issued December 16, 2003; United States Patent No. 6,724,807, issued April 20, 2004; United States Patent No. 6,873,910, application published April 22, 2004; United States Patent No. 7,171,225, application published on May 13, 2004; United States Patent No. 7,319,876, application published on July 15, 2004; United States Patent No. 7,289,786, application published on July 22, 2004; United States Patent No. 6,788,249, issued September 7, 2004; United States Patent No. 6,799,050, issued September 28, 2004; United States Patent No. 6,907,238, application published on October 14, 2004.

[4] In the September 3, 2009 Order, Judge Anello dismissed Plaintiffs' first, fourth, seventh, ninth, tenth and eleventh causes of action with prejudice, and dismissed Plaintiffs' third cause of action without prejudice and with leave to amend.

1  the claims previously dismissed with prejudice.  [Doc. No. 39.]  Plaintiffs filed their Third Amended

2  Complaint on October 9, 2009, which included the amended fraud and fraudulent inducement claims.

3  [Doc. No. 40.]  Defendants again moved to dismiss Plaintiffs' fraud claim.  [Doc. No. 41.] On December

4  14, 2009, the Court granted Defendants' motion and dismissed Plaintiffs' fraud and fraudulent

5  inducement claim with prejudice.  [Doc. No. 48.]  On January 11, 2010, Plaintiffs filed their Fourth

6  Amended Complaint ("FAC"), which did not contain any causes of action for fraud.  [Doc. No. 53.]

7  Defendants answered on January 29, 2010.  [Doc. No. 54.]

8          The FAC, [Doc. No. 53], filed January 11, 2010, sets forth the Plaintiffs' four remaining claims

9  as follows: (1) Breach of the Amended and Restated License Agreement (COUNT TWO); (2)

10  Correction of Inventorship (pursuant to 35 U.S.C. § 256) (COUNT FIVE); (3) Declaratory Judgment of

11  Ownership Interest in the Patents (pursuant to 28 U.S.C. § 2201) (COUNT SIX); and (4)

12  Misappropriation (pursuant to Cal. Uniform Trade Secrets Act) (COUNT EIGHT). On August 13, 2010,

13  the Court denied Plaintiffs' motion for leave to file a fifth amended complaint, which sought to add a

14  fraudulent concealment claim.  [Doc. No. 104.] On September 27, 2011, Defendants filed a partial

15  motion for summary judgment, [Doc. No. 188], with regard to the Plaintiffs' claims for misappropriation

16  of trade secrets and breach of contract arguing these claims are barred by the statute of limitations.

17                                      ***Legal Standard***

18          Summary judgment is appropriate where the record, when read in the light most favorable to the

19  nonmoving party, demonstrates that "there is no genuine issue as to any material fact and . . . the movant

20  is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Pursuant to Rule 56(c), the movant

21  bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. *Celotex*

22  *Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party satisfies this burden, the non-moving

23  party must set forth, by affidavit or as otherwise provided by Rule 56, "specific facts showing that there

24  is a genuine issue for trial." Fed. R. Civ. P. 56(e); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors*

25  *Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). All reasonable inferences that can be drawn from the evidence

26  "must be drawn in favor of the non-movant," *John v. City of El Monte*, 515 F.3d 936, 941 (9th Cir.

27  2008), but only admissible evidence is considered. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th

28  Cir. 2002).

08cv1992

1

### *Discussion*

2      Defendants seek partial summary judgment on Plaintiffs' Eighth Claim for Misappropriation of

3  Trade Secrets and Second Claim for Breach of Contract on the grounds that both claims are barred by

4  the statute of limitations.

5  ***I.     Plaintiffs' Eighth Claim for Misappropriation of Trade Secrets***

6      In the FAC, Plaintiffs claim Defendants misappropriated Locate's confidential and proprietary

7  information as well as Program Technology by (1) acquiring the information by improper means and (2)

8  disclosing or using the information without Locate's consent. *See* FAC at ¶152. For the purposes of this

9  claim, Plaintiffs define their trade secrets and other proprietary confidential information as including

10  Program Technology, enabling technology that was incorporated into patent filings by defendants, and

11  Locate's experience and expertise in the field of narrowband, including solutions to problems in the

12  telecommunication industry. *Id. at* ¶154.

13      Defendants seek partial summary judgment on Plaintiffs' Eighth Claim for Misappropriation of

14  Trade Secrets on the grounds that this claim is barred by the statute of limitations. Under the California

15  Uniform Trade Secret Act ("CUTSA"), "[a]n action for misappropriation must be brought within three

16  years after the misappropriation is discovered or by the exercise of reasonable diligence should have

17  been discovered." Cal. Civ. Code § 3426.6.  Under California's discovery rule, suspicion of wrongdoing

18  will trigger the statute of limitations.[5]  Consequently, "[w]hen there is reason to suspect that a trade

19  secret has been misappropriated, and a reasonable investigation would produce facts sufficient to

20  confirm this suspicion (and justify bringing suit), the limitations period begins, even though the plaintiff

21  has not conducted such an investigation."[6]  Indeed, the law is clear that "once the plaintiff has a

22  suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on

23

24  ─────────────────

25      [5] *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005) ("a plaintiff has reason to
   discover a cause of action when he or she has reason at least to suspect a factual basis for its elements");
26  *see also Cypress Semiconductor Corp. v. Super. Ct.*, 163 Cal. App. 4th 575, 586 (2008)(applying *Fox* to
   § 3426.6: "the misappropriation that triggers the running of the statute is that which the plaintiff
27  suspects, not that which mayor may not actually exist").

28      [6] *Alamar Biosciences, Inc. v. Difco Laboratories, Inc.*, 40 U.S.P.Q.2d 1437, 1440 (E.D. Cal.
   1995); *accord Memory Corp. v. Kentucky Oil Tech., NY.*, 2007 WL 2746736, at *7 (N.D. Cal. Sept. 20,
   2007).

08cv1992

her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1111 (1988).

