1  LATHAM & WATKINS LLP
       Colleen C. Smith (Bar No. 231216)
2      colleen.smith@lw.com
   600 West Broadway, Suite 1800
3  San Diego, California 92101-3375
   Telephone:  (213) 485-1234
4  Facsimile:  (858) 891-8763

5  LATHAM & WATKINS LLP
       Alan E. Kraus (*pro hac vice*)
6      alan.kraus@lw.com
       Elizabeth R. Marks (*pro hac vice*)
7      betsy.marks@lw.com
8  885 Third Avenue
   New York, New York 10022-4834
9  Telephone:  (212) 906-1200
   Facsimile:  (212) 751-4864
10
   Attorneys for Hughes, Hubbard & Reed LLP
11

12              UNITED STATES DISTRICT COURT

13           SOUTHERN DISTRICT OF CALIFORNIA

14                  SAN DIEGO DIVISION

15

16  GABRIEL TECHNOLOGIES
    CORPORATION and TRACE              CASE NO. 08-cv-1992 AJB MDD
17  TECHNOLOGIES, LLC,

18                Plaintiffs,          **HUGHES HUBBARD'S OPPOSITION
                                       TO DEFENDANTS' MOTION FOR
19       v.                            ATTORNEYS' FEES**

20  QUALCOMM INCORPORATED,
    SNAPTRACK, INC. and NORMAN         Hearing:
21  KRASNER,                           Date:   January 17, 2013
                                       Time:   2:00 PM, Courtroom 12
22                Defendants.          Judge:  Hon. Anthony J. Battaglia

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN DIEGO

CASE NO. 08-CV-1992 AJB MDD
HUGHES HUBBARD'S OPPOSITION TO
DEFENDANTS' MOTION FOR ATTORNEYS' FEES

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................... 1

ARGUMENT ............................................................................................................. 3

I.   DEFENDANTS HAVE NO STATUTORY OR COMMON LAW BASIS FOR
     SANCTIONING PLAINTIFFS' COUNSEL ......................................................... 3

     A.   There Is No Authority for Sanctioning Attorneys Under Either  35
          U.S.C. § 285 or Cal. Civ. Code § 3426.4............................................... 3

     B.   Legal Standards Under 35 U.S.C. § 285 and Cal. Civ. Code
          § 3426.4............................................................................................... 4

     C.   Legal Standard Under the Court's Inherent Authority to Sanction
          Attorneys.............................................................................................. 5

II.  HUGHES HUBBARD'S SUBJECTIVE GOOD FAITH CANNOT FAIRLY BE
     QUESTIONED................................................................................................ 6

     A.   Defendants' "Corrupt-Officers-and-Directors"-Assisted-by-a-
          "Convicted-Felon" Argument Is Irrelevant to Hughes Hubbard. ......... 7

     B.   Defendants Have Mischaracterized Emails Between Ex-Employees................... 7

     C.   Hughes Hubbard's Good Faith Is Beyond Question............................... 8

          1.   Hughes Hubbard's Due Diligence ............................................... 8

          2.   Plaintiffs Had A Credible Story ................................................... 8

          3.   Plaintiffs' Claims Were Corroborated by Four Experts ........................ 12

          4.   Posting the $800,000 Bond Confirmed Plaintiffs' Belief in
               Their Case .............................................................................. 13

          5.   The North Water Investment Furthers the Good Faith of the
               Case ......................................................................................... 13

III. DEFENDANTS' EXAMPLES OF "LITIGATION MISCONDUCT" ARE  ILL-
     FOUNDED .................................................................................................... 14

     A.   The Filing of the Fifth Amended Complaint ........................................ 14

     B.   Gabriel's Relocation to California Was Not a Deception....................... 15

     C.   The Angus Contingent Interest Is a False Issue................................... 16

     D.   The Sham Affidavit Rule Was Applied Very Broadly Here ................... 17

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SAN DIEGO

i

CASE NO. 08-CV-1992 AJB MDD
HUGHES HUBBARD'S OPPOSITION TO
DEFENDANTS' MOTION FOR ATTORNEYS' FEES

E.    Plaintiffs' Trade Secret Designations Were Served in Good Faith ................... 19

F.    Milgrim's *Amicus Curiae* Brief Was Submitted in Good Faith. ........................ 20

G.    Supplementation of Interrogatory Responses Shows Good, not Bad, Faith. ................................................................................................ 21

H.    Hughes Hubbard Appropriately Narrowed the Case in Good Faith ................. 23

IV.    THE MOTION ALSO MUST BE DENIED ON PROCEDURAL GROUNDS ........... 23

A.    Defendants Do Not Specify Which Fees Are Attributable to Hughes Hubbard ........................................................................................ 23

B.    Cooley's Billing Records Are Too Vague to Determine Reasonableness ...................................................................................... 24

CONCLUSION ........................................................................................... 25

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN DIEGO

ii

CASE NO. 08-CV-1992 AJB MDD
HUGHES HUBBARD'S OPPOSITION TO
DEFENDANTS' MOTION FOR ATTORNEYS' FEES

# <u>TABLE OF AUTHORITIES</u>

Page(s)

## CASES

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,
　421 U.S. 240 (1975).................................................................................................... 3

*Amsted Indus. v. Buckeye Steel Castings Co.*,
　23 F.3d 374 (Fed. Cir. 1994).................................................................................... 5, 6

*Anderson v. Nextel Retail Stores, LLC*,
　2010 U.S. Dist. LEXIS 71598 (C.D. Cal. June 30, 2010) ...................................... 25

*Atl. Recording Corp. v. Anderson*,
　2008 U.S. Dist. LEXIS 121070 (D. Or. June 24, 2008) ......................................... 25

*Beckman Instruments, Inc. v. LKB Produkter AB*,
　892 F.2d 1547 (Fed. Cir. 1989)............................................................................... 24

*Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*,
　393 F.3d 1378 (Fed. Cir. 2005) ................................................................................. 5

*Chalmers v. Los Angeles*,
　796 F.2d 1205 (9th Cir. 1986), *amended*, 808 F.2d 1373 (9th Cir. 1987)............. 25

*Chambers v. NASCO, Inc.*,
　501 U.S. 32 (1991) ..................................................................................................... 5

*Computer Prepared Accounts v. Katz*,
　235 Cal. App. 3d 428 (1991) .................................................................................. 3, 4

*Doyle v. Superior Court*,
　226 Cal. App. 3d 1355 (1991) ................................................................................... 4

*Ethicon, Inc. v. United States Surgical Corp.*,
　135 F.3d 1456 (Fed. Cir. 1998)............................................................................... 22

*Fink v. Gomez*,
　239 F.3d 989 (9th Cir. 2001) ..................................................................................... 6

*Forest Labs., Inc. v. Abbott Labs.*,
　339 F.3d 1324 (Fed. Cir. 2003).................................................................................. 4

*Frances Kenny Family Trust v. World Sav. Bank FSB*,
　2005 U.S. Dist. LEXIS 2403 (N.D. Cal. Jan. 19, 2005) ........................................ 14

*Galen v. County of Los Angeles*,
　477 F.3d 652 (9th Cir. 2007) ..................................................................................... 9

*Gomez v. Vernon*,
255 F.3d 1118 (9th Cir. 2001) ....................................................................... 14

*Hess v. Ramona Unified Sch. Dist.*,
2008 U.S. Dist. LEXIS 102743 (S.D. Cal. Dec. 19, 2008) ............................ 25

*Hyde v. Midland Credit Mgmt., Inc.*,
567 F.3d 1137 (9th Cir. 2009) ......................................................................... 4

*Idaho Watersheds Project v. Jones*,
253 Fed. Appx. 684 (9th Cir. 2007) ............................................................... 13

*In re Keegan Mgmt. Co. Secs. Litig.*,
78 F.3d 431 (9th Cir. 1996) ..................................................................... 6, 15

*Jewels Connection v. Czar Jewelry/Oro Direct*,
2011 Cal. App. Unpub. LEXIS 971 (Feb. 8, 2011) ......................................... 3

*Jordan v. Multnomah County*,
815 F.2d 1258 (9th Cir. 1987) ................................................................. 24, 25

*Karam v. City of Burbank*,
352 F.3d 1188 (9th Cir. 2003) ......................................................................... 9

*Kennedy v. Allied Mut. Ins. Co.*,
952 F.2d 262 (9th Cir. 1991) ......................................................................... 17

*Mach. Corp. of Am. v. Gullfiber Ab*,
774 F.2d 467 (Fed. Cir. 1985) ......................................................................... 3

*Maxwell v. Angel-Etts of Cal., Inc.*,
2001 U.S. Dist. LEXIS 25419 (C.D. Cal. Dec. 10, 2001), *reversed on other
grounds*, 53 Fed. Appx. 561 (2002) ............................................................... 25

*Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GMBH*,
603 F.3d 943 (Fed. Cir. 2010) ................................................................. 6, 13

*Messick v. Horizon Indus.*,
62 F.3d 1227 (9th Cir. 1995) ......................................................................... 17

*Monolith Portland Midwest Co. v. Kaiser Aluminum & Chem. Corp.*,
407 F.2d 288 (9th Cir. 1969) ........................................................................... 3

*Nat'l Presto Indus. v. West Bend Co.*,
76 F.3d 1185 (Fed. Cir. 1996) ......................................................................... 5

*Nat'l Warranty Ins. Co. v. Greenfield*,
2001 U.S. Dist. LEXIS 7763 (D. Or. Feb. 8, 2001) ...................................... 25

*Nelson v. City of Davis*,
571 F.3d 924 (9th Cir. 2009) ......................................................................... 18

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN DIEGO

iv

CASE NO. 08-CV-1992 AJB MDD
HUGHES HUBBARD'S OPPOSITION TO
DEFENDANTS' MOTION FOR ATTORNEYS' FEES

*Operating Eng'rs Pension Trust v. A-C Corp.*,
   859 F.2d 1336 (9th Cir. 1988) ................................................................. 14

*Pacific Harbor Capital, Inc. v. Carnival Air Lines, Inc.*,
   210 F.3d 1112 (9th Cir. 2000) ................................................................. 5

*Painton & Co. v. Bourns, Inc.*,
   442 F.2d 216 (2d Cir. 1971) .................................................................... 20

*People v. McKenzie*,
   34 Cal. 3d 616 (1983) .............................................................................. 14

*Pfingston v. Ronan Eng'g Co.*,
   284 F.3d 999 (9th Cir. 2002) ................................................................... 4

*Pixion, Inc. v. Placeware, Inc.*,
   2005 U.S. Dist. LEXIS 41652 (N.D. Cal. Apr. 26, 2005) ..................... 5