Plaintiffs' trade secrets claim is based on the disclosure by Locate of its allegedly proprietary technology to SnapTrack when both parties were working on developing Locate's product pursuant to the 1999 Agreement. (FAC, ¶¶53-108.) Under the California Trade Secret Act, "a continuing misappropriation constitutes a single claim." Cal. Civ. Code § 3426.6; *see also Forcier v. Microsoft Corp.*, 123 F. Supp. 2d 520, 527-8 (N.D. Cal. 2000) (interpreting this provision to mean that the statute of limitations for the misappropriation of all trade secrets shared with a defendant in connection with the same relationship and concerning the same matter begins to run as soon as plaintiff suspect the misappropriation of only one of the trade secrets). Here, all of Plaintiffs' purported trade secrets were allegedly shared in the same time period and in connection with the same relationship. As a result, suspicion of the first act of alleged misappropriation triggered the statute of limitations for Plaintiffs' entire claim, even as to later acts of misappropriation.

Since it is undisputed that the alleged misappropriation of trade secrets took place outside the limitations period, Plaintiffs "have the burden of proving the facts necessary to toll the statute." *Alamar Biosciences, Inc.*, 40 U.S.P.Q.2d at 1440. To delay the start of the statute of limitations period, plaintiffs must "show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." *Fox*, 35 Cal. 4th at 808. Defendants contend that Plaintiffs are unable to make such a showing. *See, e.g., Alamar Biosciences, Inc.*, 40 U.S.P.Q.2d at 1441 (where plaintiff suspected misappropriation but decided to take no further action, it could not show that it took "the steps a reasonably diligent plaintiff would take in investigating its claims"); *see also Memory Corp.*, 2007 WL 2746736, at *11.

The Defendants argue that Plaintiffs' misappropriation of trade secrets claim, is barred by the statute of limitations, because there are two separate undisputed examples demonstrating that Plaintiffs suspected that their trade secret had been misappropriated more than three years before filing suit. Plaintiffs filed this lawsuit on October 24, 2008. Taking into account the parties' tolling agreements, the

misappropriation claim is time barred if Plaintiffs suspected wrongdoing on or before December 17, 2004.[7]

Defendants argue that the evidence shows that on two separate instances, one in January of 2003 and the other in summer to fall time frame of 2004, the Plaintiffs suspected Qualcomm and SnapTrack of misappropriating trade secrets, both before December 17, 2004. The First instance cited by Defendants occurred in January 2003, when Locate's Chief Technology Officer "CTO", William Clise, concluded that SnapTrack had committed a "direct rip-off" of Locate's trade secret. The second instance relied upon by Defendants occurred when Plaintiffs' Chief Financial Officer "CFO", Maurice Shanley, became suspicious that Qualcomm was attempting to take intellectual property belonging to Locate when it proposed in the Summer of 2004 to delete the "proprietary rights" paragraph from the 1999 License Agreement.

### A.    The January 23, 2003 E-mail

On January 23, 2003, Locate's Co-Founder and Chief Technology Officer ("CTO"), William Clise, sent an e-mail to another Locate engineer, Phil DeCarlo, discussing a SnapTrack presentation.[8]  In that e-mail, Clise said "[b]y the way did you notice 'Broadcast Mode' for GSM a direct rip-off of our work with Glenayre."  Clise subsequently testified that he did nothing to investigate his suspicion because he "didn't think it was important." (Karr Dec., Ex. 35, 8/26/11 Clise Tr. at 35:8-37:25.)  In Clise's sworn deposition testimony, Clise was asked specifically whether, in January 2003, he thought Defendants had "rip[ped] off" the trade secret from Locate. Clise responded "[y]eah, I did." (Karr Decl., Ex. 35, 8/26/11 Clise Dep. 36:7-16.) Clise then admitted, in direct contradiction to his sworn affidavit

---

[7] The date is calculated as follows: Three years before Plaintiffs filed suit on October 24, 2008 is October 24,2005. Under the tolling agreements, the statute of limitations was tolled from November 30, 2007 through October 16, 2008 for a period of 311 days. Three hundred and eleven days prior to October 24, 2005 is December 17, 2004.

[8] SnapTrack made the presentation that described SnapTrack's wireless assisted GPS technology for GSM and GSM Evolution available on the internet. (Karr Decl., Ex. 5,9/23/03 email from Clise re Broadcast Mode for GSM.)  The presentation described "two location transaction modes": "broadcast mode" and "point-to-point mode." *Id*. In describing "broadcast mode," the presentation indicates that the "handset listens to broadcast messages to . . . [a]cquire one or more GPS SVs [satellites in view]." *Id*. In other words, this presentation discloses the broadcasting of data that assists a handset in acquiring one or more satellites in view (i.e. acquisition assistance data).

1  submitted in support of Plaintiffs opposition, that he did nothing to follow up on that suspicion. (Karr

2  Decl., Ex. 35, 8/26/11 Clise Dep. 37:9-13.) When asked why, he said:

3          A: I don't know. I'm a bad businessman. What's the answer? I don't know. I
           didn't think it was important. We were—our focus was trying to get our product
4          to market and build a service. I just—this was not something that was in our radar
           right then.

5

6  (Karr Decl., Ex. 35, 8/26/11 Clise Dep. 37:14-20.) Clise's sworn testimony at deposition, unfiltered by

7  the lawyers representing Plaintiffs, demonstrates that Clise suspected Defendants of misappropriation of

8  a Locate trade secret in January 2003 and did absolutely nothing to investigate that suspicion.

9          Plaintiffs opposition to Defendants motion argues that presentation referenced by Clise in the

10 email does not disclose the broadcasting of acquisition assistance ("AA") data. To support this

11 argument, the Plaintiffs submitted the affidavits of Phil DeCarlo,[9] William Clise,[10] and Allan Angus.[11]

12 Defendants argue that these witnesses do not testify as to their state of mind in January 2003, but rather

13 they testify as to what they believe the presentation shows today.  Defendants also argue that these

14 affidavits directly contradict the testimony and declaration of Dr. Anant Sahai, which Plaintiffs'

15 submitted in January 2011 in support of their fifth trade secret designation.[12]  Defendants argue that Dr.