*Primus Auto. Fin. Servs. v. Batarse*,
   115 F.3d 650 (9th Cir. 1997) ................................................................... 24

*Qualcomm, Inc. v. Broadcom Corp.*,
   2010 U.S. Dist. LEXIS 33889 (S. D. Cal. April 2, 2010) ...................... 6

*Rucklehaus v. Monsanto Co.*,
   467 U.S. 986 (1984) ................................................................................. 20

*Sealy, Inc. v. Easy Living, Inc.*,
   743 F.2d 1378 (9th Cir. 1984) ................................................................. 24

*Simonia v. Glendale Nissan/Infinity Disability Plan*,
   608 F.3d 1118 (9th Cir. 2010) ................................................................. 23

*United States v. One 2008 Toyota Rav 4 Sports Utility Vehicle*,
   2012 U.S. Dist. LEXIS 158417 (C.D. Cal. Oct. 18, 2012) .................... 25

*Valdez v. Kismet Acquisition, LLC*,
   474 B.R. 907 (S.D. Cal. 2012) ................................................................ 24

*Van Asdale v. Int'l Game Tech.*,
   577 F.3d 989 (9th Cir. 2009) ................................................................... 17

*Voice Techs. Group, Inc. v. VMC Sys., Inc.*,
   164 F.3d 605 (Fed. Cir. 1999) ................................................................. 22

*Wedgetail, Ltd. v. Huddleston Deluxe, Inc.*,
   576 F.3d 1302 (Fed. Cir. 2009) ............................................................... 4, 5

*Weissman v. Quail Lodge, Inc.*,
   179 F.3d 1194 (9th Cir. 1999) ................................................................. 5

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
SAN DIEGO

v

CASE NO. 08-CV-1992 AJB MDD
HUGHES HUBBARD'S OPPOSITION TO
DEFENDANTS' MOTION FOR ATTORNEYS' FEES

*Whitney Bros. Co. v. Sprafkin*,
   60 F.3d 8 (1st Cir. 1995) ...................................................................................... 6

*Whitworth v. Nat'l Enter. Sys.*,
   2010 U.S. Dist. LEXIS 49108 (D. Or. Apr. 21, 2010) ....................................... 25

*Yagman v. Republic Ins.*,
   987 F.2d 622 (9th Cir. 1993) ............................................................................... 6

## STATUTES

28 U.S.C. § 1927 .................................................................................................... 6, 9

35 U.S.C. § 285 ............................................................................................. 3, 4, 5, 6

Cal. Civ. Code § 3426.4 ........................................................................................ 3, 4, 5

Civ. Proc. Code § 128.5 .............................................................................................. 3

Civ. Proc. Code § 409.3 .............................................................................................. 4

## OTHER AUTHORITIES

*Milgrim on Trade Secrets* ......................................................................................... 20

## RULES

Fed. R. Civ. P. 26(a) ................................................................................................. 16

Fed. R. Civ. P. 26(e)(1)(A) ....................................................................................... 21

Rule 5-310(B), California Rules of Professional Conduct .................................. 16, 17

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN DIEGO

## **Preliminary Statement**

Having prevailed on liability—albeit only after two motions to dismiss, two summary judgment motions and over four years of hotly contested litigation—Defendants now seek to hold Plaintiffs and their attorneys, Hughes Hubbard & Reed LLP ("Hughes Hubbard"), jointly and severally liable for nearly $13.5 million in attorneys' fees and expenses (collectively, "fees") incurred by Defendants in this case.[1]  They would have this Court believe that this litigation was nothing more than a shakedown attempt by a group of liars, cheats and thieves, aided and abetted by their lawyers, who acted in subjective bad faith and repeatedly engaged in litigation misconduct amounting to fraud upon the Court.

Nothing could be further from the truth with regard to Hughes Hubbard.  That Plaintiffs and their counsel truly believed in the merits of the case was perhaps best proved by their response to the Court's order requiring Plaintiffs to post an unprecedented $800,000 bond if they wished to continue the litigation.  As Defendants' counsel put it:  "if it is a real case, they'll post it."[2]  Plaintiffs then posted the $800,000 bond.  To paraphrase Defendants' counsel, there is no better evidence that Plaintiffs and their counsel believed this was a "real case."

Indeed, Hughes Hubbard took on the representation of Plaintiffs only after conducting substantial due diligence, including multiple witness interviews and a review of the pleadings and key documents.  Hughes Hubbard took the representation on a contingency fee basis, thus exposing the firm to a substantial loss if the case was lost.  Most certainly, Hughes Hubbard did not believe that a quick settlement was in the offing:  as far as Hughes Hubbard knew, there had been no settlement discussions since the original Complaint was filed, and Defendant Qualcomm Incorporated ("Qualcomm") had rejected any notion of settlement.  Hughes Hubbard knew that Plaintiffs' case would likely have to be won after substantial litigation and perhaps trial.  It

---

[1] Motion at 22 ("The Court should find Plaintiffs and their lawyers jointly and severally liable for $13,465,331.01—the reasonable attorney fees accrued by Defendants in systematically dismantling this meritless lawsuit.").  Recognizing that Hughes Hubbard did not enter the case until 17 months after it was filed, other parts of the Motion appear to seek to hold Hughes Hubbard liable only for fees incurred after it entered its appearance.  The Motion is inconsistent in that respect.  Nowhere, however, does the Motion say what Hughes Hubbard's reduced share of the $13.5 million allegedly is.

[2] *See* Declaration of E. Marks ("Marks Decl."), Ex. 1 (9/7/10 Hr. Tr. at 10:11-12; *see also* 9:16-17, 11:12).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN DIEGO

1

CASE NO. 08-CV-1992 AJB MDD
HUGHES HUBBARD'S OPPOSITION TO
DEFENDANTS' MOTION FOR ATTORNEYS' FEES

1   would not have taken the matter on if it did not believe that a victory at trial was possible.

2       Hughes Hubbard's good faith belief in the merits of Plaintiffs' case was subsequently

3   confirmed by the opinions of four highly-credentialed experts *and* a September 2011 investment

4   of $3.1 million dollars in the case by an intellectual property ("IP") private equity fund whose

5   attorneys conducted their own extensive pre-investment due diligence.

6       Once Hughes Hubbard agreed to represent Plaintiffs, it had an obligation to do so

7   zealously.  That, of course, included opposing Defendants' motions.  That Defendants dispute

8   the merits of those oppositions or even that the Court ultimately agreed with Defendants is not,

9   of course, proof of sanctionable bad faith or litigation misconduct.  Otherwise, every victory by

10  summary judgment would result in a fee award—which is not the law.

11      The intellectual poverty of Defendants' request for millions of dollars of sanctions

12  against Hughes Hubbard is demonstrated by the brevity of that request.  Defendants devote

13  barely one-and-a-half pages of their 22-page Motion to an "explanation" of why Plaintiffs'

14  counsel should be sanctioned.  Even Defendants concede that to justify sanctions against Hughes

15  Hubbard, they would need to prove bad faith or willful misconduct, but they make no attempt to

16  demonstrate that Hughes Hubbard acted in subjective bad faith or knowingly engaged in

17  litigation misconduct, other than to boldly assert that Hughes Hubbard "filed" the pleadings to

18  which Defendants object.  (Motion at 17.)  To the contrary, at the end of their one-and-a-half

19  page discussion, Defendants reveal their real "justification" for an award of sanctions against

20  Hughes Hubbard, namely that, because Plaintiffs are allegedly insolvent, "any sanction in excess

21  of the Bond amount that does not reach counsel is no sanction at all."  (Motion at 18.)  In other

22  words, Hughes Hubbard was joined because it has deeper pockets.  But that is no justification for

23  a multi-million dollar sanction against counsel.[3]

24

25

26

---

27  [3] Moreover, Defendants have not come close to making a proper showing that the fees sought are
28  reasonable.  Defendants' billing entries attached as Exhibit E to the Motion are vague, duplicative, and do
    not identify which fees are attributable to Hughes Hubbard or to which claim.  (*See* Section IV, *infra*.)

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN DIEGO

2

CASE NO. 08-CV-1992 AJB MDD
HUGHES HUBBARD'S OPPOSITION TO
DEFENDANTS' MOTION FOR ATTORNEYS' FEES

<u>**Argument**</u>

**I.    DEFENDANTS HAVE NO STATUTORY OR COMMON LAW BASIS FOR SANCTIONING PLAINTIFFS' COUNSEL**

The American rule is well established:  ordinarily, each party bears its own fees.  *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 271 (1975) (American rule "is deeply rooted in our history and in congressional policy; and it is not for us to invade the legislature's province by redistributing litigation costs in the manner suggested by respondents") (superseded on other grounds); *Mach. Corp. of Am. v. Gullfiber Ab*, 774 F.2d 467, 471 (Fed. Cir. 1985).  The Motion relies on three narrow exceptions to this rule:  (1) Section 285 of the Patent Act, (2) Section 3426.4 of the California Uniform Trade Secrets Act ("CUTSA"), and (3) the Court's inherent authority.  But neither Section 285 nor Section 3426.4 applies to attorneys.  Even if they did, Defendants have not approached the strict standards for such a sanctions award.  Nor have they come close to justifying a sanctions award under the Court's inherent power.

**A.    <u>There Is No Authority for Sanctioning Attorneys Under Either 35 U.S.C. § 285 or Cal. Civ. Code § 3426.4</u>**

Defendants cite no case law holding that attorneys may be sanctioned under Section 285 of the Patent Act or Section 3426.4 of the CUTSA.  And for good reason:  no such cases exist.  To the contrary, courts have squarely held that attorneys cannot be sanctioned under either provision.  *See Monolith Portland Midwest Co. v. Kaiser Aluminum & Chem. Corp.*, 407 F.2d 288, 297 (9th Cir. 1969) ("The purpose of section 285 is not to discipline uncooperative counsel or counsel who is overzealous in the advocacy of his client's claims."); *Jewels Connection v. Czar Jewelry/Oro Direct*, 2011 Cal. App. Unpub. LEXIS 971, at *12 (Feb. 8, 2011)[4] (reversing sanctions against attorney because "there is no indication in either the language of section 3426.4 or the cases construing comparable statutory language that the Legislature intended the provision to operate as a direct sanction against a party's counsel").[5]

---

[4] This case is unpublished and not precedential authority; it is cited for the Court's reference.