16

---

17      [9] The Plaintiffs submitted the affidavit of Phil DeCarlo, who was the engineer recipient of Clise's
18 January 23, 2003 email. Defendants argue that the testimony from Mr. DeCarlo that Locate did not
   operate "under the assumption or belief that SnapTrack had taken a trade secret is inadmissible.
19 (DeCarlo Aff. ¶ 3).  Defendants argue that DeCarlo, who does not even recall if he responded to the
   e-mail, is speculating, lacks personal knowledge to testify as to Clise's state of mind, and directly
20 contradicts Clise's sworn deposition testimony. (Karr Decl., Ex. 35, 8/26/11 Clise Dep. 36:7-16).  The
   Court agrees finding Mr. DeCarlo's affidavit speculative, unsupported and contradictory to Clise's
21 sworn deposition testimony.

22      [10] The Plaintiffs submitted an affidavit from Clise in response to Defendants motion in which
   Clise states that he has recently reviewed the SnapTrack presentation and now concludes that his initial
23 impression was incorrect. The Defendants argue that the Court should disregard statements in Clise's
   affidavit about his impression of the presentation almost nine years later because they directly contradict
24 his sworn deposition testimony.

25      [11] The Plaintiffs submitted the declaration of Allan Angus, who began working for Gabriel in or
   about June of 2004 as a technical consultant assigned to Trace. Angus states that he became Chief
26 Technology Officer in February 2005.

27      [12] See Sahai Decl. Doc. No. 128-17 (stating that "acquisition assistance data" is the "actual
   information transmitted over the terrestrial wireless network to the aGPS receiver" and can include any
28 number of things, including "differential GPS corrections."  He fursther states that "the Locate Project
   team chose to add reference time" to the base of AA data that SnapTrack normally transmitted. See
   Decl. at ¶ 65.

1   Sahai's statements generally defining AA data directly contradict Plaintiffs arguments and affidavits that

2   the presentation does not disclose the broadcasting of AA data, because the presentation discloses the

3   broadcast of some AA data such as reference time and differential GPS corrections.  The Court finds

4   Plaintiffs arguments that the presentation was not relevant unpersuasive in light of the Plaintiffs repeated

5   assertions that their trade secret is the general concept, not the specific implementation.

6          The Court finds the Plaintiffs' arguments that Locate's failure to do anything to investigate its

7   suspicion in 2003 is excused because, nine years later and facing summary judgment, DeCarlo, Clise,

8   and Angus contend that Clise's suspicion set forth in the January 23, 2003 email was mistaken. (*See*

9   Opp. at 18-21.)  The Plaintiffs contention that if Clise had undertaken an investigation in 2003, that

10  investigation would likely have entailed simply re-reading the presentation, and Clise might have

11  concluded that he was mistaken at the time, thus negating the need to investigate further. The Court

12  finds these arguments unsupported and unpersuasive and directly contradicted by Clise's own deposition

13  testimony.

14         Furthermore, the cases that Plaintiffs cite to support their arguments are easily distinguishable,

15  because in each of these cases the  plaintiff conducted an investigation and either the information

16  necessary to discover the claim was not available or, in one case, a second expert informed the plaintiff

17  that no wrongdoing had occurred. *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal.4th 797, 814-15, 110 P.3d

18  914 (Cal. 2005); *Intermedics, Inc. v. Ventritex, Inc.*, 804 F. Supp. 35 (N.D. Cal. 1992); *Kitzig v.*

19  *Nordquist*, 97 Cal. Rptr. 2d 762 (Cal. Ct. App. 2000).  The Court finds the instant case most closely

20  resembles that of *Alamar Biosciences, Inc.*, where the court held that the plaintiff "failed to take the

21  steps a reasonably diligent plaintiff would take in investigating its claims," and that its "failure either to

22  proceed against [alleged misappropriator] based on the information known to it or to undertake readily

23  available means of confirming [the] use of [its technology] was so unreasonable that summary judgment

24  is appropriate." *Alamar Biosciences, Inc. v. Difco Labs., Inc.*, 40 U.S.P.Q.2d 1437, 1440 (E.D. Cal.

25  1995). The court in *Alamar* found "no question" that plaintiff was suspicious that its former employee

26  and his new employer had misappropriated its trade secrets. The fact not known to plaintiff (what

27  specific technology was being used) was "readily available to the public" in the form of a published

28  PCT patent application. *Id.* at 1441.  As in *Alamar*, Clise was well aware, through various presentations

1   and marketing materials, that SnapTrack was filing multiple patent applications[13] covering aGPS

2   technology. (Defs.' Mem. ISO Partial Summary Judgment at 5-7.) Some of the applications and issued

3   patents that allegedly contained Locate's trade secrets were publicly available in January 2003.[14]

4        Based upon the January 2003 email and Clise's sworn deposition testimony, the Court finds that

5   Defendants have established that Clise had a suspicion of wrong doing which triggered the statute of

6   limitations. As Such, the Court finds that Defendants have satisfied their burden of demonstrating an

7   absence of a genuine issue of material fact, thereby shifting the burden to Plaintiffs to demonstrate, by

8   affidavit or otherwise, specific facts showing that there is a genuine issue of fact for trial.[15]   The Court

9   finds that Plaintiffs have failed to meet their burden. The Court finds the affidavits of DeCarlo and

10  Angus to be speculative, unsupported and contradictory to the email, Clise's sworn deposition testimony

11  regarding the email, and Plaintiffs' previously submitted declaration of Dr. Sahai. The Court finds that

12  the affidavit submitted by Clise directly and inexplicably contradicts his prior sworn deposition

13  testimony warranting its exclusion under the sham affidavit rule.[16]   The Court also notes that it appears

14  that both Angus and Clise have a contingent interest in the outcome of this litigation,[17] which in

15  combination with the unsupported and contradictory nature of their testimony as employees and/or

16  officers of Plaintiffs, further undermines the credibility of these affidavits.   Based upon the foregoing,

17

18        [13] Seven of the patents at issue in this litigation were available for Gabriel's review and
19  investigation by September of 2004. Seven of the remaining patents at issue in this litigation resulted
    from applications that were also published before the end of 2004. Four of patent(s)/application(s) were
20  issued or published before January of 2003.