[5] We are aware of only one case involving Section 3426.4 where an attorney was held jointly and severally liable for sanctions.  *See Computer Prepared Accounts v. Katz*, 235 Cal. App. 3d 428, 433, 439 (1991).  But in *Katz*, the court also awarded sanctions under Code of Civil Procedure § 128.5, which

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN DIEGO

3

CASE NO. 08-CV-1992 AJB MDD
HUGHES HUBBARD'S OPPOSITION TO
DEFENDANTS' MOTION FOR ATTORNEYS' FEES

1    Statutory interpretation principles also dictate that attorneys may not be sanctioned under

2    either Section 285 or Section 3426.4.  In the Ninth Circuit, courts may not use fee-shifting

3    statutes to sanction attorneys unless the statute expressly permits it or there is a clear indication

4    that Congress intended it.  *See, e.g., Hyde v. Midland Credit Mgmt., Inc.*, 567 F.3d 1137, 1140

5    (9th Cir. 2009) (reversing sanctions against attorney where Fair Debt Collection Practices Act

6    was "silent as to who should pay attorney's fees and costs"); *Pfingston v. Ronan Eng'g Co.*, 284

7    F.3d 999, 1006 (9th Cir. 2002) (reversing sanctions against attorney where "[t]he plain language

8    of the False Claims Act does not indicate that fees may be awarded against an attorney"); *Doyle

9    v. Superior Court*, 226 Cal. App. 3d 1355, 1359 (1991) (reversing award of attorneys' fees

10   against counsel where Code of Civil Procedure § 409.3 made "no express provision for an award

11   of attorneys' fees and costs against counsel").  Here, Section 285 and Section 3426.4 are silent as

12   to whether attorneys may be sanctioned, and there is no indication that Congress or the

13   California Legislature intended for attorneys' fees to be assessed against counsel.  Thus, the

14   Court should not award attorneys' fees against Hughes Hubbard under either statute.

15            **B.        Legal Standards Under 35 U.S.C. § 285 and Cal. Civ. Code § 3426.4**

16            Even if Sections 285 and 3426.4 did permit sanctions awards against attorneys—

17   which they do not—Defendants cannot carry their burden under either statute.  Section 285 of

18   the Patent Act provides that "[t]he court in exceptional cases may award reasonable attorney fees

19   to the prevailing party."  35 U.S.C. § 285; *Forest Labs., Inc. v. Abbott Labs.*, 339 F.3d 1324,

20   1328-29 (Fed. Cir. 2003).  "Exceptional" cases are narrowly defined as those "involving

21   inequitable conduct before the [Patent Office]; litigation misconduct; vexatious, unjustified, and

22   otherwise bad faith litigation; a frivolous suit or willful infringement."  *Forest Labs., Inc.*, 339

23   F.3d at 1329 (quotations omitted, modification in original); *see also Wedgetail, Ltd. v.

24   Huddleston Deluxe, Inc.*, 576 F.3d 1302, 1304 (Fed. Cir. 2009) ("only a limited universe of

25   circumstances warrant a finding of exceptionality").  Where the defendant is the prevailing party,

26   "[a]bsent misconduct in conduct of the litigation or in securing the patent, sanctions may be

27

28   expressly provides for the imposition of fees against counsel as a result of bad faith or frivolous tactics.
     *Id.* at 431, 431 n.2 (attorney sanctioned after submitting forged documents).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN DIEGO

4

CASE NO. 08-CV-1992 AJB MDD
HUGHES HUBBARD'S OPPOSITION TO
DEFENDANTS' MOTION FOR ATTORNEYS' FEES

1   imposed against the patentee only if both (1) the litigation is brought in subjective bad faith, and

2   (2) the litigation is objectively baseless." *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393

3   F.3d 1378, 1381 (Fed. Cir. 2005).  The burden is on the party seeking attorneys' fees to prove the

4   exceptional nature of the case "by clear and convincing evidence." *Wedgetail, Ltd.,* 576 F.3d at

5   1304.  Even when a case is "exceptional," the district court is not required to award fees.  *See*

6   *Nat'l Presto Indus. v. West Bend Co.*, 76 F.3d 1185, 1197 (Fed. Cir. 1996) ("[T]he award of

7   attorney fees is not automatic, even for the extraordinary case.").

8         The standard is no less stringent under Section 3426.4 of CUTSA.  When an action for

9   misappropriation is brought under the CUTSA in "bad faith . . . the court may award reasonable

10  attorney's fees and costs to the prevailing party."  Cal. Civ. Code § 3426.4; *see Pixion, Inc. v.*

11  *Placeware, Inc.*, 2005 U.S. Dist. LEXIS 41652, at *4 (N.D. Cal. Apr. 26, 2005).  "Bad faith" for

12  purposes of Section 3426.4 requires both (1) objective speciousness of the plaintiff's claim, *and*

13  (2) plaintiff's subjective bad faith in bringing or maintaining the claim.  *See id*. at *4-5.

14         **C.       Legal Standard Under the Court's Inherent Authority to Sanction Attorneys**

15         The standard for imposing sanctions under the Court's inherent power is even more

16  stringent than the standards under Sections 285 or 3426.4.  Courts have the inherent power to

17  levy sanctions, including attorneys' fees against attorneys as well as litigants, but the Supreme

18  Court has limited this authority only to "narrowly defined circumstances"—specifically, when an

19  attorney or "a party ha[s] acted in bad faith, vexatiously, wantonly, or for oppressive reasons."

20  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991) (quotations omitted); *Amsted Indus. v.*

21  *Buckeye Steel Castings Co.*, 23 F.3d 374, 378-79 (Fed. Cir. 1994) (sanctions are reserved for

22  where "fraud has been practiced upon [the court], or . . . the very temple of justice has been

23  defiled").  In the Ninth Circuit, the Court's inherent sanctioning power is limited to situations

24  involving willful abuse of the judicial process, specific and articulated bad faith conduct during

25  litigation, or filing specific papers deemed frivolous.  *See Pacific Harbor Capital, Inc. v.*

26  *Carnival Air Lines, Inc.*, 210 F.3d 1112, 1122 n.2 (9th Cir. 2000); *Weissman v. Quail Lodge,*

27  *Inc.*, 179 F.3d 1194, 1198 (9th Cir. 1999).

28         This is an even higher standard than the very high standard under Section 285.  As the

LATHAM&WATKINS<sup></sup>
ATTORNEYS AT LAW
SAN DIEGO

5                                     CASE NO. 08-CV-1992 AJB MDD
                                        HUGHES HUBBARD'S OPPOSITION TO
                                    DEFENDANTS' MOTION FOR ATTORNEYS' FEES

1   Federal Circuit has explained, "a case must be 'sufficiently beyond "exceptional" within the

2   meaning of section 285 to justify . . . a sanction under the court's inherent power.'"  *Medtronic*

3   *Navigation, Inc. v. BrainLAB Medizinische Computersysteme GMBH*, 603 F.3d 943, 966 (Fed.

4   Cir. 2010) (omission in original) (citing *Amsted*, 23 F.3d at 378-79).  While recklessness may

5   qualify for the imposition of sanctions under other fee-shifting statutes, such as 28 U.S.C.

6   § 1927, it does not suffice for sanctions under the Court's inherent power—specific and

7   articulated bad faith by counsel is required.  *See Fink v. Gomez*, 239 F.3d 989, 993-94 (9th Cir.

8   2001); *In re Keegan Mgmt. Co. Secs. Litig.*, 78 F.3d 431, 436 (9th Cir. 1996); *Yagman v.*

9   *Republic Ins.*, 987 F.2d 622, 628 (9th Cir. 1993).

10         Courts should "use caution when invoking [their] inherent powers to impose sanctions."

11   *Amsted*, 23 F.3d at 378; *Yagman*, 987 F.2d at 628 ("[B]ecause of their very potency, inherent

12   powers must be exercised with restraint and discretion") (citations omitted); *Whitney Bros. Co. v.*

13   *Sprafkin*, 60 F.3d 8, 13 (1st Cir. 1995) ("[A] court's inherent power to shift attorneys' fees

14   should be used sparingly and reserved for egregious circumstances.") (quotations omitted).

15         Defendant Qualcomm is particularly well-versed in how sparing the use of a Court's

16   inherent power to sanction attorneys should be.  In *Qualcomm, Inc. v. Broadcom Corp.*, the

17   Court sanctioned Qualcomm for committing a fraud upon the Court by hiding critical documents

18   and submitting false testimony but chose not to sanction Qualcomm's attorneys because,

19   "although a number of poor decisions were made, the involved attorneys did not act in bad

20   faith."  2010 U.S. Dist. LEXIS 33889 at *24 (S. D. Cal. April 2, 2010).  Here, despite

21   Defendants' overheated rhetoric, there is no evidence Plaintiffs committed a fraud upon the

22   Court, much less evidence that Hughes Hubbard acted in bad faith, subjectively or objectively.

23   **II.   HUGHES HUBBARD'S SUBJECTIVE GOOD FAITH CANNOT FAIRLY BE**

24   **QUESTIONED.**

25         Indeed, Defendants do not seriously attempt to demonstrate that Hughes Hubbard acted

26   in subjective bad faith.  They cannot.  Rather, they try to accuse *Plaintiffs* of being a group of

27   felons and shakedown artists who knowingly brought a frivolous case and Hughes Hubbard of

28   guilt by association.  Those accusations miss the mark.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN DIEGO

6

CASE NO. 08-CV-1992 AJB MDD
HUGHES HUBBARD'S OPPOSITION TO
DEFENDANTS' MOTION FOR ATTORNEYS' FEES

**A.   Defendants' "Corrupt-Officers-and-Directors"-Assisted-by-a-"Convicted-Felon" Argument Is Irrelevant to Hughes Hubbard.**

Defendants' claims that Plaintiff Gabriel Technologies Corporation ("Gabriel") raised money in 2006 and 2007 to prosecute this case with the assistance of Nicholas Fegen, a convicted felon, and that Gabriel's then-Board misappropriated those funds is beside the point as to Hughes Hubbard. (Motion at 1-3.) Whatever the merits of those claims, and putting aside the question of whether Defendants have standing to raise those arguments, by the time Hughes Hubbard first considered becoming involved in this case in late 2009, Gabriel had a brand new Board and no continuing association with Fegen. (Affidavit of P. Sullivan ("Sullivan Aff.") ¶ 4.)

**B.   Defendants Have Mischaracterized Emails Between Ex-Employees**

Defendants next contend that a series of emails in December 2009 and January 2010 between two ex-employees of Locate Networks ("Locate"), Gabriel's predecessor-in-interest, and a current Gabriel director somehow admit that Plaintiffs never had a case, "just a lot of talk." (Motion at 4.) When read fairly in context, those emails say nothing of the sort. [6]

Those emails were written at a time when Gabriel was seeking new counsel and further funding for the litigation. Plaintiffs' lead counsel, Munck Carter, had just withdrawn and Plaintiffs were running out of cash. Munck Carter had refused to turn over its client files to Plaintiffs. Thus, the drafters of the emails were actually complaining that, despite several years of representation by Munck Carter, Plaintiffs had no collection of key documents or written narrative of the litigation to show to replacement counsel or potential investors. The drafters of the emails were not opining that the case was frivolous. As John Hall, a Gabriel director, explained in one email:

> Munck Carter never produced the materials the board requested so Gabriel could obtain third party financing for the lawsuit. . . . These companies talked to Munck Carter requesting material but to no avail. Unacceptable!! and outragoius [*sic*].