21        [14] *See, e.g.*, Karr Decl., Exs. 37-40: U.S. Patent No. 6,377,209, filed March 21, 2000 and issued
    April 23, 2002; U.S. Patent No. 6,895,249, application published June 13, 2002; U.S. Patent No.
22  7,254,402, application published September 5, 2002; U.S. Patent No. 6,583,757,  application published
    March 21, 2002.

23        [15] Fed. R. Civ. P. 56(e); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626,
24  630 (9th Cir. 1987).

25        [16] *See Kennedy v. Allied Mutual Ins. Co.*, 952 F.2d 262, 266-267 (1991)(district court may
    dispose of case on summary judgment if it makes a factual determination that contradictory evidence in
26  affidavit is a sham); *Schuyler v. United States*, 987 F. Supp. 835, 840 (S.D. Cal. 1997) ("[A] party
    opposing summary judgment cannot create a genuine issue of fact by contradicting or repudiating his
27  own sworn deposition testimony"); *Martinez v. Marin Sanitary Serv.*, 349 F. Supp. 2d 1234, 1242 (N.D.
    Cal. 2004).

28        [17] Allan Angus, Plaintiffs CTO, claims to have a 3.125% interest and Maurice Shanley,
    Plaintiffs' CFO, claims to have a 4.6875% interest in the outcome of this case.

08cv1992

1  the Court finds that Defendants have demonstrated that there is no genuine issue of material fact that

2  Plaintiffs had a suspicion of wrongdoing in January of 2003, which was more than three years before

3  they filed the claim, thereby making this claim barred by the statute of limitations.[18]

4       **B.    Renegotiations of the License Agreement in June of 2004**

5       The Defendants contend that Plaintiffs' CFO, Maurice Shanley, became suspicious that

6  Qualcomm was attempting to take intellectual property belonging to Locate when it proposed in the

7  Summer of 2004 to delete the "proprietary rights" paragraph from the 1999 License Agreement.

8  Defendants contend that other Gabriel employees also openly questioned "what" Qualcomm was "after

9  with the inventions paragraph" and suggested that Gabriel obtain advice from counsel. (Karr Dec., Ex.

10  12, 7/9/04 e-mail from Mike May re proposed amendment.)

11       In September 2004, Shanley met with Gabriel's original lead trial counsel in this case, William

12  Munck. (Karr Dec., Ex. 27, 12/1/09 e-mail to J. Hall re Status Report.) At the time, Shanley thought it

13  was important to meet with a patent attorney who was familiar with wireless and GPS technology and an

14  attorney who had litigated against Qualcomm. (*Id.*; Karr Dec., Ex. 33, 6/2/11 Shanley Tr. at 89:10-90:7.)

15  In an e-mail sent by Shanley to Munck on October 27, 2008, three days after this lawsuit was filed,

16  Shanley admitted that the purpose of the September 2004 meeting with Munck was "to determine if

17  there was any merit to Trace's claim against QCOM." (Karr Dec., Ex. 26, 10/27/08 e-mail to Munck re

18  Mshanley offer to help.)  When asked what he meant by "Trace's claim against QCOM," Shanley

19  confirmed during his deposition that he was referring to the claims asserted in this litigation. (Karr Dec.,

20  Ex. 33, 6/2/11 Shanley Tr. at 103:2-104:6.)

21       Shanley also testified during his deposition that Qualcomm's insistence in mid-2004 that

22  he agree to delete the "proprietary rights" paragraph from the original license agreement made

23  him suspicious that Qualcomm may have taken Locate technology:

24
25       Q: So what led you to believe that there may be some merit to Trace's claim
         against Qualcomm that you wanted to discuss with Mr. Munck?

26

27  [18] *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005) ("a plaintiff has reason to discover a cause of action when he or she has reason at least to suspect a factual basis for its elements"); *see also Cypress Semiconductor Corp. v. Super. Ct.*, 163 Cal. App. 4th 575, 586 (2008)(applying *Fox* to

28  § 3426.6: "the misappropriation that triggers the running of the statute is that which the plaintiff suspects, not that which mayor may not actually exist").

> A: Mr. Fries' insistence that I sign the revised agreement that I didn't want to change. I was totally comfortable leaving that license in place and – and launching Trace's business and he wouldn't leave it alone. . . .
> Q: And that made you suspicious that Qualcomm may have taken some of the intellectual property that Locate or Gabriel had created?
> A: I decided that based on the insistence of Mr. Fries, the attempts to get money out of me under maintenance agreements, penalties and interest . . . here's this big behemoth, seeming to go out of our way – their way to keep me from executing a business plan.
> Q: And that made you suspicious of –
> A: Yes.
> Q: – Qualcomm's actions?

(Karr Decl., Ex. 33, 6/2/11 Shanley Dep. 151:12-153:1.) Shanley also testified that as a result of "Fries' aggressive position," he decided to "do a little search on Qualcomm" and allegedly:

> found a site that indicated . . . that the third largest IP fraud settlement at the time was Qualcomm's acquisition of SnapTrack for a billion dollars . . . and I thought, well there's a track record there, and decided that maybe we should hire a – an attorney.

(Karr Decl., Ex. 33, 6/2/11 Shanley Dep. 16:17-17:14.)

Defendants argue that Shanley's testimony[19] and corroborating documentary evidence establishes that Plaintiffs actually considered its potential claims against Qualcomm well before December 17, 2004.  Defendants also point to additional corroborative evidence. For example, months before the October 27, 2008 e-mail, Shanley sent another email to Munck. In that January 7, 2008 e-mail, which is titled "another year gone by," Shanley complains about the lack of progress on the "QC matter" and the toll it is taking on the investors in the lawsuit:

> Bill: Its been a year now since I have left Gabriel and Trace, and no conclusion to the QC matter. Its been nearly 3 1/2 years since you started on this scavenger hunt, with no results.

(Karr Dec., Ex. 25, 1/7/08 e-mail to Munck re Another year gone by.) Another example is a set of Trace items for discussion that Shanley circulated on November 30, 2004, a few months after his first meeting with Munck in September 2004. Listed among the topics for discussion is: "Co-Ownership of Technology Trace vs SnapTrack." (Karr Dec., Ex. 14, 11/30/04 Trace Technologies Status Memo.)