---

[6] Defendants first cited those emails, which they obtained from a non-party, in their bond motion. (Dkt 105; Sullivan Aff. ¶¶ 5-6.) In the current Motion, Defendants claim that their bond motion "relied on a series of candid emails" and that "Gabriel barely disputed the contents of the emails" in Plaintiffs' opposition. (Motion at 4.) That is not true. Defendants attached the emails to their *reply*, depriving Plaintiffs of an opportunity to respond in writing. (*See* Dkt 105-2 at Exs. 1-33.) Plaintiffs sought leave to file a sur-reply to address the emails, which was denied. (Sullivan Aff. ¶ 6.)

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN DIEGO

7

CASE NO. 08-CV-1992 AJB MDD
HUGHES HUBBARD'S OPPOSITION TO
DEFENDANTS' MOTION FOR ATTORNEYS' FEES

1   (Marks Decl., Ex. 2  (1/5/10 email from J. Hall to M. Shanley).)[7]

2       **C.**    **Hughes Hubbard's Good Faith Is Beyond Question**

3          Hughes Hubbard's good faith is amply proven by (1) the due diligence that Hughes

4   Hubbard conducted before agreeing to represent Plaintiffs; (2) the credible story of

5   misappropriation told by Plaintiffs; (3) four highly-credentialed experts who confirmed that

6   Locate had conceived of valuable contributions to assisted GPS ("aGPS") technology that were

7   later included in patents filed by Defendants; (4) the fact that Plaintiffs posted an $800,000 bond

8   as ordered by this Court; and (5) the substantial investment in the case made in 2011 by an IP

9   private equity fund after the bond ruling and after performing due diligence, assisted by

10  experienced counsel.

11          **1.**     **Hughes Hubbard's Due Diligence**

12         When Plaintiffs filed suit in October 2008, they were represented by Munck Carter.  (Dkt

13  1.)  On December 22, 2009, Munck Carter moved to withdraw due to a conflict of interest

14  between Gabriel's old and new Boards of Directors.  (Dkt 49).  Gregory Williams and Peter

15  Sullivan of Hughes Hubbard learned that Plaintiffs were seeking new counsel. (Sullivan Aff.

16  ¶ 3.)  Before agreeing to represent Plaintiffs, Hughes Hubbard conducted almost 300 hours of

17  due diligence including:  (1) studying the relevant patent applications and issued patents; (2)

18  reviewing company documents and analyses comparing Plaintiffs' technologies and Defendants'

19  patents; (3) interviewing multiple witnesses; and (4) conducting legal research.  (Sullivan Aff.

20  ¶ 7.)  Hughes Hubbard would not have taken the case if it believed it had no merit:  Hughes

21  Hubbard values its professional reputation.  (*Id.* ¶ 8.)  Nor did Hughes Hubbard believe that a

22  quick settlement was likely:  Defendants had already rejected that possibility.  (*Id.* ¶ 9.)

23  Moreover, Hughes Hubbard, who took the case on a contingency fee basis, had no incentive to

24  invest thousands of hours of attorney and paralegal time into an unpaid losing effort.  (*Id.* ¶ 10.)

25          **2.**     **Plaintiffs Had A Credible Story**

26         As Hughes Hubbard has tried (albeit unsuccessfully) to explain to the Court on multiple

27

28  ---

[7] At a minimum, Hughes Hubbard's reading of those emails is at least as plausible as Defendants', and the emails cannot be construed as an admission of bad faith by anyone, much less by Hughes Hubbard.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN DIEGO

8

CASE NO. 08-CV-1992 AJB MDD
HUGHES HUBBARD'S OPPOSITION TO
DEFENDANTS' MOTION FOR ATTORNEYS' FEES

1  occasions, Plaintiffs have a credible story to tell of inventorship, sharing with Defendant

2  SnapTrack, Inc. ("SnapTrack"), and misappropriation of Locate's technology by SnapTrack.

3  That the Court ultimately granted summary judgment in Defendants' favor does not detract from

4  Hughes Hubbard's good faith belief in the merits of Plaintiffs' claims or carry Defendants'

5  burden of proving specific and articulated bad faith on Hughes Hubbard's part. *See, e.g., Galen*

6  *v. County of Los Angeles*, 477 F.3d 652, 667 (9th Cir. 2007) (affirming denial of attorneys' fees

7  awarded because the fact that plaintiff "lost at summary judgment does not render his case per se

8  frivolous, unreasonable or without foundation"); *Karam v. City of Burbank*, 352 F.3d 1188, 1196

9  (9th Cir. 2003) (plaintiff's "inability to defeat summary judgment" did not mean her claims were

10  "frivolous, unreasonable or groundless" to warrant a sanction of fees).  Notably, in over four

11  years of litigation, Defendants never filed a Rule 11 motion against Hughes Hubbard (or

12  Plaintiffs) or sought sanctions for unduly prolonging the litigation under 28 U.S.C. § 1927.

13  Indeed, Hughes Hubbard respectfully disagrees with the Court's summary judgment

14  rulings and has filed a notice of appeal to the Federal Circuit.  (Dkt 340.)

15  The facts of this case presented, in Hughes Hubbard's view, compelling evidence of

16  opportunity, motive and misappropriation by Defendants of Plaintiffs' intellectual property. This

17  case arose out of a joint development relationship between Locate and SnapTrack.  William

18  Clise and Michael Crowson founded Locate, Gabriel's predecessor-in-interest, in 1998.  (Marks

19  Decl., Ex. 3 (7/30/10 Clise Aff. ¶ 6).)  Clise and Crowson were entrepreneurs with a track record

20  of successfully building tech companies from scratch.[8]  (*Id.* ¶¶ 3-5.)  The objective of Locate was

21  to create location-based services, using a pager network.  (*Id.* ¶¶ 6-8.)  Locate wanted to develop

22  pagers and "tags" whose locations could be determined wirelessly, allowing the tracking of

23  persons or assets.  (*Id.*; Marks Decl., Ex. 4 (Sahai Decl. ¶ 42).)  Pagers were more suitable for

24  these sorts of purposes than cellular devices because they are smaller, lighter and use less power.

25  (Marks Decl., Ex. 5 (9/2/11 Clise Dep. Tr. 192:1-193:6).)  Pagers use less power because they

26

27  [8] In 1986, Mr. Crowson was convicted under the RICO statute for claims unrelated to this litigation.  That
    conviction, while regrettable, did not detract from his subsequent successful record as an entrepreneur or

28  disprove his inventive contributions to Locate.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN DIEGO

9

CASE NO. 08-CV-1992 AJB MDD
HUGHES HUBBARD'S OPPOSITION TO
DEFENDANTS' MOTION FOR ATTORNEYS' FEES

1    are usually in "sleep" mode and only turn on occasionally to send or receive messages. (*Id.*)

2    While cellular devices rely on continuous connections during a call, pagers communicate using

3    asynchronous (*i.e.*, not continuous) messages. (*Id.* at 190:21-25; Marks Decl., Ex. 6

4    (Medvidovic Decl. ¶¶ 32-37).)

5           At the time, it was difficult to determine the location of pagers because they were usually

6    in "sleep" mode and did not transmit messages quickly. (Marks Decl., Ex. 4 (Sahai Decl. ¶¶ 42,

7    70).) It was also difficult to determine the locations of large numbers of cellular devices because

8    a location-determining entity (*e.g.*, a computer) could only serve a limited number of devices at

9    once, due to the need for a continuous connection. (Marks Decl., Ex. 6 (Medvidovic Decl.

10   ¶¶ 52-53).) Locate invented a solution to this problem. (Marks Decl., Ex. 7 (8/25/11 Crowson

11   Dep. Tr. 96:24-98:25).) Clise and Crowson conceived of a system that would handle millions of

12   asynchronous messages sent from any number of mobile devices in the field, and send them on

13   through land-based networks to location-determining computers. (Marks Decl., Ex. 6

14   (Medvidovic Decl. ¶¶ 37-41).) This system, coordinating messages between pagers and land-

15   based networks, allowed the location of a pager to be determined efficiently. (Ex. 51 to Sullivan

16   Decl. at Dkt 324.) The server software could also be used for cellular devices by chopping a

17   transaction into a series of asynchronous messages, allowing the demands of many cellular

18   devices to be evenly spread across multiple location-determining entities. (Marks Decl., Ex. 6

19   (Medvidovic Decl. ¶¶ 40-41); Ex. 8 (Min Decl. ¶ 61).) Locate's system was a unique and cutting

20   edge method of delivering location-based services using aGPS technology. (Marks Decl., Ex. 6

21   (Medvidovic Decl. ¶¶ 32, 44); Ex. 8 (Min Decl. ¶¶ 56-57).) This system architecture was a key

22   aspect of Locate's system and one of its most important trade secrets. (Sullivan Aff. ¶ 13; Marks

23   Decl., Ex. 6 (Medvidovic Decl. ¶¶ 32, 44).)

24          By mid-2000, Locate had over fifty employees, including thirty-five engineers. (Marks

25   Decl., Ex. 3 (7/30/2010 Clise Aff. ¶ 14).) Because Clise and Crowson were "big picture"

26   inventors and not engineers, they relied on Locate's engineers to create the architecture for the

27   software and to write the source code. (Sullivan Aff. ¶ 14.) By 2002, Locate had reduced its

28   ideas to practice and created test pagers whose locations could successfully be determined. (*Id.*

LATHAM&WATKINS™
ATTORNEYS AT LAW
SAN DIEGO

10

CASE NO. 08-CV-1992 AJB MDD
HUGHES HUBBARD'S OPPOSITION TO
DEFENDANTS' MOTION FOR ATTORNEYS' FEES

1   ¶ 15.)  Locate never became a profitable company, however, because its manufacturing partner

2   abruptly left the paging business, and when the dot-com bubble burst in 2001, the funding for

3   start-up tech companies all but completely dried up.  (*Id.*)

4          Locate's product required three components:  (1) Locate's server software; (2) hardware

5   (*i.e.*, pagers); and (3) aGPS servers to compute information about the location of the devices.