---

[19] During his deposition, when asked whether Mr. Munck had conducted a review of the patents between September 2004 and December 2004 and prepared and provided a summary of SnapTrack patent extensions to support Trace's interest at the January 24, 2005 meeting, Shanley testified "Yes". *See* Depo at 162:3-13.  Shanley also testified that at the time he conveyed the January 5, 2005 letter to Qualcomm he had a factual basis for believing that Qualcomm had misappropriated Locate technology. *Id.* at 164:23-165:2. When specifically asked by Plaintiffs' counsel during his deposition if he were told "that the date [for the patent review] was in 2005 instead of 2004, would that alter your testimony with respect to whether you had a reason to believe" Shanley flatly replied no. *Id.*  at 166:5-9.

1    Defendants argue that Plaintiffs would not have met with lead trial counsel and "started on this

2    scavenger hunt" or discussed "co-ownership of technology" in terms of "Trace vs SnapTrack" if they did

3    not suspect any alleged wrongdoing by Qualcomm.

4          In response these arguments, Plaintiffs refer to the affidavits of Maurice Shanley and Allan

5    Angus. In Shanley's affidavit Plaintiffs attempt to explain Shanley's prior deposition testimony by

6    saying that it was just a typical business suspicion and nothing more. Given the unsupported and

7    contradictory nature of Shanley's affidavit and his contingent interest in the outcome of this litigation,

8    the Court finds his affidavit appropriate for exclusion pursuant to the sham affidavit rule.[20]

9          In Angus' affidavit, he repeatedly tries to interpret certain documents relied upon by

10   Defendants.[21] Angus also attempts to contradict Shanley's sworn deposition testimony, but lacks the

11   personal knowledge to do so.[22]  The Court finds that Angus lacks personal knowledge to testify as to

12   what these documents mean or what inferences the Court should draw from them and the questionable

13   nature of his affidavit is further compounded by the contradictory nature of his testimony and the

14

15

16

17

18         [20] *See Kennedy v. Allied Mutual Ins. Co.*, 952 F.2d 262, 266-267 (1991)(district court may
     dispose of case on summary judgment if it makes a factual determination that contradictory evidence in
19   affidavit is a sham); *Schuyler v. United States*, 987 F. Supp. 835, 840 (S.D. Cal. 1997) ("[A] party
     opposing summary judgment cannot create a genuine issue of fact by contradicting or repudiating his
20   own sworn deposition testimony"); *Martinez v. Marin Sanitary Serv.*, 349 F. Supp. 2d 1234, 1242 (N.D.
     Cal. 2004).
21
           [21] Angus Aff. ¶ 18 (testifying as to what Shanley meant in an e-mail to Munck); ¶ 20 ("This
22   e-mail does not indicate to me any suspicion of misappropriation or wrongdoing."); ¶ 21 ("[Exhibit 14]
     had nothing to do with suspicion of misappropriation."); ¶ 23 ("I do not know what Mr. Shanley meant
23   by this statement . . . To the extent this email implies otherwise, Mr. Shanley's recollection was
     mistaken."); ¶ 25 ("While I cannot know exactly what Mr. Hall meant by his statement, I understand it
24   to be an expression of frustration at not having received the supporting documentation from Mr.
     Munck.").) For documents Angus is referencing, *see* Karr Decl., Ex. 5, 1/23/03 email from Clise to
25   DeCarlo; Ex. 12, 7/9/04 email from May to Shanley and Feilmeier; Ex. 14, 11/30/04 email from Shanley
     to Feilmeier and May; Ex. 26, 10/27/08 email from Shanley to Munck; Ex. 29, 1/5/10 emails between
26   Hall and Shanley.)

27         [22] Angus states that the purpose of Shanley's meeting with Munck in September 2004 was not to
28   discuss potential claims against Defendants. (Angus Aff. ¶¶ 23, 24.) But Shanley testified that he did not
     believe that Angus attended that meeting, and Angus does not state in his declaration that he did. (Supp.
     Karr Decl., Ex. 4, 6/2/11 Shanley Dep. 106:1-4; Angus Aff. ¶ 8.)

08cv1992

1    contingent interest he holds in the outcome of this litigation.  As such, the Court finds Angus' affidavit

2    warrants exclusion pursuant to the sham affidavit rule.[23]

3          Based upon the foregoing, the Court finds Defendants have demonstrated that there is no dispute

4    of material fact that Plaintiffs became suspicious of misappropriation by Qualcomm well before

5    December 17, 2004.  As such, the Defendants motion for summary judgment on Plaintiffs Eighth Cause

6    of Action for misappropriation of trade secrets is GRANTED because the claim is barred by the statute

7    of limitations.

8    ***II.    Plaintiffs Second Claim for Breach of Contract***

9          Plaintiffs breach of contract claim alleges that SnapTrack breached the Amended and Restated

10    License Agreement when it, among other things, (1) took ownership of Locate's patents, trade secrets,

11    copyrights, and other Intellectual Property Rights; (2) took and destroyed Locate's joint ownership

12    interest in Program Technology; (3) failed to maintain the confidentiality of Locate's trade secrets and

13    other confidential and proprietary information; (4) failed to establish a process for identifying all

14    Program Technology Intellectual Property Rights; (5) failed to establish a process for

15    determining which intellectual property filings to make with respect to such Program Technology; and

16    (6) filed patent applications and patents without listing Locate as an assignee or Locate personnel as

17    inventors.[24] Plaintiffs also contend that SnapTrack breached the Amended and Restated License

18    Agreement in secret by, among other things, not disclosing its patent filings relating to both Locate's

19    technology and Program Technology. The Plaintiffs contend that the harm flowing from SnapTrack's

20    breaches was not reasonably discovered by Gabriel until a future time.

21          The Defendants move for summary judgment on the Plaintiffs' Second Claim for Breach of

22    Contract on two independent grounds, first that the claim is barred by the statute of limitations and

23    second that the Plaintiffs did not meet their contractual obligations and therefore cannot bring suit.