6   (Marks Decl., Ex. 3 (7/30/2010 Clise Aff. ¶ 15).)  In August 1999, Locate contracted with

7   Defendant SnapTrack to provide the aGPS service.  (*Id.* ¶ 13.)  At that time, SnapTrack's

8   products worked only under cellular (not paging) networks, using a direct, continuous (not

9   asynchronous) wireless connection between mobile devices and location-determining entities.[9]

10  (Marks Decl., Ex. 3 (7/30/2010 Clise Aff. ¶ 12); Ex. 6 (Medvidovic Decl. ¶¶ 45-47) Ex. 8 (Min

11  Decl. ¶¶ 40, 41, 50).)  The collaboration between Locate and SnapTrack was a technical

12  partnership.  Their contract provided that both companies would develop technology related to

13  Locate's products that would be jointly owned and protected.  In March 2000, in the midst of

14  that co-development effort, Qualcomm bought SnapTrack.  Locate held regular meetings and

15  weekly conference calls with SnapTrack and Qualcomm to discuss development of the

16  technology.  (Dkt 324-17 (Grajski Dep. Tr. 114:19-115:10); Dkt 324-36 (Ressler Dep. Tr. 83:4-

17  20).)

18          Plaintiffs' claims arose because the software architecture and techniques in their technical

19  documents and disclosures can be traced forward to Qualcomm's later-filed patents.  (Marks

20  Decl., Ex. 4 (Sahai Decl. ¶¶ 44-53, 56-62); Ex. 6 (Medvidovic Decl. ¶¶ 43-46, 56-59, 65-68, 76-

21  81); Ex. 8 (Min Decl. ¶¶ 78-84); Ex. 11 (Garlan Decl. ¶¶ 69-76).)  For example, after working

22  with Locate, Qualcomm filed U.S. Patent Nos. 7,421,277 and 7,974,639, which include a system

23  performing the same functions as Locate's implementation.  (Marks Decl., Ex. 6 (Medvidovic

24  Decl. ¶¶ 46, 54).)  Other examples of developments by Locate that were shared with Defendants

25  and ended up in Qualcomm's patents were:  (i) methods for reporting the location of a mobile

---

[9] As Magistrate Dembin explained:  "Again, what I view and what you've agreed to, is really what Locate brought to the game was a unique approach to the problem.  That SnapTrack didn't have because they were looking at it from the wrong perspective or from a perspective that wasn't going to work."  (Marks Decl., Ex. 9 (9/29/2011 Hr. Tr. at 41:2-6).)

LATHAM&WATKINS
ATTORNEYS AT LAW
SAN DIEGO

11

CASE NO. 08-CV-1992 AJB MDD
HUGHES HUBBARD'S OPPOSITION TO
DEFENDANTS' MOTION FOR ATTORNEYS' FEES

1    device to emergency services upon the occurrence of specified events; (ii) a method for

2    broadcasting acquisition assistance data in advance of need to mobile devices within a region;

3    (iii) software to address privacy concerns by controlling access to location information using a

4    system of permissions; and (iv) a technique referred to as "context switching" that would power

5    off the communications function of the pager while position location functions were occurring.

6    (Marks Decl., Ex. 10 (Trade Secret Disclosure); Exs. 4, 6, 8, 11 (Sahai ¶¶ 44-53, 56-62;

7    Medvidovic Decl. ¶¶ 56-59, 65-68, 76-81; Min Decl. ¶¶ 78-84; Garlan Decl. ¶¶ 69-76).)

8           In its most basic form, this is a classic "before and after" case.  Locate developed

9    valuable technology and shared it with SnapTrack and Qualcomm (the "before").  Subsequently,

10   SnapTrack and Qualcomm obtained patents that included the very ideas that Locate had

11   originated (the "after").  Hughes Hubbard believed in good faith that those facts reasonably led

12   to the conclusion that SnapTrack and Qualcomm had misappropriated Locate's creations and

13   wrongfully claimed inventorship on patents without acknowledging Locate's contributions.

14   (Sullivan Aff. ¶ 12.)   Nothing in the Motion challenges the good faith of that belief.

15              **3.      Plaintiffs' Claims Were Corroborated by Four Experts**

16          Plaintiffs' version of events was corroborated by the opinions of four highly-respected

17   experts:  (1) Dr. Nenad Medvidovic, a professor in the Computer Science Department at the

18   University of Southern California who has published extensively regarding the architecture of

19   message-based software systems; (2) Dr. Anant Sahai, a professor in the Electrical Engineering

20   and Computer Sciences Department at the University of California at Berkeley with a PhD from

21   MIT; (3) Dr. David Garlan, a professor of Computer Science at Carnegie Mellon University with

22   a PhD from Carnegie Mellon who has published over 150 scholarly articles on software

23   architecture; and (4) Dr. Paul Min, a professor at Washington University in the Electrical and

24   Systems Engineering Department with a PhD in Electrical Engineering from the University of

25   Michigan.  (*See* Marks Decl., Exs. 4, 6, 8, 11, 12, 13 (Expert Declarations and Reports).)

26   Together, these experts confirmed that Locate made inventive contributions to the aGPS field,

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN DIEGO

12

CASE NO. 08-CV-1992 AJB MDD
HUGHES HUBBARD'S OPPOSITION TO
DEFENDANTS' MOTION FOR ATTORNEYS' FEES

1   and that those contributions could be found in Defendants' patents.[10]  *See Idaho Watersheds*

2   *Project v. Jones*, 253 Fed. Appx. 684, 687 (9th Cir. 2007) ) ("[W]hen a plaintiff's claim is

3   supported by expert testimony, it is generally not frivolous."); *Medtronic*, 603 F.3d at 959.

### 4.   Posting the $800,000 Bond Confirmed Plaintiffs' Belief in Their Case

5   In September 2010, at Defendants' request, the Court directed Plaintiffs to post an

6   $800,000 bond as security for costs, expenses and attorneys' fees that Defendants would likely

7   incur in defending against Plaintiffs' claims.  (Dkt 110.)  At the bond hearing, Plaintiffs' counsel

8   made very clear that "the purpose of this motion is to try and put an end to this case" because

9   Defendants did not believe that this was "a real case."  (Marks Decl., Ex. 1 (9/7/10 Hr. Tr. at

10   9:16-17; 10:11-12; 11:12).)  Indeed, Defendants' counsel dared Plaintiffs to put up the bond "if it

11   is a real case."  (*Id.*)  Plaintiffs did file the $800,000 bond, proving that this was (and is) "a real

12   case."  (Dkt 121.)  If Hughes Hubbard had any doubt that this was (and is) "a real case"—which

13   it did not—the filing of that bond erased that doubt.  (Sullivan Aff. ¶ 19.)

### 5.   The North Water Investment Furthers the Good Faith of the Case

15   On September 16, 2011, nearly a year after the bond motion was decided, Gabriel issued

16   $3.1 million in senior secured notes to North Water Intellectual Property Fund L.P. 3A ("North

17   Water"), the proceeds of which were to be used to fund this litigation.  (Marks Decl., Ex. 14

18   (8K.)  The only way North Water could ever expect to be repaid on its investment was if

19   Plaintiffs prevailed in this action.  (Sullivan Aff. ¶ 20.)  Before investing, North Water and its

20   counsel, a firm with a nationally renowned IP department, conducted substantial due diligence.

21   Common sense compels the conclusion that North Water would not have made so substantial an

22   investment in this case unless it concluded that there was a reasonable prospect for success.[11]

23   *   *   *

24   In sum, there can be no dispute that Hughes Hubbard prosecuted Plaintiffs' claims

25   zealously and in good faith, as it was ethically obligated to do.  *See. e.g., Operating Eng'rs*

---

[10] The Court never addressed the merits of the opinions of the four experts.

[11] $2.1 million of North Water's investment was used to pay expert fees, a few of Gabriel's administrative expenses, and litigation costs.  The remainder was paid to Hughes Hubbard as a partial payment for its accrued fees.  (Sullivan Aff. ¶ 21.)

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN DIEGO

13

CASE NO. 08-CV-1992 AJB MDD
HUGHES HUBBARD'S OPPOSITION TO
DEFENDANTS' MOTION FOR ATTORNEYS' FEES

1   *Pension Trust v. A-C Corp.* 859 F.2d 1336, 1344 (9th Cir. 1988) ("Rule 11 must not be construed

2   so as to conflict with the primary duty of an attorney to represent his or her client zealously.

3   Forceful representation often requires that an attorney attempt to read a case or an agreement in

4   an innovative though sensible way.") (citations omitted); *People v. McKenzie*, 34 Cal. 3d 616,

5   631 (1983).  That is reason enough to deny Defendant's Motion against Hughes Hubbard.

6   **III.   DEFENDANTS' EXAMPLES OF "LITIGATION MISCONDUCT" ARE**
        **ILL-FOUNDED**

7

8           In addition to arguing that the entire case was frivolous, Defendants also seek to hold

9   Hughes Hubbard liable for specific instances of alleged "misconduct during litigation."  (Motion

10  at 2, 14.)  However, none of Defendants' examples measure up to the standard for sanctionable

11  misconduct, much less conduct worthy of $13.5 million in sanctions.  There is no comparison

12  between the conduct cited by Defendants, which Hughes Hubbard undertook in good faith in the

13  zealous representation of its clients, and the sorts of extraordinary misconduct that have been the

14  subject of sanctions issued under a court's inherent powers.  *See Gomez v. Vernon*, 255 F.3d

15  1118 (9th Cir. 2001) (attorney received privileged documents and retained them after receiving a

16  contrary ethics opinion); *Frances Kenny Family Trust v. World Sav. Bank FSB*, 2005 U.S. Dist.

17  LEXIS 2403 (N.D. Cal. Jan. 19, 2005) (attorney filed multiple lawsuits on behalf of fraudster

18  and knowingly failed to disclose twenty years' worth of dispositive, adverse case law).  Nor do

19  Defendants make any effort to connect examples of alleged misconduct to specific fees.

20          **A.      The Filing of the Fifth Amended Complaint**

21          Defendants' citation of the filing of a Fifth Amended Complaint "without permission" is

22  much ado about nothing.  (Motion at 4.)  As Hughes Hubbard explained at the time, that filing

23  was a simple mistake.  Hughes Hubbard incorrectly believed that the Magistrate Judge had given

24  Plaintiffs leave to file a fraudulent concealment claim.  (Sullivan Aff. ¶ 23.)  When the Court

25  pointed out Hughes Hubbard's mistake, Plaintiffs promptly moved for leave to file the Fifth

26  Amended Complaint.  (*Id.*)  The Court allowed that motion to be filed.  Defendants opposed

27  leave, arguing that the new fraudulent concealment claim was substantively the same as a

28  previously dismissed fraudulent inducement claim.  (Dkt 88 at 3-6.)  Plaintiffs disagreed—but

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SAN DIEGO

14

CASE NO. 08-CV-1992 AJB MDD
HUGHES HUBBARD'S OPPOSITION TO
DEFENDANTS' MOTION FOR ATTORNEYS' FEES

1    the Court denied leave to amend.  (Dkt 104.)  This was most certainly not abusive conduct.  It

2    was a mistake, plain and simple.  And there was no harm to Defendants or the Court:  Plaintiffs

3    had permission to file for leave to amend; that is what was ultimately filed; and the motion was

4    denied.  No harm, no foul.  *See Keegan*, 78 F.3d at 436 (reversing sanctions for recklessly filing

5    a complaint when the complaint was not frivolous and there was no showing of bad faith).