24

25        [23] *See Kennedy v. Allied Mutual Ins. Co.*, 952 F.2d 262, 266-267 (1991)(district court may

26    dispose of case on summary judgment if it makes a factual determination that contradictory evidence in affidavit is a sham); *Schuyler v. United States*, 987 F. Supp. 835, 840 (S.D. Cal. 1997) ("[A] party

27    opposing summary judgment cannot create a genuine issue of fact by contradicting or repudiating his own sworn deposition testimony"); *Martinez v. Marin Sanitary Serv.*, 349 F. Supp. 2d 1234, 1242 (N.D.

28    Cal. 2004).

       [24] *See* FAC ¶ 134-135.

### A.     The Breach of Contract Claim is Barred By the Statute of Limitations

The Defendants argue that the Plaintiffs second cause of action for breach of contract is barred by the statute of limitations. California's statute of limitations for a written contract is four years. Cal. Civ. Code § 337. Generally, a cause of action for breach of contract "accrues at the time of the breach" and the statute begins to run "regardless of whether any damage is apparent or whether the injured party is aware of their right to sue." *Perez-Encinas v. Amerus Life Ins. Co.*, 468 F. Supp. 2d 1127, 1134 (N.D. Cal. 2006).

The more lenient "discovery rule" is applied in select cases where (1) "[t]he injury or the act causing the injury, or both, have been difficult for the plaintiff to detect"; (2) "the defendant has been in a far superior position to comprehend the act and the injury"; and (3) "the defendant had reason to believe the plaintiff remained ignorant he had been wronged."  *Id.* at 1134. Under the "discovery rule," a breach of contract claim accrues when the plaintiff "discovers or could have discovered, through the exercise of reasonable diligence, all of the facts essential to his cause of action." *Id.* Defendants argue that the discovery rule should not apply in this case, but even if it does, Defendants contend that Plaintiffs' breach of contract claim is time-barred. Taking into account the parties series of tolling agreements, Defendants argue that the breach of contract claim is untimely if Plaintiffs suspected or had reason to suspect the alleged breach on or before December 17, 2003.[25]

Plaintiffs claim that Qualcomm and SnapTrack breached the contract by failing to protect their proprietary rights.[26] As set forth above, Clise suspected in January 2003 that SnapTrack technology was "a direct rip-off" of Locate's work but "didn't think it was important" at a time when Locate's "focus was trying to get our product to market and build a service."[27] Defendants argue that as a party to the 1999 Agreement, Locate was certainly aware of the contents of that contract, including the provisions

---

[25] The date is calculated as follows: Four years before Plaintiffs filed suit on October 24, 2008 is October 24, 2004. Under the tolling agreements, the statute of limitations was tolled for a period of 311 days (from November 30, 2007 through October 16, 2008). Three hundred and eleven days prior to October 24, 2004 is December 17, 2003.

[26] Plaintiffs base their breach of contract claim, in part, on Defendants' alleged failure to preserve Plaintiffs' ownership in their solely owned trade secrets. *See* FAC, Doc. No. 53, ¶ 134.

[27] *See* Karr Dec., Ex. 5, 9/23/03 e-mail from Clise re Broadcast Mode for GSM; Ex. 35, 8/26/11 Clise Tr. at 35:8-37:25.

1  concerning Program Technology that Qualcomm is now accused of breaching. (Karr Dec., Ex. 1, 1999

2  Agreement at ¶¶ 1, 8.) Defendants argue that the undisputed evidence shows that Plaintiffs, through

3  their predecessors-in-interest, had reason to suspect and investigate the alleged claim for breach of

4  contract as early as January 2003, well before December 17, 2003, thereby rendering the Plaintiffs'

5  breach of contract barred by the statute of limitations.[28]

6          Plaintiffs' argue that the supposition in the Clise e-mail was incorrect and could not lead to a

7  determination of misappropriation and therefore also cannot be the predicate to trigger the limitations

8  period for their breach of contract claim.  However, the Court has already rejected Plaintiffs' attempt to

9  re-evaluate the presentation discussed by Clise is his 2003 email as a mistake and the Court finds the

10  *Leaf v. City of San Mateo* case relied upon by the Plaintiff to be distinguishable because, as set forth

11  above, Plaintiffs suspected Defendants of misappropriation. 163 Cal. Rptr. 711, 716 (Ct. App. 1980);

12  *Perez-Encinas v. AmerUs Life Ins. Co.*, 468 F. Supp. 2d 1127, 1134-35 (N.D. Cal. 2006).

13          The Court notes that Plaintiffs' breach of contract claim sets forth six separate grounds for

14  breach.  The 2003 Clise e-mail is only directly relevant to the third ground cited by Plaintiffs, namely

15  that Defendants failed to maintain the confidentiality of Locate's trade secrets and other confidential and

16  proprietary information.  Since Defendants have clearly established that Plaintiffs were aware of this

17  breach in January of 2003, well before December 17, 2003, the Court finds that Defendants are entitled

18  to summary judgment pursuant to their statute of limitations argument on the first ground with respect to

19  Plaintiffs trade secrets only and the third ground only. Defendants have not demonstrated that the statute

20  of limitations would be triggered on the remaining intellectual property set forth in ground one or

21  grounds two, and four through six,[29] and as such, Defendants motion for summary judgment as to these

22  claims based on the statute of limitations is DENIED.

23

24

25

26  [28] *See, e.g., Alamar Biosciences, Inc.*, 40 U.S.P.Q.2d at 1442 (claims for misappropriation and breach of contract were time barred "in light of [plaintiffs'] inactivity in the face of strong evidence of [defendant's] use of what [plaintiff] now claims were its trade secrets").

27

28  [29] Specifically with regard to Plaintiffs intellectual property rights other than trade secrets in ground one and ground six, Defendants demonstrated that Plaintiffs weren't aware of Defendants patents filings until September to December of 2004.

### B.   Plaintiffs Did Not Meet Their Contractual Obligations

Defendants argue that Plaintiffs have failed to demonstrate that they fully performed their contractual obligations in opposing this motion.[30]  Defendants contend that Plaintiffs' full performance is an essential element of their breach of contract claim,[31] because in bilateral contracts such as the 2006 Amendment, California law construes each party's obligation as dependent upon the performance of the other party such that if one party fails to perform, the other party's duty to perform is discharged. *See, e.g., Rubin v. Fuchs*, 1 Cal. 3d 50, 54 (1969) (noting that "whenever possible the courts will construe promises in a bilateral contract as mutually dependent and concurrent" and that "neither party can place the other in default unless he is fully able to perform or make a tender of the promised performance"). Consequently, to sue for breach of contract a plaintiff must "prove that he was able and offered to fulfill all obligations imposed upon him by the contract." *Kane v. Sklar*, 122 Cal. App. 2d 480, 482 (1954). Defendants contend that the Plaintiffs cannot meet this requirement because Plaintiffs' failed to: (1) identify and protect program language; and (2) pay royalties.