6           **B.      Gabriel's Relocation to California Was Not a Deception**

7           Defendants further claim that Gabriel was "caught in a deception" when it asserted it had

8    moved its headquarters and, hence, was not subject to the statutory bond requirement.  (Motion

9    at 5).  Once again, Defendants have substantially overstated their case.

10          These are the facts.  In May 2010, nearly two months *before* Defendants filed their bond

11   motion (Dkt 81), Gabriel's Board authorized opening an office in San Francisco, where Gabriel's

12   Chief Executive Officer, George Tingo, resided.  Although the Board minutes did not

13   specifically say so, Tingo verified under oath that the Board's intent was to transfer Gabriel's

14   headquarters from Nebraska to California.  (Marks Decl., Ex. 15 (Tingo Aff. ¶ 7).)  Gabriel no

15   longer had any assets, operations or employees in Nebraska.  (*Id.* ¶¶ 2-5.)  Tingo rented an

16   apartment in Gabriel's name in San Francisco but failed to get the landlord's written permission

17   to use the apartment as an office; he received only oral permission.  Tingo also forgot at that time

18   to immediately change the designation of Gabriel's headquarters on state and Securities and

19   Exchange Commission filings, although this was later corrected.  (*See* Dkt 110 at 7.)

20          Tingo stated, under oath and without equivocation, that Gabriel intended to move its

21   headquarters to California without regard to the bond motion.  Gabriel did not document that

22   transfer well in writing, but there is no evidence that Plaintiffs—much less Hughes Hubbard—

23   intended to defraud the Court.  And in any event, there was no harm to Defendants or the Court

24   because Hughes Hubbard conceded in Plaintiffs' opposition brief that, wherever Gabriel's

25   headquarters was located, the Court had the inherent authority to require a bond.  (Dkt 90 at 7.)

26   Given that concession, there would have been no point in attempting to deceive the Court about

27   the location of Gabriel's headquarters.

28

### C.   The Angus Contingent Interest Is a False Issue

Defendants also claim that Hughes Hubbard improperly submitted an affidavit by Allan Angus, the former Chief Technology Officer ("CTO") of Gabriel, that "violated California Rule of Professional Conduct 5-310(B)" because Angus has a contingent interest in the outcome of the litigation.  (Motion at 8.)[12]  The facts are considerably more complicated.

In 2009, Angus was laid off by Gabriel, but later rehired as a non-testifying consultant for the litigation.  (Marks Decl., Ex. 17 (9/8/2011 Angus Dep. Tr. 71:12-72:1; 152:3-6).)  Because Gabriel was cash-poor, it reaffirmed a prior feature of Angus' compensation, a 3.125% interest in Trace (a successor to Locate) awarded to him in 2006.  (*Id*. at 138:16-141:15.)  Because Trace did not have substantial assets in 2009, Gabriel specified that Angus' interest would include any settlement or judgment in this litigation.  At the time, no one at Hughes Hubbard expected Angus to be a witness because he did not work at Locate during the key 1999-2002 period.  (Sullivan Aff. ¶ 25.)  For example, Angus was not listed as a witness on Plaintiffs' Rule 26(a) disclosure. (*Id.*)  Nor was he identified as a testifying expert.  (*Id.*)

It was *Defendants* who made Angus a witness by noticing his deposition.  (*Id.* ¶ 26.)  And then it was *Defendants* who cited Angus' deposition in their motion for summary judgment on statute of limitations grounds.  (Dkt 188-1 at 24.)  In Hughes Hubbard's judgment, Defendants mischaracterized Angus' testimony.  (Sullivan Aff. ¶ 26.)  Accordingly, Plaintiffs submitted an affidavit from Angus in opposition to the motion for summary judgment to correct those mischaracterizations.  (*Id.*)  There was no attempt by Plaintiffs to hide Angus' contingent interest:  that fact was already disclosed in produced documents and at Angus' deposition.  (*Id.*)

To hold that Hughes Hubbard was not allowed to submit Angus' corrective affidavit would give Defendants carte blanche to mischaracterize his deposition testimony without fear of being called on it.  That cannot be the intent of California's Rule of Professional Conduct

---

[12] Defendants also assert that Maurice Shanley, the former Chief Financial Officer ("CFO") of Gabriel, another affiant, held a contingent interest in the litigation.  (Motion at 8.)  That is false.  In 2006, pursuant to an executive incentive bonus plan, Stanley received a 4.6875% interest in the proceeds from a sale of the Company.  He did not have a percentage interest in the litigation, which was not even filed in 2006. To the contrary, Gabriel expressly refused to give Shanley a contingent interest in the litigation because it would disqualify him as a witness.  (Marks Decl., Ex. 16 (1/28/2010 Email from J. Hall to M. Shanley).)

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN DIEGO

16

CASE NO. 08-CV-1992 AJB MDD
HUGHES HUBBARD'S OPPOSITION TO
DEFENDANTS' MOTION FOR ATTORNEYS' FEES

1    5-310(B).  The submission of the Angus affidavit was not litigation misconduct.[13]

2        **D.    The Sham Affidavit Rule Was Applied Very Broadly Here**

3        Defendants also allege that Hughes Hubbard should be held jointly and severally liable

4    for Defendants' fees because "it was counsel that had responsibility for submitting the sham

5    affidavits in opposition to Defendants' first summary judgment motion."  (Motion at 17.)  Once

6    again, Defendants have overstated their case:  Hughes Hubbard reasonably believed that the

7    affidavits it filed were appropriate under the case law, even though the Court disagreed.

8        The "sham affidavit" rule allows a court to exclude on summary judgment an affidavit

9    that seeks to create a disputed issue of fact by directly contradicting the affiant's prior deposition

10    testimony.  *See Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991).  As the Ninth

11    Circuit has explained, the sham affidavit rule "should be applied with caution" because it "is in

12    tension with the principle that a court's role in deciding a summary judgment motion is not to

13    make credibility determinations or weigh conflicting evidence."  *Van Asdale v. Int'l Game Tech.*,

14    577 F.3d 989, 998 (9th Cir. 2009) (quotations omitted).  "[T]he inconsistency between a party's

15    deposition testimony and subsequent affidavit" must be "clear and unambiguous" to render it a

16    sham.  *Van Asdale*, 577 F.3d at 998-99.  Notably, "the non-moving party is not precluded from

17    elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on

18    deposition[.]"  *Messick v. Horizon Indus.*, 62 F.3d 1227, 1231 (9th Cir. 1995).

19        Here, in their motion for partial summary judgment, Defendants argued that Plaintiffs

20    suspected misappropriation (1) as early as January 2003, based on a single email from William

21    Clise to a Locate engineer, referring to a SnapTrack presentation as a "direct ripoff" or,

22    alternatively, (2) in June 2004, when Qualcomm demanded to renegotiate their contract to

23    remove a provision on shared "Program Technology."  (Dkt 188.)  In their opposition, Plaintiffs

24    explained that they did not suspect that Defendants stole their trade secrets until the spring or

25    summer of 2005, which was within the statute of limitations.  (Dkt 218.)  In support, Plaintiffs

26

27    [13] In any event, Defendants' fees involved in responding to the Angus affidavit were minimal at worst (as
is true for so many of their examples of alleged litigation misconduct).  At most, Defendants had to write

28    a paragraph or two in their summary judgment reply brief to address the topic.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN DIEGO

17

CASE NO. 08-CV-1992 AJB MDD
HUGHES HUBBARD'S OPPOSITION TO
DEFENDANTS' MOTION FOR ATTORNEYS' FEES

1   submitted affidavits from five witnesses:  (1) William Clise, former CEO of Locate; (2) Phil

2   DeCarlo, a former Locate engineer; (3) Maurice Shanley, former CFO of Gabriel; (4) Allan

3   Angus, former CTO of Gabriel; and (5) Dr. Anant Sahai, one of Plaintiffs' experts.

4           In their reply, Defendants argued that those affidavits should be excluded under the sham

5   affidavit rule.  (Dkt 221.)  Plaintiffs moved for leave to file a sur-reply to respond, but the Court

6   denied leave, explaining in its order that Plaintiffs would have an opportunity to respond at oral

7   argument.  (Dkt 226.)  However, the Court ultimately granted summary judgment without oral

8   argument.  (*See* Dkt 252 at 1.)  Suffice it to say, if given the opportunity to respond, Hughes

9   Hubbard would have argued vigorously that Defendants had mischaracterized the sham affidavit

10  rule and the affidavits at issue were not "shams" because they were intended to explain and

11  clarify prior deposition testimony, and not to contradict the affiant's own prior testimony.

12  (Sullivan Aff. ¶ 28.)

13          As Hughes Hubbard would have explained if given the opportunity, Defendants

14  improperly convinced the Court to exclude the *Angus* and *DeCarlo* affidavits as contradicting the

15  *Clise* and *Shanley* depositions.  The sham affidavit rule only applies to affidavits contradicting

16  one's *own* deposition testimony.  *See Nelson v. City of Davis*, 571 F.3d 924, 928 (9th Cir. 2009)

17  ("rationale underlying the sham affidavit rule is that a party ought not to be allowed to

18  manufacture a bogus dispute with *himself* to defeat summary judgment" but that rationale does

19  not apply to disputes with the testimony of other witnesses) (emphasis in original).

20          Similarly, Hughes Hubbard reasonably believed that neither the Clise nor the Shanley

21  affidavits were "shams."  Clise's affidavit, for example, states:  "I did not suspect SnapTrack or

22  Qualcomm of misappropriation of Locate intellectual property until the Fall of 2008."  (Marks

23  Decl., Ex. 18 (10/18/11 Clise Aff. ¶ 12).)  That was a fair and appropriate explanation of his

24  deposition, where he testified that, although he wrote in a 2003 email that a SnapTrack

25  presentation "looked like a direct ripoff of our work," he did not think it was "something that

26  was IP protected" and misappropriation was "not something that was on our radar right then."