### 1.   Plaintiffs Failed to Identify and Protect Program Technology

Defendants argue that Plaintiffs cannot claim breach of contract based on Qualcomm's alleged failure to establish processes to identify and protect Program Technology for two reasons. First, no Program Technology exists by the clear terms of the agreements. Second, Plaintiffs concede that they also failed to meet their own contractual obligations with regard to the identification and protection of Program Technology.

The parties defined Program Technology as "those items of work carried out by the parties in connection with this Agreement that are identified as Program Technology in the Project Plan."[32] (Karr

---

[30] *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) ("When the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the non-movant fails to 'make a showing sufficient to establish the existence of an element essential to [its] case.'").

[31] *Kane v. Sklar*, 122 Cal. App. 2d 480, 482 (Cal. Ct. App. 1954).

[32] The intent that Program Technology be "identified as Program Technology in the Project Plan" is evidenced by the negotiating history of that definition. In an earlier draft of the proposed contract ("7/13/99 Draft Agreement"), "Program Technology" is defined as "work carried out by the parties in connection with this Agreement and described in more detail in the Project Plan." (Karr Dec., Ex. 2, 7/13/99 Draft Agreement at ¶ 1 (emphasis added».) The final agreement, however, expressly requires that "Program Technology" be "identified as Program Technology in the Project Plan." (Karr Dec., Ex.

1  Dec., Ex. 1, 1999 Agreement at ¶ 1; Ex. 19, 2006 Amendment at ¶ 8(a) (incorporating by reference

2  Program Technology provisions of 1999 Agreement).) The Project Plan "means the project plan, set

3  forth in Exhibit B hereto . . . " (Karr Dec., Ex. 1, 1999 Agreement at ¶1 and Exhibit B.) The agreements

4  do not state that Program Technology exists. Rather, the agreements expressly provide and anticipate

5  that if Program Technology comes into existence, the parties have a joint obligation to identify it in

6  Exhibit B.[33]

7       Defendants argue that Plaintiff's failed to comply with section 8 of the licensing agreement by

8  failing to identify Program Technology or establish a process to protect Program Technology, which

9  were joint obligations of the parties.[34] The Plaintiffs argue that Locate did comply with the obligation to

10  identify Program Technology. (Opp. at 23.) Specifically, Plaintiffs argue that because the Project Plan

11  expressly states what is not Program Technology, all other work in the Plan "by implication" is Program

12  Technology. (Opp. at 23.) The Court finds this argument unpersuasive as it directly contradicts the

13  express language of the License Agreement, which requires that Program Technology be "identified as

14  Program Technology in the Project Plan." (*See* Karr Decl., Ex. 1, 1999 Agreement at ¶ 1.)

15       Plaintiffs also contend that their breach of the Program Technology provision does not bar a

16  claim for breach of the confidentiality provision of the recital that states that each party shall retain

17  ownership of their solely owned intellectual property rights. (Opp. at 23.) Defendants argue that the

18

19

20

---

21  1, 1999 Agreement at ¶ 1.) After comparing the Draft Agreement with the 1999 Agreement during his
   deposition, signatory Crowson was asked whether he agreed to the change requiring that "Program

22  Technology" be "identified as Program Technology in the Project Plan." Crowson testified: "By my
   signature I guess I would have agreed, yes." (Karr Dec., Ex. 34, 8/25/11 Crowson Tr. at 52:23-54:21.)

23  Crowson also testified that based on the definition of "Program Technology" in the 1999 Agreement, it
   "seems to make sense" that Program Technology would be identified in the Project Plan. (Id. at

24  44:5-10.) As executed copies of both agreements show, Program Technology is not identified in the
   Project

25  Plan. (Karr Dec., Ex. 1, 1999 Agreement at ¶ 1, Exhibit B; Ex. 19, 2006 Amendment at ¶ 8(a).)

26       [33] Section 8 of the agreement requires the parties to "establish a process for identifying Program
   Technology Intellectual Property Rights" and to "establish a process for determining which intellectual

27  property filings to make with respect to such Program Technology." (FAC ¶¶ 29, 124; Karr Dec., Ex. 1,
   1999 Agreement at ¶ 8(b); Karr Dec., Ex. 19, 2006 Amendment at ¶ 8(a).)

28       [34] *See* Karr Decl., Ex. 1, 1999 Agreement at ¶ 8(b).

1  argument fails, however, because Plaintiffs have not provided any evidence establishing that the parties

2  intended the various obligations in sections 8 and 9 of the License Agreement to be divisible.[35]

3        Defendants argue that the Plaintiffs cannot recover based on non-existent Program Technology,

4  and a mutually dependent contractual obligation that it never fulfilled, or even offered to fulfill. *See*

5  *Kane*, 122 Cal. App. 2d at 482. The Court has already held as much. In its order on Qualcomm's motion

6  for bond, the Court held: "Section 8(b) of the 1999 Agreement imposes a duty on the parties, not just

7  Qualcomm, to 'establish a process for identifying all Program Technology Intellectual Property Rights.

8  '" [Doc. No. 110, Bond Order at p. 11, fn. 7.] The Court went on to hold that because the 1999

9  Agreement never identified any Program Technology, Qualcomm could not be liable for breach of

10  contract for failing to protect such Program Technology:

11        The Project Plan (Exhibit B), identifies several broad categories or stages of
       development largely dealing with the parties' respective obligations to test and
12        accept certain technologies . . . . Nowhere, does the Project Plan identify any "items
       of work" as "Program Technology." Thus, applying the plain meaning of the
13        definition created by the parties, if there are no items of work identified as
       Program Technology in the Project Plan (Exhibit B)-which there are not-there
14        is no Program Technology.