27  (Marks Decl., Ex. 19 (8/26/11 Clise Dep. Tr. 36:7-37:25).)

28          Likewise, Shanley's affidavit explained that his concerns in 2004 were over the existence

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN DIEGO

18

CASE NO. 08-CV-1992 AJB MDD
HUGHES HUBBARD'S OPPOSITION TO
DEFENDANTS' MOTION FOR ATTORNEYS' FEES

of "Program Technology" that arose from Qualcomm's demand to re-negotiate the contract, and

Locate's desire not to give away valuable contract rights without compensation.  He did not have

a concern at that time that Defendants had misappropriated Locate's IP.  (Marks Decl., Ex. 20

(10/18/2011 Shanley Aff. ¶¶ 4-5).)  That statement was entirely consistent with Shanley's

deposition, where he testified that the reason Locate consulted with an attorney in 2004 was to

determine "whether or not there was any need for us to either execute the revised agreement or

look [at] what was behind the technology that somebody wanted to get control of."  (Marks

Decl., Ex. 21 (6/2/2011 Shanley Dep. Tr. 17:11-14).)  As Shanley further clarified on

re-direct examination by Plaintiffs' counsel, referring to the discussions with Qualcomm in 2004:

> Q.  So Mr. Angus first was trying to review the technology that was developed by Locate during the period you just referred to [1999-2000] and see what technology was there that was Locate's; is that correct? . . .
>
> A.  (Witness nods head.)
>
> . . .
>
> Q.  . . .  And – and this is prior to looking at Qualcomm patents or determining whether there was a match between those two sets of information; is that right?
>
> . . .
>
> A.  Yes.
>
> Q.  . . .  when did that take place, the period in which Allan Angus was reviewing Locate technology?
>
> Q.  Between September and December of '04.
>
> Q:  … And the period in which the comparison of the Locate technology developed to the existing Qualcomm patents began in January 2005?
>
> A: No, not – prob – probably a little later than that, maybe February, March to June.

(*Id.* at 146:18-147:21; *see also* 143:13-147:21).)  In short, the so-called "sham" affidavits were

submitted in good faith.  They were not litigation misconduct.[14]

## E.   Plaintiffs' Trade Secret Designations Were Served in Good Faith

Defendants further contend that they are entitled to attorneys' fees because "despite seven

tries, Plaintiffs have never been able to identify even a single protectable trade secret."  (Motion

---

[14] At any rate, the portion of Defendants' fees spent on responding to these four affidavits would have been minimal, amounting to only a few pages of the reply brief.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN DIEGO

19

CASE NO. 08-CV-1992 AJB MDD
HUGHES HUBBARD'S OPPOSITION TO
DEFENDANTS' MOTION FOR ATTORNEYS' FEES

at 7.)  Apparently, Defendants believe that Plaintiffs' trade secret misappropriation claim must have been pled in bad faith because the Court held that Hughes Hubbard's articulations of those trade secrets were not sufficient.  Defendants are wrong.[15]

Hughes Hubbard respectfully disagrees with the Magistrate Judge's holding that Plaintiffs' trade secret designations were insufficient.  But, for present purposes, the key point is that the Magistrate Judge never suggested that Plaintiffs or Hughes Hubbard were acting in bad faith or filing frivolous designations.  To the contrary, at the September 29, 2011 hearing on Plaintiffs' motion to compel, Magistrate Judge Dembin effectively instructed Plaintiffs' counsel, Peter Sullivan, to stop talking because he had won the argument that Trade Secret No. 1 was sufficiently stated.  (Marks Decl., Ex. 9 (9/29/2011 Hr. Tr. 13:17-14:9).)  That the Magistrate Judge later changed his mind is unfortunate from Plaintiffs' viewpoint—but his initial inclination is ample proof of Hughes Hubbard's good faith.  So, too, are the affidavits of Plaintiffs' four experts confirming that, in their opinions, Plaintiffs had adequately described trade secrets. Marks Decl., Ex. 4 (Sahai Decl. ¶¶ 43-73); Ex. 6 (Medvidovic Decl. ¶¶ 43-88); Ex. 8 (Min Decl.¶¶ 42-98); Ex. 11 (Garlan Decl.¶¶ 36-77).)

### F.   Milgrim's *Amicus Curiae* Brief Was Submitted in Good Faith.

Defendants also accuse Plaintiffs and Hughes Hubbard of having "filed an *ex parte* motion for leave to file a [biased] amicus curiae brief by Roger Milgrim."  (Motion at 7.) Defendants are mistaken.  Plaintiffs did not file the *amicus* motion; Milgrim did.  (Dkt 234.)

In any event, the submission of that brief was not litigation misconduct.  Milgrim is the author of the seminal treatise on trade secrets, *Milgrim on Trade Secrets*.  That treatise has been cited by the United States Supreme Court.[16]  Defendants' claim that he was "biased" because he supported the Plaintiffs' position on trade secrets discovery is spurious.  There is no suggestion

---

[15] As an initial matter, Defendants have miscounted.  Plaintiffs only submitted three trade secret designations to the Court.  Earlier, during the meet and confer process, Plaintiffs sent four initial versions to Defendants' counsel, intended to resolve Defendants' objections.  (Sullivan Aff. ¶ 30.)  When it became clear that Defendants' counsel were never going to accept any of Plaintiffs' designations, Plaintiffs filed their first motion to compel.  (*Id.*; Dkt 128.)  Plaintiffs' final trade secret designation was 74 pages long with approximately 100 additional pages of source code listings.  (Marks Decl., Ex. 10.)

[16] *Rucklehaus v. Monsanto Co.*, 467 U.S. 986, 1004 n.9 (1984).  Milgrim has submitted *amicus* briefs in other cases as well.  *See, e.g., Painton & Co. v. Bourns, Inc.*, 442 F.2d 216, 222 (2d Cir. 1971).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN DIEGO

20

CASE NO. 08-CV-1992 AJB MDD
HUGHES HUBBARD'S OPPOSITION TO
DEFENDANTS' MOTION FOR ATTORNEYS' FEES

1   that he had any relationship with Plaintiffs as a shareholder, investor or otherwise.  Nor is there

2   any notion that he was paid to provide his opinion—he was not.  (Sullivan Aff. ¶ 31.)

3          The Court, as was its prerogative, chose not to accept the Milgrim *amicus* brief.  But that

4   does not make its submission litigation misconduct.

5          **G.     Supplementation of Interrogatory Responses Shows Good, not Bad, Faith.**

6          Defendants also criticize Hughes Hubbard (and Plaintiffs) for supplementing Plaintiffs'

7   interrogatory responses regarding omitted inventors, claiming those changes prove the

8   inventorship claim "was all a sham."  (Motion at 9.)  But Defendants have missed the point:  the

9   Federal Rules require parties to supplement discovery responses when additional facts are

10  learned.  *See* Rule 26(e)(1)(A) ("A party who has . . . responded to an interrogatory . . . must

11  supplement or correct its disclosure or response . . . in a timely manner if the party learns that in

12  some material respect the disclosure or response is incomplete or incorrect.").

13         Defendants' naked assertion that Plaintiffs should have been able to identify the omitted

14  inventors at the outset of discovery is far too facile.  (Motion at 9 ("Plaintiffs should not have

15  asserted a claim to correct inventorship on these patents if it [*sic*] did not know who else

16  contributed to the patents after seventeen months of litigation.").)  First, Defendants have ignored

17  the chronology of events here.  And second, Defendants have far over-simplified the process of

18  identifying omitted inventors in this case.

19         Hughes Hubbard did not notice its appearance until March 2010—some 17 months after

20  the Complaint was filed.  (Dkt 62, 63.)  Defendants served their first set of interrogatories on

21  April 5, 2010—a week and a half after Hughes Hubbard was formally engaged.  (Sullivan Aff.

22  ¶ 33.)  Even though Hughes Hubbard was still gathering facts and interviewing witnesses,

23  Plaintiffs timely responded to the first set of interrogatories, only 35 days after they were served.

24  (*Id.*; Marks Decl., Ex. 22 (Initial Responses).)  In response to Interrogatory No. 1, asking for the

25  identification of the omitted inventors for the sixteen patents at issue, Plaintiffs provided names

26  for thirteen patents and truthfully stated "Under investigation" for the remaining three.  (*Id.* at

27  4-6.)  Only six weeks later, as a result of Hughes Hubbard's continuing investigation, Plaintiffs

28  served supplemental responses, identifying omitted inventors for the remaining three patents and

LATHAM & WATKINS ⸯⸯⸯ
ATTORNEYS AT LAW
SAN DIEGO

21

CASE NO. 08-CV-1992 AJB MDD
HUGHES HUBBARD'S OPPOSITION TO
DEFENDANTS' MOTION FOR ATTORNEYS' FEES

1    refining Plaintiffs' prior answers as to certain of the thirteen other patents.  (Marks Decl., Ex. 23

2    (First Suppl. Responses).)   Plaintiffs then served their second supplemental responses on

3    May 14, 2012.[17]  Two weeks later, on May 29, 2012, Plaintiffs served their third (and final)

4    supplemental responses, before depositions on the inventorship claims commenced.

5         If Plaintiffs had not amended their interrogatory responses as new facts were discovered,

6    it might be understandable for Defendants to complain.  But Hughes Hubbard (and Plaintiffs) did

7    exactly what the Rules require.  That is textbook good faith.

8         Perhaps more to the point, Defendants substantially understate the difficulty Hughes

9    Hubbard faced in identifying the individuals who were omitted inventors.  Locate developed its

10   inventions in 1999 through 2001, some *ten years* before Defendants' interrogatories were served.

11   (*See* pp. 9-12 *supra*.)  Those inventions were the result of a group effort, involving both laymen

12   (Clise and Crowson) and Locate engineers.  (*Id*.)  None of the potential omitted inventors was

13   still employed by Plaintiffs.  Many had relocated, requiring extensive travel by Hughes Hubbard.

14   (Sullivan Aff. ¶ 38.)  Moreover, many of the potential inventors—particularly Clise and

15   Crowson—were not skilled in the art of reading patents.  *See Voice Techs. Group, Inc. v. VMC*

16   *Sys., Inc.*, 164 F.3d 605, 615 (Fed. Cir. 1999)  ("Patents are written not for laymen, but for and

17   by persons experienced in the field of the invention."); *Ethicon, Inc. v. United States Surgical*

18   *Corp.*, 135 F.3d 1456, 1465 (Fed. Cir. 1998)  ("[A] layman, untrained in the language of the

19   patent law, may reasonably err in interpreting claim language.").