15  [Doc. No. 110, at p. 12.]

16        Based upon the foregoing, the Court finds that the Plaintiffs failure to identify program

17  Technology is fatal to their breach of contract claim for grounds two, four and five, which all rely on

18  Program Technology having been defined.  As such, Defendants motion for summary judgment on

19  grounds two, four and five is GRANTED.

20        **2.**     **Plaintiffs Failed To Pay Royalties On Devices That Were Sold**

21        The Defendants also contend that Plaintiffs made material misrepresentation and breached the

22  2006 License Agreement by failing to pay royalties on devices that were sold. The 2006 License

23  Agreement requires Plaintiffs to pay royalties to Qualcomm. (Karr Dec., Ex. 19, 2006 Amendment, Ex.

24  F at ¶ 3.) The Defendants argue that the evidence demonstrates that Plaintiffs breached the 2006

25  Amendment by rigging monthly reports that Trace was required to provide in an effort to avoid

26

27      [35] *See Filet Menu, Inc. v. C.C.L. & G. Inc.*, 79 Cal. App. 4th 852, 860-61 (Cal. Ct. App.
2000)(holding that a divisible contract is "one in which two or more separate partial performances on
28  each side are agreed to be exchanged for partial performances on the other side" and the "failure to
perform one part does not bar recovery for performance of another.").

1   conditions precedent that would have triggered its obligation to pay Qualcomm royalties. (Karr Dec.,

2   Ex. 19, 2006 Amendment at ¶ 5(f); Ex. F at ¶ 3.)  Defendants contend that Shanley testified to that

3   effect:

4

5               We finally got to the point where we had our service installed in Nevada at the-at
                the nuclear test center there. [Qualcomm] kept beating me up to pay royalties, and I

6               said-and I did not have the money to complete a backup network operating center so I
                refused to declare that Gabriel-or that Trace was in commercial business.

7   (Karr Dec., Ex. 33, 6/2/11 Shanley Tr. at 125:15-21.)  As Trace CTO Allan Angus testified during his

8   deposition, Trace had indeed actually gone commercial by selling hundreds of its Onyx devices to the

9   United States Department of Energy in the summer of 2006. (Karr Dec., Ex. 36, 9/8/11 Angus Tr. at

10  15:25-16:13.)

11          Defendants argue that a series of November 2006 emails between Trace management

12  corroborates the conclusion that can be drawn from Shanley's and Angus' testimony, namely that Trace

13  misrepresented that it was "non-commercial" in order to avoid its obligation to pay royalties under the

14  2006 Amendment. (Karr Dec., Ex. 20, 11/16/06 internal Trace e-mails re SnapTrack Report ("We need

15  to look at the report and pare it down to devices, actually in test, including the ones with Nevada. If they

16  are all activated on USA Mobility, used on a daily basis, so as to make our claim of non-commercial

17  weaker, we are looking at making - royalty payments").) Moreover, as a June 29, 2007 e-mail from

18  Angus shows, Gabriel's Directors knew that Trace was "close to a breach of its license agreement with

19  SnapTrack, having failed to pay royalty fees owed on operational devices." (Karr Dec., Ex. 21, 6/29/07

20  e-mail from Angus to Gabriel Directors re Next steps, if any.) Defendants claims that to date,

21  Qualcomm has not received the royalties that Trace was obligated to pay under the 2006 Agreement

22  once the commercial sales of its devices began. (Dec. of Daniel Albosta, ¶¶ 1-6.)

23          In response to Defendants arguments, Plaintiffs claim that no royalties were due, because they

24  only sold test devices, not commercial devices, and had no "subscribers." (Angus Aff. ¶ 27.) However,

25  Angus testified unambiguously that Plaintiffs sold devices "commercially" in 2006. (Karr Celc., Ex. 36,

26  9/8/11 Angus Dep. 15:9-16:15.)  However, as set forth above, the Court finds the Angus affidavit's

27  unsupported and contradictory nature warrants exclusion pursuant to sham affidavit rule.

28

1    Plaintiffs also argue that if any royalties are due, which Plaintiffs dispute, the amount due would

2 be $450.30 which would be *de minimus*. However, Defendants contend that because Plaintiffs made

3 material misrepresentations to avoid paying royalties,[36] whether the amount owed is *de minimus* or not is

4 irrelevant. *See Posner v. Grunwald-Marx, Inc.*, 56 Cal. 2d 169, 187 (1961).  Based upon the foregoing,

5 the Court finds that a genuine dispute of material fact remains regarding Plaintiffs payment of royalties

6 under the 2006 License Agreement.  The court finds that Defendants have failed to demonstrate that the

7 Plaintiffs failure to pay these royalties amounts to a material breach that would precluded any claim for

8 breach by the Plaintiff and as such, Defendants' summary judgment arguments in this regard are

9 DENIED.

10            ***Conclusion***

11    For the reasons set forth above, the Defendants' partial motion for summary judgment, [Doc. No.

12 188], is GRANTED IN PART as to:

13    (1) Plaintiffs' Eighth Claim for Misappropriation of Trade Secrets;

14    (2) Plaintiffs' Second Claim for Breach of Contract on Ground One as to Trade Secrets only and

15 grounds Two, Three, Four and Five;

16 and DENIED IN PART as to:

17    (1) Plaintiffs' Second Claim for Breach of Contract on the remaining intellectual property claims

18 in Ground One and Ground Six.

19    Defendants' request for judicial notice, [Doc. No. 188-54], is GRANTED and the Plaintiffs ex

20 parte application to further supplement the record, [Doc. No. 249], is GRANTED.

21    IT IS SO ORDERED.

22

23 DATED:  March 13, 2012

24          _____

25          Hon. Anthony J. Battaglia
           U.S. District Judge

26

27    [36] Defendants cite to posts by Shanley on the Gabriel Yahoo message board as confirmation of
Plaintiffs intent to mislead Qualcomm: "No other royalty payments were due under the terms of the

28 agreement until Trace declared themselves delivering 'Commercial Service'. I went to great pains to
make sure that never happened." (Supp. Karr Decl., Ex. 8; Ex. 4, Shanley Dep. 136:6-137:2 (confirming
he posts under the "MoeShanley" username).)