20        Given those facts, it was hardly surprising that it was time consuming to pin down

21   exactly who was an omitted inventor on patents drafted by SnapTrack or Qualcomm, or that

22   witnesses would get confused at depositions as to whether they were omitted inventors on all or

23   part of a patent.  To cite just one example, Defendants make much of the fact that Clise testified

24   at his deposition that he was not an inventor of the '402 patent.  (Motion at 11.)  But they left out

25   Clise's testimony that he did not "even understand most of the formulas" in the Qualcomm

26

---

27   [17] The delay between the first and second supplemental responses was due to the stay of discovery related
     to the patent claims issued by Magistrate Judge Porter in February 2011, and later continued by
     Magistrate Judge Dembin.  (*See* Dkt 254 at 2.)  Discovery on the patent claims did not resume until April
28   2012 after partial summary judgment was granted in part.  (*See* Dkt 259; Sullivan Decl. ¶ 35.)

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
SAN DIEGO

22

CASE NO. 08-CV-1992 AJB MDD
HUGHES HUBBARD'S OPPOSITION TO
DEFENDANTS' MOTION FOR ATTORNEYS' FEES

1  implementation described in the disclosure of the '402 patent and "would have to have an

2  engineer explain it to me and then I could tell you what it meant." (Marks Decl., Ex. 24 (6/8/12

3  Clise Dep. Tr. 768:10-15, 769:2-8.).) That lack of understanding necessarily made it difficult for

4  Clise to determine if he invented all or part of that patent. [18]

5       In short, Hughes Hubbard (and Plaintiffs) made their best efforts to correctly identify the

6  omitted inventors. That the Court analyzed the underlying facts differently is regrettable—but

7  hardly evidence of litigation misconduct.

8       **H.   Hughes Hubbard Appropriately Narrowed the Case in Good Faith**

9       Perversely, Defendants also criticize Hughes Hubbard for withdrawing Plaintiffs' claims

10  as to ten of the sixteen patents originally in dispute. (Motion at 12.)[19] But narrowing a complex

11  case like this shows good faith, not bad faith. *See Simonia v. Glendale Nissan/Infinity Disability*

12  *Plan*, 608 F.3d 1118, 1121 (9th Cir. 2010) (defendant "evidence[d] good faith" by voluntarily

13  dismissing counterclaim after discovering evidence that rendered it not viable).

14  **IV.   THE MOTION ALSO MUST BE DENIED ON PROCEDURAL GROUNDS**

15       The Motion also should be denied because Defendants have failed to meet their burden of

16  showing that the fees sought are reasonable. It cannot be determined: (1) which fees are

17  attributable to Hughes Hubbard versus Plaintiffs, local counsel, or predecessor counsel; (2)

18  which fees are attributable to the defense of which claims; or (3) whether the fees are excessive.

19       **A.   Defendants Do Not Specify Which Fees Are Attributable to Hughes Hubbard**

20       The Motion seeks to hold Plaintiffs' counsel jointly and severally liable for *all* of

21  Defendants' fees incurred during this four-year long litigation. (Motion at 22.) Yet, Hughes

22  Hubbard was not even engaged until March 2010, 17 months after the case began. There is no

23  basis to hold Hughes Hubbard liable for fees incurred while Plaintiffs were represented by

24  predecessor counsel. Even if Defendants seek fees from Hughes Hubbard incurred after its

25

26  [18] Of course, if Defendants had instead asked Clise if he was an inventor of the Locate technology underlying the claims in the '402 patent, they likely would have gotten very different answers.

27  [19] In a misleading fashion, Defendants assert that Plaintiffs originally challenged "at least ninety-two U.S. and Foreign patents." (Motion at 12.) As Defendants well know, there were only *sixteen* patents ever at

28  issue. The remainder were duplicate patents in multiple jurisdictions. (Sullivan Aff. ¶ 39.)

1  appearance, Defendants make no attempt to explain which fees were incurred in response to

2  Hughes Hubbard's alleged misconduct versus that of Plaintiffs or local counsel.  *See Primus*

3  *Auto. Fin. Servs. v. Batarse*, 115 F.3d 644, 650 (9th Cir. 1997) ("any sanctions imposed against

4  [an attorney] should be based solely on his own improper conduct without considering the

5  conduct of the parties or any other attorney.") (quotations omitted); *Valdez v. Kismet Acquisition,*

6  *LLC*, 474 B.R. 907, 922 (S.D. Cal. 2012) (bankruptcy court abused its discretion when it "failed

7  to limit the sanctions imposed against [counsel] to losses sustained as a result of her particular

8  conduct") (quotations omitted).  Nor do Defendants make any effort to identify which fees were

9  incurred as a result of any specific examples of alleged misconduct by Hughes Hubbard.  *See*

10  *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1552 (Fed. Cir. 1989) ("Since

11  any injustice present in this case is based upon [defendant's] bad faith and misconduct during

12  litigation, the penalty imposed must in some way be related to bad faith and misconduct.").

13      **B.**    <u>**Cooley's Billing Records Are Too Vague to Determine Reasonableness**</u>

14      Defendants have also failed to meet their burden of providing sufficient documentation to

15  enable the Court to evaluate the reasonableness of their fee request.  *See Jordan v. Multnomah*

16  *County*, 815 F.2d 1258, 1262-1263 (9th Cir. 1987) ("The fee applicant has the burden of

17  producing satisfactory evidence" to demonstrate that the rates requested and hours expended are

18  reasonable).  Defendants request nearly *$13.5 million* in fees, but the 14,724 billing entries

19  attached as Exhibit E to Defendants' Motion are excessive, duplicative, vague, and contain non-

20  recoverable items.  *See id.* at 1263 n.8; *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1385 (9th

21  Cir. 1984) ("Though plaintiff's counsel submitted voluminous records to show that over 2,515.5

22  hours had actually been spent on this case, there is no showing that the time actually spent was

23  reasonably necessary.") (disapproved on other grounds).  Numerous problems with Cooley's

24  billing entries amount to at least $8,605,731, plus $391,928 in contract attorneys' fees, that

25  cannot be awarded.  (*See* Marks Decl., Exs. 25-31)  Nor should the $2,829,349 in expenses for

26  the H5 algorithm be awarded.  For example:

27      •  **<u>Pre-Dating Hughes Hubbard's Engagement</u>**:  The first 97 pages of Exhibit E are
    dated before Hughes Hubbard's appearance.  Those fees, totaling $1,966,159, cannot

28      be imposed against Hughes Hubbard.  (Marks Decl., Ex. 25.)

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN DIEGO

24

CASE NO. 08-CV-1992 AJB MDD
HUGHES HUBBARD'S OPPOSITION TO
DEFENDANTS' MOTION FOR ATTORNEYS' FEES

- **Unidentified Billers**:  Of the 82 individuals in Exhibit E who billed time to this matter, we were able to identify only 53 as attorneys or paralegals and 4 as librarians. The additional 25 are not identifiable.  It is thus impossible to determine whether their rates are reasonable.  *See Jordan*, 815 F.2d at 1262-63.  (Marks Decl., Ex. 26.)

- **Excessive Timekeepers**:  Frankly, it is highly unreasonable for 82 Cooley individuals to have billed time to the matter, including at least 53 attorneys and paralegals, plus 18 contract attorneys—especially considering it never went to trial.  *See Chalmers v. Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986), *amended*, 808 F.2d 1373 (9th Cir. 1987); *Maxwell v. Angel-Etts of Cal., Inc.*, 2001 U.S. Dist. LEXIS 25419, *23-24 (C.D. Cal. Dec. 10, 2001), *reversed on other grounds*, 53 Fed. Appx. 561 (2002).

- **Overstaffed Projects**:  Exhibit E also shows that multiple attorneys unnecessarily attended calls or meetings.  *See Nat'l Warranty Ins. Co. v. Greenfield*, 2001 U.S. Dist. LEXIS 7763 at *14 (D. Or. Feb. 8, 2001); *Whitworth v. Nat'l Enter. Sys.*, 2010 U.S. Dist. LEXIS 49108, at *18 (D. Or. Apr. 21, 2010).  (Marks Decl., Ex. 27.)

- **Vagueness**:  Many entries in Exhibit E are impermissibly vague and unrecoverable. Moreover, the $391,928 in fees incurred by the Black Letter Discovery contract attorneys are also unrecoverable—their invoices attached as Exhibit G to the Motion contain *no* descriptions.  *See Hess v. Ramona Unified Sch. Dist.*, 2008 U.S. Dist. LEXIS 102743, at *18-19 (S.D. Cal. Dec. 19, 2008) ("Plaintiff communication," "Draft Pl memo and supporting docs," "Research for reply," and "Finalize memo" all too vague); *Anderson v. Nextel Retail Stores, LLC*, 2010 U.S. Dist. LEXIS 71598, at *16 (C.D. Cal. June 30, 2010); *United States v. One 2008 Toyota Rav 4 Sports Utility Vehicle*, at 2012 U.S. Dist. LEXIS 158417, at *27-28 (C.D. Cal. Oct. 18, 2012); *Atl. Recording Corp. v. Anderson*, 2008 U.S. Dist. LEXIS 121070, at *17-19 (D. Or. June 24, 2008).  (Marks Decl., Ex. 28.)

- **Nonsensical**:  Many entries reflect multiple billings by the same attorney on the same day for the exact same task.  These entries do not make sense and cannot be recoverable.  (Marks Decl., Ex. 29.)

- **Document Review and Vendor Communications**:  Exhibit E lists nearly $2 million in fees incurred in collecting and reviewing documents for production.  But $300,000 of that pre-dates Plaintiffs' first set of document requests.  Further, it is unreasonable that Cooley "collected more than *12 million*" records (Motion at 19, emphasis in original), yet produced only 46,499 documents in the entire case.  Hughes Hubbard should not be responsible for Defendants' failure to conduct a targeted collection. (Marks Decl., Exs. 30-31.)  For the same reason, the $2.8 million in expenses for H5's algorithm should be unrecoverable—it obviously did not work well and most of the invoices pre-date Plaintiffs' document requests.  Nor should Cooley's communications with its vendors be covered.

## Conclusion

For the foregoing reasons, Hughes Hubbard respectfully requests that Defendants' request to hold Plaintiffs' counsel jointly and severally liable for attorneys' fees be denied.

Dated:  December 14, 2012                    LATHAM & WATKINS LLP

                                             By      /s/ Alan E. Kraus

                                             Alan E. Kraus (*pro hac vice*)
                                             Attorneys for Hughes Hubbard & Reed LLP

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN DIEGO

25

CASE NO. 08-CV-1992 AJB MDD
HUGHES HUBBARD'S OPPOSITION TO
DEFENDANTS' MOTION FOR ATTORNEYS' FEES